# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| ROBERT TOMASSINI, on behalf of himself and others similarly situated, | : :  : | |
| | : | Case No. 3:14-cv-01226-MAD-DEP |
| Plaintiff, | : : | |
| vs. | : : | Hon. Mae A. D'Agostino |
| | : | United States District Judge |
| CHRYSLER GROUP LLC (n/k/a FCA US LLC), | : : | |
| | : | |
| Defendant. | : : | |

# MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Elmer Robert Keach, III, Esq.
Law Offices of Elmer Robert Keach III, P.C.
1040 Riverfront Center
P. O. Box 70
Amsterdam, NY  12010
Tel: (518) 434-1718

Gary E. Mason, Esq.
Jennifer Goldstein, Esq. (*pro hac vice to be filed*)
Whitfield Bryson & Mason LLP
1625 Massachusetts Ave. NW, Ste. 605
Washington, DC 20036
Tel: (202) 429-2290

Daniel C. Calvert, Esq. (*pro hace vice*)
Parker Waichman LLP
27300 Riverview Center Boulevard
Suite 103
Bonita Springs, Florida 34134
Tel: (239) 390-1000

Nicholas A. Migliaccio, Esq.
Jason Rathod, Esq. (*pro hac vice*)
Migliaccio & Rathod LLP
412 H Street N.E., Ste. 302
Washington, DC 20002
Tel: (202) 470-3520

Gary S. Graifman, Esq.
Jay Brody, Esq.
Kantrowitz Goldhamer
& Graifman, P.C.
747 Chestnut Ridge Rd., Ste. 200
Chestnut Ridge, New York 10977
Tel: (845) 356-2570

*Attorneys for Plaintiff and the Putative Class*

# **TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................... 1

II.   FACTUAL BACKGROUND ................................................................................... 3

   A.   Common Evidence Shows That Chrysler Knew About The Defect Yet Did Not Inform
   Consumers. ........................................................................................................ 3

      1.    Defendant Possessed Exclusive Prior Knowledge That AL2000 Series Valve Stems and
      Nuts Were Defective. ..................................................................................... 3

         i. Reports of Chrysler and Continental Confirm the Existence of a Materials Defect in the
         Class Vehicles…………………………………………………………………..…3

         ii. Chrysler Engineers Who Owned Chrysler Minivans Put Chrysler on Notice of the De-
         fect………………………………………………………………………………...7

         iii. Chrysler Was on Notice of the Defect Through Other Customer Complaints………...9

      2.    Chrysler Failed to Resolve the Defect or Disclose It to Consumers as a Safety Issue, in
      Order to Save Money.......................................................................................... 12

         i. Chrysler's Own Standards Should Have Prevented the Use of Defective TPMS Valve
         Stems and Nuts and Should Have Compelled a Robust Response When the Defect Was
         Discovered…………………………………………………………………………12

         ii. Chrysler Concluded That the Defect Was Not Safety-Related Based on a Federal Mo-
         tor Vehicle Safety Standard That Mandates that Rims Must Retain Tires, and on the Pur-
         ported Lack of Reports of Accidents at the Time………………………………………..14

         iii. Chrysler Rejected a Field Action or Extended Warranty Because It Would Cost Up to
         $400 Million, and Its Supplier Did Not Have the Production Capacity………………....15

      3.    Chrysler Concealed the Defect from Its Customers ....................................... 16

   B.   Plaintiff's Experts Have Opined on the Common Nature of the Defect and Damages ..... 17

      1.    The AL2000 Valve Stems and Nuts Are Defective and Will Inevitably Suffer from
      Progressive Intergranular Corrosion and Stress Corrosion Cracking.................................... 17

      2.    The Defect is Common to the Class Regardless of the Specific Type of 2000 Series
      Aluminum, Heat Treatment, or Anodization Used for the Valve Stems and Nuts. .............. 19

      3.    The Defect is Common Regardless of Purported Variances in the Maintenance of Class
      Vehicles by Consumers or their Exact Location in New York. ........................................... 20

      4.    The Common Defect Poses a Class-Wide Safety Risk to Owners and Lessees of the
      Class Vehicles, Their Passengers, and Other Drivers on the Road. ..................................... 21

      5.    Damages Can Be Calculated on a Class-Wide Basis.................................................... 22

III.   ARGUMENT ......................................................................................................... 23

i

A.   The Proposed Class Satisfies the Requirements of Rule 23 (a). .......................................... 24

  1.   The Numerosity Requirement Is Satisfied. ................................................................... 24

  2.   Questions of Law and Fact Are Common to the Proposed Class. ................................. 26

  3.   The Proposed Class Representative's Claims Are Typical of the Class. ....................... 27

  4.   The Proposed Class Representative Will Fairly and Adequately Protect the Interests of the Class............................................................................................................................. 28

  5.   The Proposed Class is Ascertainable. .......................................................................... 29

B.   The Proposed Class Satisfies the Requirements of 23(b). .................................................. 29

  1.   The Class Meets the Requirements of 23(b)(3). .......................................................... 29

    i. Common Issues of Law and Fact Predominate Over Individual Issues………………30

      a. Common Evidence Will Demonstrate That Chrysler's Conduct Was Consumer-Oriented………………………………………………………………………………32

      b. Common Evidence Will Demonstrate That Chrysler's Failure to Disclose the Defect was a Deceptive Act and That it was Material…………………………...32

      c. Common Evidence Will Demonstrate That the Class Suffered Common Injuries………………………………………………………………………………..35

    ii. The Class Action Mechanism is Superior to Other Available Methods for the Fair and Efficient Resolution of This Case…………………………………………………..37

  2.   The Class Meets the Requirements of 23(b)(2). .......................................................... 38

  3.   In the Alternative, the Class Meets the Requirements of 23(c)(4). ............................... 39

IV.   CONCLUSION…………………………………………………………………………..40

## **TABLE OF AUTHORITIES**

<u>Cases</u>

*Ackerman v. Coca-Cola Co.*, 2010 WL 2925955 (E.D.N.Y. July 2, 2010) ................................... 35

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) .................................................................. 30

*Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013) ..................................... 24

*Atik v. Welch Foods, Inc.*, 2016 WL 5678474 (E.D.N.Y. Sept. 30, 2016) .................................... 35

*Baffa v. Donaldson*, 222 F.3d 52 (2d Cir. 2000) .......................................................................... 28

*Brooks v. Roberts*, No. 16-1025, 2017 U.S. Dist. LEXIS 68808 (N.D.N.Y. May 5, 2017) ........... 26

*Cent. States Se. and Sw. Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
     504 F.3d 229 (2d Cir. 2007) .................................................................................................... 25

*Chana Friedman-Katz v. Lindt & Sprungli (USA), Inc.*, 270 F.R.D. 150 (S.D.N.Y. 2010) ........... 25

*Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473 (2d Cir. 1995) ........................................ 25

*Daffin v. Ford Motor Co.*, 458 F.3d 549 (6th Cir. 2006) .......................................................... 27, 28

*Daniel v. Ford Motor Co.*, No. 11-02890, 2016 U.S. Dist. LEXIS 130745 (E.D. Cal. Sep. 23,
     2016) ....................................................................................................................................... 27

*De Carrasco v. Life Care Servs., Inc.*, No. 17-cv-5617 (KBF), 2017 U.S. Dist. LEXIS 206682
     (S.D.N.Y. Dec. 15, 2017) ....................................................................................................... 39

*Ebin v. Kangaris Foods*, Inc., 297 F.R.D. 561 (S.D.N.Y. 2014) .................................................. 26

*Edwards v. Ford Motor Co.*, 603 F. App'x 538 (9th Cir. 2015) .................................................... 28

*Enea v. Bloomberg, L.P.*, No. 12-4656, 2014 U.S. Dist. LEXIS 35613 (S.D.N.Y. Mar. 17, 2014) 26

*Falco v. Nissan N. Am., Inc.*, No. 13-00686, 2016 U.S. Dist. LEXIS 46115 (C.D. Cal. Apr. 5,
     2016) ....................................................................................................................................... 27

*Gold v. Lumber Liquidators, Inc.*, No. 14-05373, 2017 U.S. Dist. LEXIS 193891 (N.D. Cal. Nov.
     15, 2017) .................................................................................................................................. 33

*Hamelin v. St. Luke's Healthcare*, 274 F.R.D. 385 (N.D.N.Y. 2011) ........................................... 28

*Helmer v. Goodyear Tire & Rubber Co.*, No. 12-00685, 2014 U.S. Dist. LEXIS 37501 (D. Colo.
     Mar. 21, 2014) ......................................................................................................................... 38

*In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-1775, 2014 U.S. Dist. LEXIS 180914
     (E.D.N.Y. Oct. 15, 2014) .................................................................................................. 24, 38

*In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-1775, 2015 U.S. Dist. LEXIS 90402
     (E.D.N.Y. July 10, 2015) ........................................................................................................ 24

*In re Amla Litig.*, No. 16-cv-6593, 2017 U.S. Dist. LEXIS 175950 (S.D.N.Y. Oct. 24, 2017) 33, 39

*In re Facebook, Inc.*, 312 F.R.D. 332 (S.D.N.Y. 2015) ................................................................ 26

*In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006) .................................. 39

*In re Petrobas Sec. Litig.*, 862 F.3d 250 (2d Cir. 2017) .............................................................. 29

*In re Scotts EZ Seed Litig.*, 304 F.R.D. 397 (S.D.N.Y. 2015) ................................................ 31, 36

*Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 589 (S.D.N.Y. 2013) ............................................ 39

*Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418 (S.D.N.Y. 2009) .............................................. 31

*Kurtz v. Kimberly-Clark Corp.*, No. 14-1142, 2017 U.S. Dist. LEXIS 44576 (E.D.N.Y. Mar. 27,
     2017) ................................................................................................................................... 27, 36

*Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir. 1997) .............................................................. 26, 28

iii

*Maurizio v. Goldsmith*, 230 F.3d 518 (2d Cir. 2000) .................................................................. 31

*Mazzanti v. Gen. Elec. Co*., No. 13-1799, 2017 U.S. Dist. LEXIS 32903 (D. Conn. Mar. 7, 2017) 8, 26

*Orlander v. Staples, Inc*., 802 F.3d 289 (2d Cir. 2015) ............................................................... 31

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20 (1995) ................................................................................................................................................ 31

*Roach v. T.L. Cannon Corp.*, 778 F.3d 401 (2d Cir. 2015) ......................................................... 30

*Robidoux v. Celani*, 987 F.2d 931 (2d Cir. 1993) ....................................................................... 28

*Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147 (2d Cir. 2001)..................................... 39

*Samuel-Bassett v. Kia Motors Am., Inc.*, 34 A.3d 1 (2011)......................................................... 27

*Sanchez Knutson v. Ford Motor Co*., 310 F.R.D. 529 (S.D. Fla. 2015) ................................. 25, 27

*Sanchez-Knutson v. Ford Motor Co*., 181 F. Supp. 3d 988 (S.D. Fla. 2016) ............................. 36

*Seekamp v. It's Huge, Inc.*, No. 09-00018, 2012 U.S. Dist. LEXIS 33295 (N.D.N.Y. Mar. 13, 2012) ............................................................................................................................... 25, 27, 38, 39

*Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393 (2010)................................ 24

*State Autobahn, Inc. v. Progressive Ins. Group Co.*, 102 A.D.3d 5 (2d Dep't 2012) ................... 31

*Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014)..................................................... 30

*Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70 (2d Cir. 2015) ....................................... 24, 30

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016) ............................................... 24, 30, 37

*V.W. v. Conway*, No. 16-1150, 2017 U.S. Dist. LEXIS 24395 (N.D.N.Y. Feb. 22, 2017) ........... 28

*Vargas v. Howard*, No. 1:15 5101, 2018 U.S. Dist. LEXIS 4883 (S.D.N.Y. Jan. 10, 2018)......... 29

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ............................................................. 26

*Zhang v. Wen Mei, Inc.*, No. 14-CV-1647, 2017 U.S. Dist. LEXIS 213389 (E.D.N.Y. Dec. 28, 2017)........................................................................................................................................ 25

Statutes

New York General Business Law § 349 ......................................................................................... 1

Rules

Fed. R. Civ. P. 23 ........................................................................................................................ 25

Fed. R. Civ. P. 23(b)(3) ...................................................................................................... 30, 38, 39

Plaintiff Robert Tomassini, by and through the undersigned counsel, submits this Memorandum of Law in support of his Motion for Class Certification pursuant to Rule 23(b)(3), Rule 23(b)(2), and, in the alternative, Rule 23(c)(4). The Class is defined as all persons who purchased and/or leased Chrysler and Dodge Minivans manufactured after June 10, 2009 through May 25, 2010 (the "Class Vehicles" or "minivans"), in the State of New York. For all the reasons discussed herein, Plaintiff's Motion for Class Certification should be granted.

## I.   <u>INTRODUCTION</u>

Minivans. They take kids to soccer practice and get messy on family vacations.  They should not experience sudden tire deflation and careen off the road. That's common sense. Yet, as Plaintiff alleges, FCA US LLC ("Chrysler" or "Defendant") sold minivans with defective TPMS valve stems and nuts that put New York drivers like Robert Tomassini at unreasonable risk of a sudden, catastrophic tire air-out. Chrysler used valve stems and nuts made from material known to corrode when exposed to road salts, ice, and snow (the "defect").

Defendant knew that its TPMS valve stems and nuts were destined for early failure due to Intergranular Corrosion and Stress Corrosion Cracking ("SCC").  The alloy it used for the parts – 2000 series aluminum alloys ("AL2000") – is notorious for its susceptibility to SCC. Any reasonable minivan purchaser would want to know of this defect since it involves safety as well as cost, durability, performance, and quality. Chrysler should have disclosed, rather than concealed, the defect. Consequently, Plaintiff seeks class certification of his claim under the New York General Business Law § 349 (hereafter, "§ 349") for Defendant's failure to disclose the defect in the Class Vehicles at the time of purchase and thereafter. Plaintiff seeks for himself and the Class the out-of-pocket costs to replace the AL2000 valve stems and nuts and the diminished value of the minivans.

1

Not long after the release of the minivans to the public, Chrysler received a barrage of disturbing reports from the field. Valve stems and nuts were cracking, and owners were voicing safety concerns and complaining about replacement costs. Indeed, the demand for the parts was so great that TPMS units were on back order. Chrysler reviewed warranty data, complaints from internal and external sources, reports detailing the inferior corrosion resistance of AL2000 and failure of valve stems and nuts, and statistical projections estimating that failures could reach 100 percent in the field within five years. The solution Chrysler devised involved a change of materials—replacing AL2000 alloy with 6000 series aluminum alloy ("AL6000") for valve stems and nuts, notifying owners and lessees of the defect, and providing an extended the warranty. The notice and extended warranty were shelved, however, when the price tag came back at $400 million and Chrysler was advised that the supplier lacked the ability to provide the quantity of parts that would be required.

Chrysler also concealed this information from consumers like Mr. Tomassini and other minivan owners and lessees in New York. These consumers have had to replace the defective TPMS valve stems and nuts, often repeatedly, at their own expense. Worse, by hiding the defect, Chrysler knowingly placed their customers' safety at risk since at any time, the valve stems or nuts can fail while they are driving. Class certification will allow these consumers to seek the relief that Chrysler itself contemplated providing but then abandoned because of the cost.

Class certification should be granted because this matter meets the requirements of Rule 23(b)(3), Rule 23(b)(2), and, in the alternative, Rule 23(c)(4). The dispute between Chrysler and the Class turns on common issues, including whether the AL2000 valve stems and nuts are defective and, if so, the measure of damages. As this Court noted in its Memorandum-Decision and Order denying Defendant's Motion for Summary Judgment and Motion to Exclude: "Whether a reasonable consumer acting reasonably would be misled by Defendant's omission that the aluminum

2

alloy used was failing due to stress corrosion cracking is a genuine question of material fact for a jury . . ." p.12, Nov. 23, 2016, Dkt. #155 ("Mem. Op."). That question, based on an objective consumer standard, is well-suited for a class trial and will resolve a central issue of the GBL § 349 claim. Resolution of questions like this by a jury, weighing evidence common to the Class as to the claimed defect, will materially advance the litigation of all class members. Hence, a class action is the superior mechanism to resolve this dispute in a just, speedy, and efficient manner.

## II.   FACTUAL BACKGROUND

### A. Common Evidence Shows That Chrysler Knew About the Defect Yet Did Not Inform Consumers.

#### 1. Defendant Possessed Exclusive Prior Knowledge That AL2000 Series Valve Stems and Nuts Were Defective.

Chrysler manufactured Class Vehicles with TG1B and TG1C valve stems and nuts made out of AL2000 after June 10, 2009, until May 25, 2010.[1] The particular TPMS models in Class Vehicles were the TG1B and TG1C[2] units. *See* Continental Report (CAS0001060), Exh. 2 (stating that "both TG1B and TG1C for Chrysler have a valve stem and a nut made of aluminum 2000 series"). Chrysler knew early on that the AL2000 Series valve stems and nuts were defective based on internal reports, the personal experience of Chrysler's own engineers, and customer complaints.

##### i. Reports of Chrysler and Continental Confirm the Existence of a Materials Defect in the Class Vehicles.

Chrysler was aware, from at least 2009, that AL2000 valve stems and nuts were susceptible to Intergranular Corrosion and Stress Corrosion Cracking in chloride environments such as roads in New York. Indeed, as early as January 27, 2009, Chrysler's third-party supplier, Continental Automotive Systems US, Inc. ("Continental"), provided a presentation notifying Chrysler of the

---

[1] *See* FCA US LLC's Resp. to Plaintiff's Second Set of Disc. Demands, at 5, Declaration of Nicholas Migliaccio in Support of Plaintiff's Motion for Class Certification ("Migliaccio Dec."), Exhibit 1. (hereinafter "Exh. __" refers to the exhibits appended to the Migliaccio Dec.").
[2] "TG" stands for "Tire Guard."

differences between AL2000 and AL6000 valve stems and nuts. *See* Email from ███████ ███ (CAS0001056) (Jan.27, 2009), Exh. 3; Exh. 2 (CAS0001060) ("The corrosion resistance of the 2000 series is inferior to the corrosion resistance of the 6000 series (6061). This resistance is mostly linked to the amount of copper found in the alloy"). The document noted that Continental planned to switch within one year to AL 6000 series but also noted "*this new alloy carries an additional cost.*" *Id.* at CAS0001062 (emphasis supplied).

Chrysler also knew about the defect from the large number of back orders of replacement parts and the number of customers waiting for parts. *See* Deposition of ███████ ("███ Dep.")(May 10, 2017), 77:19-78:22, Exh. 4 ("what prompted the investigation [into using another supplier] was the high number of back orders. Just the high number of back orders and customers that we had waiting for parts") & Exhibit 11, Exh. 5.  Chrysler's analysis of its warranty databases indicated that tens of thousands of TPMS units had been replaced in 2005-2010 Chrysler vehicles. *See* ███ Dep. at 62:14-66:6, 67:18-70:24, 71:14-72:19 & Exhibit 8. The Warranty Claims database revealed at least 162 claims of "broken or cracked" valve stems or nuts and 352 claims for "leaks" during the proposed Class Period in New York State alone. *See* Warranty Claims, Exh. 6.

On April 6, 2009, the pervasive problem with broken and cracked valve stems led to the creation of a "Black Belt" project to determine the cause of the broken and cracked stems. *See* Black Belt Project Update (MCPS038242-MCPS038243)(Aug. 14, 2009), Exh. 7.[3] The Black Belt project continued through at least August 11, 2009 and entailed collecting data and testing failed parts. *Id*.

By April 2010, Chrysler concluded that the "2011 alloy that [is] *being used now is definitely prone to stress corrosion cracking* (SCC), while 6000 series *is not susceptible to this type of*

---

[3] A "Black Belt" is someone who has been specifically trained in problem-solving techniques, and a Black Belt project is led by someone with a Black Belt using those techniques. *See* ███ Dep., at 59:15-19.

*corrosion*." Email from ████████ (CAS0000345)(Apr. 19, 2010), Exh. 8 (emphasis added); *see also* Forever Requirement Summary (MCPS034506)(May 26, 2010), Exh. 9 (affirming that "Al 6000 series components are less sensitive to corrosion compared to Al 2000 series."); Email from ████████ (MCPS002394)(Apr. 29, 2010), Exh. 10 ("the material report is complete and attached. Stress Corrosion and Cracking is believed to have caused the failures" which can produce "catastrophic cracking, often leading to devastating and unexpected failure"); Email from ████████ ██ (CAS0000097)(May 21, 2010), Exh. 11 (referencing the "TPM breakage issue, and process changes made on the Schrader stem," and noting that he saw "next to no breakage on the competitors stems . . .").

Chrysler's Engineering Department also issued two reports entitled "Materials Engineering Lab Report" on April 21, 2010 ("MELR – 2010") and April 1, 2011 ("MELR – 2011"). MELR – 2010 stated that "[s]everal field issues have been reported from fleets related to the TPS." Exh. 12, at MCPS001736. The report also noted that "[a]luminum alloys with a higher copper content are susceptible to SCC, although the performance of this lesser known alloy is not particularly known." *Id.* at MCPS001737. The subsequent report, MELR – 2011, began with the notation, "This tire pressure monitor/valve stem failed in Europe on a 2009 JC *it is a safety office request* [sic]," Exh. 13, at MCPS001747 (emphasis added), and concluded:

> The fracture was most likely caused by Stress Corrosion Cracking due to the presence of Chlorine (Cl). This is a well-known phenomenon in copper containing aluminum alloys.

*Id.* at MCPS001748.

Finally, Chrysler received a report from its third-party supplier, Continental, that detailed testing of valve stems made out of AL2000 and AL6000 with two heat treatments. Continental Report (MCPS002396-MCPS002405), Exh. 14. The recommendation of this report was a stop-gap

change in the specification to use only T4 heat treatment in the AL2000 stems before moving to AL6000 stems, and defining a more robust test procedure. *Id.* at MCPS002405. ███████ ███████, the first named author of this Continental report, testified that Continental did not compare warranty returns to see if they matched what was predicted in the Continental report. *See* Deposition of ███████████ ("███████████")(June 27, 2017),71:23-72:24, Exh. 15. Mr. ███████ also testified that he could not "establish a correlation" between the tests that were run and "field conditions." *Id.* at 101:8-105:21.

Nonetheless, Chrysler adopted Continental's common solution and changed the material used to AL6000, which had substantially less copper and was not susceptible to SCC. In the Chrysler Change Notice Worksheet, it is noted that the "[c]hange [was] made due to warranty claims in the field. Valve stems and nuts have broke [sic]." *See* Change Notice Worksheet (MCPS002408) (Oct. 16, 2015), Exh. 16. The Change Notice Worksheet indicates, under the heading "Why Are We Making This Change?," that Chrysler is "[g]oing From Al2000 to Al6000 to improve robustness of the sensor valve stem." *Id.* In the section titled "What is the Technical Solution?," the Change Notice indicated "Change Material to AL6000." *Id.* Consistent with this common technical solution, Chrysler engineer ███████ identified the "Clean Point" as the introduction of the AL6000 series aluminum. *See* Deposition of ███████ ("███████")(May 10, 2017), at 12:4-13:4, Exh. 17. ███████ described the Clean Point as follows:

A.   Well, the Clean Point is kind of like a description of adaptation of the change.
Q.   It was to fix an ongoing issue?
A.   Correct, correct.  The intended fix, yeah.

*Id.* at 67:15-20 & 82:6-83:11; *see also* ███████, Exhibit 21, Exh. 18 (discussing clean point and change to AL6000 alloy). Notably, ███████ *did not* identify the Clean Point as the stop-gap change in heat treatment in the AL2000 series stems from T6 to T4. Indeed, none of Chrysler's

6

contemporaneous documents indicated that it believed this minor change was the fix or ultimately reduced the failure rate in any way, and Chrysler resolved that only a materials change to the AL6000 alloy could resolve the defect. *See* ████ Dep., Exhibit 26; *see also* ████ Dep., at 100:10-101:12.[4]

Faced with the high number of reported failures, Chrysler considered a field action or extended warranty for the AL2000 valve stems and nuts.[5] Using a "Weibull analysis,"[6] Chrysler found that the c/1000 rate (condition per thousand) at 36 MIS (months in service), would be 70/1000. *See* Email from ████████ (MCPS037916) (Sept. 9, 2010), Exh. 19. In other words, Defendant determined that there would be a 7% failure rate at three years. *Id.*; *see also* Calendar Appointment and Document from ████████ (MCPS037930)(Oct.18, 2010), Exh. 20. Chrysler's Weibull analysis further determined that the failure rate would reach 180 – 250 c/1000 at 60 MIS, or 18% to 25% at five years under "normal use." Exh. 19, at MCPS037915. However, the failure rate was expected to "max out" when the tires were changed (as was expected in five years), and had the "potential to be 4x with all four sensors at once." *Id.* Thus, Chrysler predicted a potential 100% failure rate within five years.

### ii. Chrysler Engineers Who Owned Chrysler Minivans Put Chrysler on Notice of the Defect.

In addition to the Black Belt project, lab reports, and multiple reports received from Continental, Chrysler was put on notice of the defect by several engineers who worked in other departments but who personally owned Chrysler minivans and had experienced the defect. ████ ████ complained about the defect on his 2009 minivan and wrote, in part, the following:

- "[My Wife] . . . attempted to fill the tire with air.  While doing this the TPM Sensor Schrader Valve broke into two pieces and all air was lost in the tire."

---

[4] In subsequent model years, Chrysler switched to a rubber snap in TPMS valve stem and did not have further corrosion problems. ████ Dep., at 83:14-84:1.

[5] Notably, any replacement TPMS units that Defendant made would have presumably been made with the same defective AL2000 valve stems and nuts since the change to AL6000 did not occur until May 26, 2010.

[6] A Weibull analysis deals with reliability predictions. *See* ████ Dep., at 81:20-22, 44:8-22 (explaining c/1000 and MIS).

- "[I]t is in a garage every night. We take good care of the car and do not expect problems like this.  Our Minivan is two years old this week with 24,000 miles on it."

- "In addition, when my Wife mentioned this issue to a friend at a party on Saturday Night, he told my wife that he has replaced 3 of these on his 2008 Dodge Ram at $ 50 each, and just had one on his Dodge Journey that destroyed the tire because his wife drove too long on the tire."

- "Let me know if you think I should discuss the replacement of the other three valves.  My wife is concerned about this issue and that it's a known concern with the local Tire Shops."

Email from ██████████ (MCPS035528)(Jan. 10, 2011),  Exh. 21. Faced with this complaint,

another Chrysler engineer, ██████ (who ironically had a valve stem on her own vehicle fail),

noted in part:

> This is not the first customer that is trash talking us due to this part failure.  Interestingly ████ is seeing that most of the sales are non-warranty. I'm wondering if most customers are being told it's customer pay.

Email from ██████████ (MCPS035530)(Jan. 10, 2011), Exh. 22.

Another engineer, ████████, complained about the defect on his 2009 minivan and the

fact that he had to spend $520-600 for new TPMS units:

> [T]he tire center manager  . . . [t]old my wife that there might be a problem before he ever saw the vehicle. Based on his inspection - he indicated he could not work on the Vehicle to install new tires because all 4 valve cores were "seized" in the TPM. His advice was that we need to go to the dealer and purchase 4 new TPM's and have them replace at the dealer before he would [ ] install the new tires.

> Since this was new to me, I asked several internal contacts about this issue - and I reviewed the parts on the vehicle. It appears that [the tire center manager] [i]s correct in his identification of the condition - and that his recommended action is the only available alternative. I spoke with Suburban Chrysler - Where we purchased the vehicle - and was given a rough estimate of $130/sensor plus labor to do this work.

> As a customer - this is very disappointing since the issue may have been present but was not identifiable by a customer until I tried to spend $550 for new tires.

8

Now it appears I will need to spend $520-600 additional and make two additional trips to a service facility to get the issue resolved.

Deposition of ██████████ ("██████ Dep."), Exhibit 10, at 3-4 (May 11, 2017), Exh. 23.

██████████ shared this concern over the replacement cost and wrote that "it's not surprising why customers get upset with cost especially when they need something like a replacement sensor valve stem." ██████ Dep., Exhibit 23; *see also* ██████ Dep., at 77:4-18 (cost to Chrysler for replacement TPMS unit is $10, and retail price is $75). It is reasonable for customers to be upset over the cost of replacing valve stems and nuts because there is no replacement interval noted for TPMS units in the owner's manual and the units' battery is expected to last 10 years. *See* Email from ██████████ (MCPS035473)(Aug. 15, 2012), Exh. 24; *see also* ██████ Dep., at 16:12-17:1; Deposition of Eric V. Sullivan, P.E. ("Sullivan Dep.")(July 18, 2017), 126:5-127:7, Exh. 25; Expert Report of David R. McLellan ("McLellan Rep."), at 7 (Feb. 25, 2016), Exh. 26; Deposition of David R. McLellan ("McLellan Dep.")(July 27, 2017), 268:16-269:6, Exh. 27 ("McLellan Dep."). As detailed below, many consumers complained about the high cost of repair.

These were hardly the only Chrysler employees to complain about broken AL2000 valve stems on their personally owned Chrysler vehicles. Indeed, ██████, was aware of valve stems failures experienced by at least three other Chrysler employees, including her husband, who had several failures, and ██████, quoted above. *See* ██████ Dep., at 38:7-40:6.

### iii. Chrysler Was on Notice of the Defect Through Other Customer Complaints.

Chrysler's Customer Assistance Inquiry Records ("CAIR records") for customers in New York show that Chrysler knew that the defect was an issue material to consumers because it posed a safety risk and had a high cost of repair. For example:

- On August 8, 2011 a customer reported to Defendant's CAIR unit he had a ***blowout*** at 41,500 miles and had the vehicle towed to the nearest repair shop. While having one

of the tire pressure monitors replaced, the repair shop told the customer that the other three tire pressure monitors were ready to break as well.

Customer Assistance Inquiry Records (MCPS034032), Exh. 28.

- Customer is concerned about tire pressure monitoring sensors failing and causing incident where vehicle went off road.  Customer states that their vehicles [sic] tire pressure monitoring system failed when wife was taking someone to doctor and vehicle went off the road.  One tire was damaged and replaced as well as the valve stems.

- [C]ustomer was almost in an accident when the tire went out due to the sensor disinigrated [sic] causing the tire to loose [sic] pressure and be destroyed.

Excerpts of Customer Assistance Inquiry Records (MCPS034504), Exh. 29.

In addition to the CAIR records, there are over 130 NHTSA ODI records indicating vehicle owners' safety concerns. *See* Compl. ¶¶ 31-37, Exhibit A. These complaints include the following:

- "Blown tire and valve stem  . . .  while driving 65 MPH"

- "Front valve stem broke driving on the highway causing the tire to immediately go flat."

- "Tire valve stem broke off while at highway speed causing the tire to immediately deflate."

- Tire went flat in "less than 8 seconds."

- "Valve stem broke off two time [2] on separate occasions, caused tires to lose air quickly, and resulted in tire failure and *a loss of control, car crashed into curb*."

- "The second one [failed] while I was driving the vehicle... My children and I could have been killed if I didn't pull over immediately."

*Id.* (emphasis added); *see also* Declaration of ███████████ (P/Tomassini,Robert00157-P/Tomassini,Robert00158)(Aug. 13, 2017), Exh. 30; Declaration of ████████ (P/Tomassini,Robert00158- P/Tomassini,Robert00160)(Aug. 19, 2017), Exh. 31; Declaration of ████ ███████████ (P/Tomassini,Robert000172- P/Tomassini,Robert000174)(Aug. 25, 2017), Exh. 32 (detailing their experiences with air outs).

Beyond these individual consumer complaints, Chrysler was put on notice by a major fleet customer, GE Capital, which was concerned with the safety implications of sudden air-outs.

█████████, a Chrysler Regional Fleet Manager, reported that "GE Capital is a large Fleet Account that raised this issue at a Client Advisory Meeting (CAB) meeting yesterday held at CTC [Chrysler Technical Center] and feel it is a Safety issue." Email from █████████ (MCPS037991)(Mar. 3, 2010), Exh. 33. █████████ more fully expressed GE Capital's concern as follows:

> [W]e have a Large Fleet Account, GE Capital, who has surfaced the below issue during a Fleet Client Advisory Board meeting at CTC yesterday and based on the feedback and postings from the Automotive.com website, stating that there are numerous issues with TPS valves, they are considering grounding their units until we can establish a plan.

> Can you let me know if there is anything pending that we can share with this Fleet?

> Can we be proactive and provide them with an inspection procedure to provide to their drivers in efforts to prevent their drivers to become stranded on the side of the road?

*Id.* at MCPS037989.

Chrysler was also placed on notice of the subject safety issues by its European affiliates. In one email, Chrysler employee █████████ stated, "We are getting a lot of heat from the Euro community: re our TPM's falling out. . ." Email from █████████ (MCPS036719) (Mar. 19, 2010), Exh. 34. In another email, prioritized as "Significant", the problem was described as "TPM nipple falls off without any external influence." Email from █████████ (MCPS036715)(Mar. 19, 2010), Exh. 35. This email chain went on to state that the "situation is escalating, we receive cases from our Call center, where customers refuse to drive their vehicles any more before there is a clear solution for service." Email from █████████ (MCPS036721)(Mar. 19, 2010), Exh. 36.[7]

---

[7] █████████ also noted that Chrysler's Safety Office was looking at "addressing problem of cracked and broken sensor valve stems." █████ Dep., Exhibit 23; *see also* █████ Dep., at 70:8-71:10 (indicating that he attended a meeting with the Safety Office).

11

Finally, Chrysler was on notice of the safety issues because there have been at least three prior NHTSA investigations or sanctioned recalls relating to broken valve stems or nuts. *See*, *e.g.*, ████ Dep., Exhibit 4 (safety recall of Nissan vehicles for valve stem nuts that may corrode and crack in salt belt states); *see also* ████ Dep, Exhibit 5, at 1 (NHTSA investigation where "valve stem may pop out while driving causing the tire to deflate rapidly and the driver to lose control of the vehicle"); ████ Dep., Exhibit 6, at 1 (NHTSA investigation where "[a] leaking tire valve could result in tire deflation, tire damage (e.g., overheating, rupture) and possible vehicle control problems"). Indeed, a NHTSA report has found that "[t]ire problems are inherently hazardous to vehicle safety. When these problems emerge in the pre-crash phase, the time window for attempting a crash avoidance maneuver is normally very small."[8]

### 2. Chrysler Failed to Resolve the Defect or Disclose It to Consumers as a Safety Issue, in Order to Save Money.

#### i. Chrysler's Own Standards Should Have Prevented the Use of Defective TPMS Valve Stems and Nuts and Should Have Compelled a Robust Response When the Defect Was Discovered

On paper, Chrysler's design process for component parts is supposed to account for the expectations of consumers. To the extent there arises a problem which, like those reported above, constitutes a dramatic deviation from consumer expectations, the design process should catch the problem before a vehicle is put on the market. *See* ████ Dep., at 17:3-13. Chrysler engineers are trained in a method called Design Failure Mode and Effect Analysis ("DFMEA"), which quantifies the risk associated with identified potential design failure modes, and they are expected to perform a DFMEA before a vehicle is put on the road. *See* ████ Dep., at 23:4-7; Exh. 5, at P/Tomassini,Robert00138-39.

---

[8] *Tire-Related Factors in the Pre-Crash Phase*, April 2012, at p. 15, available at https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/811617 (last accessed Jan. 22, 2018). "Official government reports and other types of government records are appropriate for judicial notice." *Paskar v. City of N.Y.*, 3 F. Supp. 3d 129, 134 (S.D.N.Y. 2014) (citing authority).

Consumer expectations dictate the durability targets that Chrysler sets for its products. *See* ███ Dep., at 15:13-23. The batteries in the minivan's TPMS units were designed to last for 10 years, which can be considered an indicator of the minimum length of time that Chrysler expected them to last. *See* Exh. 24; *see also* ███ Dep., at 16:12-17:1. The weather conditions in which Chrysler consumers drive are also considered, including the effects of cold weather on product durability. *Id.* at 18:3-23. Chrysler engineers are familiar with the conditions in the "salt belt" and understand that it refers to "northern states that salt their roads in the wintertime." *Id.* at 40:11-17.

Chrysler never validated its design of TPMS valve stems and nuts fabricated from AL2000 with real-world testing to see if these materials were safe and would last at least as long as the TPMS battery.  Instead, "FCA was using the general public as a test …, and they found out after a lot of these failed that there was a problem with that particular material." *See* Sullivan Dep., at 124:16-125:2.

When a serious defect reaches customers, Chrysler's standards dictate that the company should work up a robust solution such as a field action (i.e., a recall) and/or an extended warranty. To ensure that such a defect is detected and addressed, Chrysler is supposed to examine feedback from consumers to determine whether any improvements are needed for vehicles it has on the road. *See* ███ Dep., at 19:20-20:11. Warranty data is the largest source of information for such decisions. *See id.* at 20:1-11. Customer complaints kept by the National Highway Traffic Safety Administration ("NHTSA") are another source that Chrysler examines. *See id.* at 20:19-25. When an internal investigation is opened after a spike in warranty claims, Chrysler gets "failed parts back from the dealer, and they review warranty narratives, the narratives that are input into the warranty system by the dealer to see if there is a common root cause." *See id.* at 57:13-16. When a common root cause is identified, "[t]hen you try and fix it" by, for example, "determin[ing] what the

problem was, was it a manufacturing defect or was it a design issue, and then you try to come up with a robust solution." *See id.* at 57:19-25.

### ii. Chrysler Concluded That the Defect Was Not Safety-Related Based on a Federal Motor Vehicle Safety Standard That Mandates that Rims Must Retain Tires, and on the Purported Lack of Reports of Accidents at the Time.

When confronted with overwhelming evidence from the field that the TPMS valve stem and nut are defective and pose serious safety risks to its customers, Chrysler relied on an irrelevant tire rim retention test to maintain that the defect was not safety related.

, the chief safety investigator for the TPMS valve stems and nuts, brushed aside GE Capital's decision to ground its fleet because of the safety risks presented by the defect. ███████ said he did not "believe a Safety Recall [was] warranted" and that his "only sugges-tion would be concerning the use of aftermarket caps that are not compatible with the aluminum bodied TPS."[9] ███████ Dep., Exhibit 3, at 3. A later email from Chrysler employee ███████ to Mr. ███████ laid out a plan to justify this position:

> Your conclusion (I think we agreed) was that it was non safety, and we discussed collecting times for the tires to deflate as sufficient justification of the position. With that conclusion in hand, what is it that we need to tell the fleet customer?

Exh. 10, at MCPS002395.

Mr. ███████ acknowledged at his deposition that he looked at CAIR and NHTSA com-plaints, but he contended that none of them at the time involved "an accident or losing control of the vehicle due to the TPS." *See* ███████ Dep., at 159:10-160:22 & 53:6-54:2. He also testified that, as further justification for his position, he also, in subsequent exchanges, pointed to Federal

---

[9] If the pervasive valve stem and nut fractures truly were caused by customers who replace Chrysler valve caps with aftermarket valve caps (it is not), then this, too, would reflect an oversight failure. Customer conduct of this kind "should be taken into consideration in the DFMEA" at the outset and designed around. ███ Dep., at 80:19-25.

Motor Vehicle Safety Standard (FMVSS) 110, which on its face appears to apply to rims' retention of tires in the event of a deflation:

> S4.4 *Rims.*
>
> 54.4.1 *Requirements.* Each rim shall:
>
> (a) Be constructed to the dimensions of a rim that is listed by the manufacturer of the tires as suitable for use with those tires, in accordance with S4 of § 571.139-
>
> (b) In the event of rapid loss of inflation pressure with the vehicle traveling in a straight line at a speed of 97 kilometers per hour [60.27 miles per hour], retain the deflated tire until the vehicle can be stopped with a controlled braking application.

S4.4 Rims, Exh. 37.

Mr. ██████ assumed that this test was run at the proving grounds and believed from reviewing the schematics that it was conducted on the right front tire by pulling four valve stems at once. ██████ Dep., at 90:4-8 & 154:23-155:10. Chrysler never actually determined the deflation rates of tires (i.e., rapidity of loss of inflation) when TPMS valve stems or nuts broke off. *Id.* at 120:15-121:16.[10]

### iii. Chrysler Rejected a Field Action or Extended Warranty Because It Would Cost Up to $400 Million, and Its Supplier Did Not Have the Production Capacity.

Faced with an expected potential failure rate of 100%, Chrysler considered its options for a field action or extended warranty and tasked its employees with drafting a Customer Satisfaction Notification (CSN) document. The resulting CSN recounted the background of the AL2000 valve stem and nut defect, forecasted the expected volume of warranty claims, and summarized reports of the defect in the field, including CAIR records, VOQs [NHTSA Vehicle Owner Quality reports like those excerpted above], and QNA (Quality Narrative Analyzer) field reports. *See* Exh. 20, at

---

[10] Mr. ██████ also testified that in his opinion no TSB should have been issued "Because putting a Technical Service Bulletin out there would result in essentially every TPS getting replaced on every vehicle that came in regardless of whether or not it had experienced an issue." *Id.* at 180:21-181:1.

MCPA037931. The CSN went on to state that "Chrysler Group LLC is not aware of any accidents or injuries related to this issue (*if true*)." *Id*. (emphasis supplied). As shown above, Chrysler was well aware of the safety issues created by the defect. The CSN document ended with the "Recommendation" to "[p]rovide an extended warranty for the TPM sensor" *Id*. In the face of this well documented recommendation, Chrysler rejected providing an extended warranty or taking any field action due to the "significant cost"—approximately $400 million—and the fact that supplier did not have the production capacity. *See* Email from ███████ (Aug. 17, 2011), Exh. 38 ("There was no extended warranty or field action for this item. The supplier did not have the capacity and the price tag was approx $400M.").

### 3.  Chrysler Concealed the Defect from Its Customers

Chrysler not only nixed its internal recommendation for an extended warranty program or other field action, but also buried its findings from its customers. As the Court noted in its Memorandum-Decision and Order denying Defendant's motions for summary judgment and to exclude class members, Defendant never revealed the defect to its customers or allowed its dealers or repair facilities to inform owners like Plaintiff Tomassini. Mem. Op., at pp. 3-4, 11. Rather, Defendant's CAIR unit told Mr. Tomassini that "This is how this vehicle was designed, engineered and built. Any additional information is either unavailable or considered proprietary." CAIR record of Robert Tomassini (MCPS003736), Exh. 39. There are many such similar CAIR records. *See* Exh. 28 (examples of CAIR records where Defendant avoided disclosing the defect).

Moreover, Chrysler's own documents indicate that it never disclosed the defect to customers. For example, Chrysler employee ███████ asked in an email "was there anything distributed to the field on this issue[?] To my knowledge none." Plantinga Dep. Exhibit 10, at 3. And while ███████ spoke candidly to his fellow Chrysler engineer ███████, who was also a customer, customers who were not Chrysler engineers were told nothing of the sort. *See*

16

█████ Dep., at 92:2-19; *see also* Email from █████████ (Jan. 10, 2011), Exh. 40; Exh. 21. Mr. █████ also testified that he was unaware of any efforts made by Defendant to tell its other customers about the defect. █████ Dep., at 86:25-88:15. Chrysler's communications with its dealers demonstrated its desire to likewise keep them in dark about the defect, for fear of "invit[ing] further questions from groups outside Chrysler." Email from █████ (MCPS036816) (Sept. 8, 2009), Exh. 41.

### B. Plaintiff's Experts Have Opined on the Common Nature of the Defect and Damages

#### 1. The AL2000 Valve Stems and Nuts Are Defective and Will Inevitably Suffer from <u>Progressive Intergranular Corrosion and Stress Corrosion Cracking.</u>

Plaintiff's experts Eric Sullivan and Dr. Richard Lynch have opined that valve stems and nuts with AL2000 as the base metal alloy will, in vehicles operated in the salt belt, experience progressive corrosion that will culminate in corrosive fracture and TPMS failure.

Mr. Sullivan's lab, Intertek Laboratory Services, examined a failed corroded TPMS unit provided by Plaintiff Tomassini and concluded that the unit failed due to "stress corrosion cracking" which was the result Chrysler's use of the AL2000, which contains copper. Expert Report of Eric V. Sullivan ("Sullivan Rep.")(Feb. 15, 2016), 7-8, Exh. 42. Mr. Sullivan has also opined that all of the valve stems made out of AL2000 series alloys are defective and will suffer from progressive intergranular corrosion leading to Stress Corrosion Cracking:

> I have concluded that all members of the class with 2xxx series aluminum valve stems have this material defect because all of the TPMS devices have valve stems composed of an aluminum alloy that is susceptible to intergranular corrosion and [stress corrosion cracking] SCC. When a susceptible aluminum alloy is used for the TPMS valve stems, intergranular corrosion and degradation of the valve stems is progressive and inevitable. The intergranular corrosion and degradation begins as soon as the valve stems are exposed to the saline environment and chemicals to which automobiles are typically exposed. The two other factors involved in SCC of the valve stems, stress and environment, cannot be reasonably avoided because stress is inherent to the design of the part and chlorides are widespread in the environment.

> I have determined that the defect does not occur when the valve stem finally breaks off, but rather has manifested itself as soon as the SCC or intergranular corrosion begins.  Although the SCC and intergranular corrosion are not visible to the naked eye, it is progressive and does not stop once it has started.  Once crack growth has started, it is very difficult to clean the valve stems sufficiently to remove all of the chlorides that have penetrated deeply into the cracks.

Rebuttal Report of Eric V. Sullivan (May 23, 2016), at 16, Exh 43. Similarly, Dr. Lynch,

in his report, opined:

> [A]luminum alloys containing appreciable amounts of the alloying elements copper, magnesium, silicon and zinc are susceptible to Stress Corrosion Cracking.[1] I have found that evidence and analysis applicable to the class as a whole is capable of showing that copper containing 2xxx series aluminum alloys including alloy 2011 and alloy 2030 used by Chrysler in threaded in valve stems in the T6 and/or T4 heat treated conditions, are highly susceptible to stress corrosion cracking and provide common proof that this category  of TPMS units are capable of failure by Stress Corrosion Cracking (SCC)…

> … Every vehicle in this class is subject to corrosion because the TPMS is made from corrosion susceptible aluminum 2011 or 2030 alloys and is operated in a "salt belt" state and will experience progressive intergranular and/or SCC corrosion which will ultimately lead to corrosive fracture and TPMS failure.

Expert Report of Dr. Richard F. Lynch ("Lynch Rep.")(Feb. 15, 2016), at 3, Exh. 44.

Both Mr. Sullivan and Dr. Lynch opined at their depositions that the defect is common to all

class members. Mr. Sullivan opined:

> [T]he -- the alloy itself is susceptible. And the fact that they're all – the stresses are inherent. It's just part of the design. There is the stress in the stem. It's a susceptible alloy. And the environment – the materials are present in the environment, chlorides and iron dust and road -- other contaminants from the road. Those are all present for all cases.

Sullivan Dep., at 336:1-22. Dr. Lynch agreed:

> [W]hat that comes down to is simply we have stress corrosion cracking. It's a situation where the common elements, the cause that are always present is the common condition. As I mentioned, it's progressive and failure is inevitable; just a matter of how long it will take.

Deposition of Dr. Richard F. Lynch ("Lynch Dep.")(July 25, 2017), 165:18-24, Exh. 45.

### 2. The Defect is Common to the Class Regardless of the Specific Type of 2000 Series Aluminum, Heat Treatment, or Anodization Used for the Valve Stems and Nuts.

The defect is common regardless of whether a valve stem was made from 2011 aluminum or 2030 aluminum and whether it was subjected to T4 or T6 heat treatment. This is so because the significant copper content of AL2000 series alloys, when combined with stress and chlorides, makes the alloys distinctly susceptible to corrosion, regardless of other factors. *See* Lynch Dep., at 35:4-9 ("My opinion is that the corrosion which occurs, intergranular stress corrosion cracking, for stress corrosion cracking to occur there are three major elements that need to be present. One is a susceptible material. In this case the aluminum alloys 2011, 2030, any of the T4, T6 conditions"); *see also* Sullivan Dep., at 337:10-17 ("They both have a significant concentration of copper, and that's the -- and they're known to be susceptible to stress corrosion cracking in a similar environment. They are really not that much different as far as the alloy and the structure of the alloy and microstructure, so they would be expected to perform similar but not exactly the same due to the differences") & 145:17-20 (stating that the differences between T-4 and T-6 heat treatment amount to "one is bad, and one is worse"). Indeed, the valve stems that fractured on Mr. Tomassini's vehicle most likely had the T4 heat treatment, *see* Sullivan Dep., at 325:9-19, and Defendant's warranty records indicate that large numbers of Class Vehicles that likely had the T4 heat treatment had stems or nuts break or crack. *See* Warranty Claims, Exh. 6.

Testing performed by Continental purports to show differences in the performance of valve stems and caps depending on whether they received T4 or T6 heat treatment. As referenced above, however, Armando Gutierrez testified that the testing performed by Continental does not reflect real-world conditions, and therefore the conclusions of the test are inapplicable to the real world. *See* Gutierrez Dep., at 101:8-105:21. Plaintiff's expert, Mr. Sullivan, agrees. *See* Sullivan Dep., at

281:13-24, 288:1-7, 289:17-20. Plaintiff's expert, Dr. Lynch, has also agreed and testified as follows about purported validation via testing in artificial laboratory conditions:

> What occurred over time was a recognition, I believe, that the initial testing was not severe enough and didn't give a good indication of what would happen in the field over a period of time… In all these cases what we have is a situation where you have an artificial laboratory test, such as in salt spray, also referred to as salt fog. It's designed to give a quick result. It's acknowledged in the industry that it is, if you will, not a good or credible test to give an accurate indication of what the material may do in service. It doesn't replicate what happens in the field.

Lynch Dep., at 58:9-14 & 79:4-14.

Chrysler's expert, Dr. Duquette, also agrees that the T4 and T6 heat treatments have about the same corrosion resistance. *See* Deposition of David J. Duquette ("Duquette Dep.")(July 25, 2017), 34:23-35:6, Exh. 46 ("Q. Well, the heat treatment referred to, that got the D rating was T4. Hasn't your testimony been previously that the T4 provides even better corrosive resistance than the T6 heat treatment? A. *The T4 and the T6 have about the same corrosion resistance*.") (emphasis added).

Whether the TPMS units were anodized or not is also irrelevant. As both Mr. Sullivan and Dr. Lynch point out, the corrosion process can easily penetrate any anodization layer. *See* Sullivan Dep., at 339:14-24 (the corrosion process attracts hydrogen ions that form hydrochloric acid that dissolves any anodization layer); Lynch Dep., at 124:25-125:4 & 125:18-24 ("It can be penetrated simply by exposure to weather, to the environment in the air, if you will.").

### 3. The Defect is Common Regardless of Purported Variances in the Maintenance of Class Vehicles by Consumers or their Exact Location in New York.

Both Mr. Sullivan and Dr. Lynch opined at their respective depositions that the presence or absence of a valve stem cap does not alter their opinions. *See* Sullivan Dep., at 287:2-3 (the presence or absence of a valve stem cap "might affect the rate, but it doesn't affect the susceptibility to [corrosion]") & 306:5-13 (discussing presence or absence of the cap: "[T]he corrosion will

start from the outside. And eventually if corrosion starts from the outside, it will get to the inside, and then the contaminants can enter the inside also."); *see also* Lynch Dep., at 270:4-7 ("It would still occur below the cap and the threaded region on the outside, which is the most susceptible part because of the thin cross section and the high stress.").

Dr. Lynch also opined that the defect is common regardless of the maintenance practices of the vehicle owner because even the best maintenance practices will not prevent corrosion. *See* Lynch Dep., at 100:12-24 & 271:21-272:7. Moreover, the defect is common regardless of variance in the precise composition of the salt used in the region of New York where the vehicle is operated, or even whether the owner operates the vehicle at all in the winter. *See* Lynch Dep., at 164:14-16 ("[T]hey all contain chlorides, and that's the common actor here, the victim, the villain rather"); *see* Sullivan Dep., at 336:1-22 ("Even people that don't drive in the winter … [t]he salts don't go away after the winter. So the salt particles are around and chlorides are around at all times of the year, so the chemistry is there also for the environment. And so I believe that it applies to all of the class.").

In addition, Mr. Sullivan and Dr. Lynch both opined that the AL2000 nut is also defective; this part was never tested in the Continental report. *See* Supplemental Report of David R. McLellan, at 3 (June 2, 2017), Exh. 47; Supplemental Report of Eric V. Sullivan, at 3 (June 2, 2017), Exh. 48; Supplemental Report of Dr. Richard F. Lynch, at 3 (June 2, 2017), Exh. 49.

### 4. The Common Defect Poses a Class-Wide Safety Risk to Owners and Lessees of the Class Vehicles, Their Passengers, and Other Drivers on the Road.

Plaintiff's automotive engineering expert, former Corvette chief engineer David McLellan, has opined that "the identified common materials failure of the TPMS valve stem while a Class Vehicle is in motion *poses a common and class-wide safety risk to owners and lessees of the Class Vehicles, their passengers and other drivers on the road*." McLellan Rep., at 6 (emphasis added).

21

Mr. McLellan testified that the defect is both a safety issue and a cost issue. *See* McLellan Dep., at 231:4-238:19 & 205:5-207:24 (detailing changes in vehicle dynamics and safety risks for a rear tire air out, like that which occurs when a TPMS valve stem or nut breaks); *see also id.* at 311:5-313:10 (detailing cost issues with replacing TPMS units and potentially ruined tires). Contrary to Mr. ████████ position, Mr. McLellan has opined that the FMVSS 100 test is "a fairly inconsequential test" because "it's predominantly looking at rim retention. And rim retention has not been a problem for my engineering lifetime in General Motors." *Id*. at 291:21-292:6. In all, Mr. McLellan also testified that he was "incredulous that some suppliers and carmakers succeeded in increasing the failure rate of tires" as a result of meeting the federal mandate to use TPMS sensors. *Id.*at 204:9-12; *see also* McLellan Rep., at 4 (Chrysler's use of defective alloy in the valve stem and its nut leads to "the worst of the problems the regulation was implemented to prevent.").

### 5.  **Damages Can Be Calculated On a Class-Wide Basis.**

Finally, Plaintiff's experts have concluded that damages and diminution in value resulting from Defendant's failure to disclose this material defect can be calculated on a class-wide basis. Plaintiff's experts have opined that all class members, having received a product with an undisclosed, material defect, experienced a loss of value at the point of sale, and that loss can be measured by a well-accepted survey methodology known as conjoint analysis.  As explained by Plaintiff's economist:

> Assuming that the Plaintiff proves that Chrysler commonly failed to disclose a material defect to the class, damages can be calculated on a classwide basis in this matter by using a diminution in value framework.  In general, the failure to disclose material information, such as a material defect, in the sale of a product would be expected to influence the market price of that product.  When the market price of a product is set at a higher point based on the presumed absence of a material defect, all consumers purchasing the product will pay more even if individual consumers in the market hold different subjective beliefs with respect to the material defect at-issue.  Conjoint analysis is one well-accepted method that can be used in this matter to discern the value of the concealed material defect in the marketplace.

22

Expert Report of Gregory A. Pinsonneault, at 4 (May 23, 2016), Exh. 50. Plaintiff's conjoint analysis expert stated:

> The results obtained after conducting a conjoint analysis will allow me to calculate the diminution in value that relevant consumers assign to the risks associated with the defective valve stems (i.e., sudden and unexpected tire air loss) described in the Complaint. Stated differently, I will be able to calculate the diminution in value due to the problem, which is the difference in the amount relevant customers are willing to pay for either Chrysler Town & Country or Dodge Grand Caravan minivans with fully functional valve stems compared to the amount they are willing to pay for otherwise identical Chrysler Town & Country and Dodge Grand Caravan minivans with the defective valve stems described in the Complaint that may fail and result in air suddenly and unexpectedly releasing from the tires.

Declaration of Steven P. Gaskin, at 7 (Feb. 14, 2016), Exh. 51.

Another class-wide measure of damages is based on replacement costs. Because all class members had defective TPMS valve stems and nuts destined to prematurely fail, all class members are entitled to receive the cost of replacement for four non-defective TPMS units:

> In my opinion, the expected useful lifespan of a valve stem of the tire pressure monitoring unit in the Class Vehicles should be no less than the life of the vehicle. Anything less and the vehicle owner is subjected to a replacement cost for 4 TPMS units of $375.00 (parts and labor per Chrysler). I am also of this opinion because I am unaware of any maintenance schedule or recommended replacement interval from Chrysler relating to the TPMS units as used in the Class Vehicles.

McClellan Rep., at 7.

## III.   <u>ARGUMENT</u>

Plaintiff seeks certification of a class defined as all persons who purchased and/or leased Chrysler and Dodge minivans that were manufactured from after June 10, 2009 until May 25, 2010, in the State of New York.

Rule 23 "creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action." *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010); *see also Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1042 (2016). To

be certified, a proposed class must satisfy the requirements of Rule 23(a) and one or more subsec-

tions of Rule 23(b). *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 104 (2d Cir. 2015). While

certification requires a rigorous analysis that may entail some overlap with the merits, "Rule 23

grants courts no license to engage in free-ranging merits inquiries at the certification stage."

*Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013). Accordingly,

there is "no use in a class certification order that is required to list all possible defenses to all possi-

ble damages claims, nor do we see, in the text of Rule 23, any requirement for it." *Sykes*, 780 F.3d

at 95. This is so because the overarching purpose is "not to adjudicate the case . . . [but] to select

the method best suited to adjudication of the controversy fairly and efficiently.'" *In re Air Cargo

Shipping Servs. Antitrust Litig.*, No. 06-1775, 2014 U.S. Dist. LEXIS 180914, at * 176 (E.D.N.Y.

Oct. 15, 2014) (citation omitted), report and recommendation adopted by *In re Air Cargo Shipping

Servs. Antitrust Litig.*, No. 06-1775, 2015 U.S. Dist. LEXIS 90402, at * 1 (E.D.N.Y. July 10,

2015). Plaintiff meets the requirements for certification of a Rule 23(b)(2) and (b)(3) class, and in

the alternative, a (c)(4) class.

### A.   The Proposed Class Satisfies the Requirements of Rule 23 (a).

#### 1.   <u>The Numerosity Requirement Is Satisfied.</u>

A party seeking class certification must demonstrate that "the class is so numerous that

joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The burden of establishing nu-

merosity is not great. It does not require a showing that joinder is impossible, but only that "the dif-

ficulty or inconvenience of joining all members of the class make use of the class action appropri-

ate." *Cent. States Se. and Sw. Areas Health and Welfare Fund v. Merck-Medco Managed Care,

L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007). In fact, "a level of 40 [class] members" suffices. *Con-

sol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Evidence of the number of

defect manifestations is unnecessary. *See Sanchez Knutson v. Ford Motor Co*., 310 F.R.D. 529, 535 (S.D. Fla. 2015).

Here, Plaintiff has satisfied numerosity because "[t]he record indicates that [Chrysler]… sold thousands of [class vehicles]… to customers… between [June 2009 and May 2010]… alone." *Seekamp v. It's Huge, Inc.*, No. 09-00018, 2012 U.S. Dist. LEXIS 33295, at *9 (N.D.N.Y. Mar. 13, 2012). Plaintiff contends that all TPMS valve stems and nuts in the Class Vehicles were manufactured out of the same defective AL2000 material. Defendant's Notice of Removal establishes that 26,302 Dodge Grand Caravan and Chrysler Town & Country vehicles, model years 2008 - 2011, were sold to individuals (21,089 vehicles) or businesses (5,213 vehicles) in New York on or after June 10, 2009. *See* Notice of Removal of Defendant Chrysler Group LLC, ¶ 10, Oct. 8, 2014, Dkt #1. Though Plaintiff has narrowed the Class to vehicles manufactured from June 10, 2009 to May 25, 2010, a period of just shy of one year, the Court may "rely on reasonable inferences drawn from available facts" to support a finding of numerosity. *See Zhang v. Wen Mei, Inc.*, No. 14-CV-1647, 2017 U.S. Dist. LEXIS 213389, at * 46 (E.D.N.Y. Dec. 28, 2017) (internal citation and quotation omitted); *see also Chana Friedman-Katz v. Lindt & Sprungli* (USA), Inc., 270 F.R.D. 150, 155 (S.D.N.Y. 2010) ("The certification of a class may proceed on estimates…."). Based upon Chrysler's sales records, there can be no question that there are thousands of vehicles in the Class period. Moreover, according to Chrysler's CAIR and Warranty records, hundreds of putative class members contacted Chrysler about the defective TPMS valve stems in class vehicles —far greater than the 40 individuals required to reach the threshold of numerosity. *See* Exh.29; Exh. 28 (25 New York complaints); *see also* Exh. 6 (518 New York warranty claims).  Plaintiff has established numerosity.

### 2. __Questions of Law and Fact Are Common to the Proposed Class.__

Rule 23(a)(2) requires "questions of law or fact that are common to the class." There

need only be a single common question capable of being answered on a class-wide basis whose

resolution is central to the validity of each claim. *See Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct.

2541, 2551 (2011); *Brooks v. Roberts*, No. 16-1025, 2017 U.S. Dist. LEXIS 68808, at *25

(N.D.N.Y. May 5, 2017). This requirement, therefore, imposes a "low hurdle." *In re Facebook,*

*Inc.*, 312 F.R.D. 332, 342 (S.D.N.Y. 2015); *see also Enea v. Bloomberg, L.P.*, No. 12-4656, 2014

U.S. Dist. LEXIS 35613, at * 8 (S.D.N.Y. Mar. 17, 2014) ("[C]ommonality has never been under-

stood to require that all issues must be identical as to each member, but rather [to] require[] that

plaintiffs identify some unifying thread among the members' claims that warrant[s] class treat-

ment.").

A standardized course of conduct affecting all class members generally satisfies the com-

monality requirement, irrespective of consumers' subjective experiences. *Ebin v. Kangaris Foods*,

Inc., 297 F.R.D. 561, 567 (S.D.N.Y. 2014) (citing *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d

Cir. 1997)); *Mazzanti v. Gen. Elec. Co.*, No. 13-1799, 2017 U.S. Dist. LEXIS 32903, at *15 (D.

Conn. Mar. 7, 2017) ("[V]arying conduct of the consumers" is irrelevant when plaintiffs allege that

all of the products suffer from a safety defect that the defendant concealed.). This is especially so

when plaintiffs proceed on the theory that class members suffered injury at the point of purchase

by paying more than they would have otherwise. *See Kurtz v. Kimberly-Clark Corp.*, No. 14-1142,

2017 U.S. Dist. LEXIS 44576, at *24 (E.D.N.Y. Mar. 27, 2017) (internal alterations, citations, and

quotations omitted) ("Liability does not depend on whether class members relied upon the repre-

sentation when they purchased [the product] . . . Rather, the injury is the excessive purchase

price."). Indeed, in consumer cases such as this, "Plaintiff is not required to demonstrate that the

putative class members had identical motivations to purchase…." *Seekamp*, 2012 U.S. Dist. LEXIS 33295, at *11.

Here, commonality is present because the matter turns on core common questions, namely, whether the TPMS valve stems and nuts on Class Vehicles are defective and whether they pose a material safety risk. The answer to these questions will materially advance the litigation in one stroke. If the answers are "yes," then Plaintiff has proven a critical element of his § 349 claim for all class members, and Plaintiff's damages experts, through proven survey methodology, can determine the difference in the amount [at the point of sale] that class members, in the aggregate, would have paid had the safety defect been disclosed. If the answer to either of these questions is "no," then Defendant can secure a classwide judgment in its favor.

Ultimately, commonality exists here, as courts have routinely found in other cases involving auto defects. *See, e.g.*, *Falco v. Nissan N. Am., Inc.*, No. 13-00686, 2016 U.S. Dist. LEXIS 46115, at *13-14 (C.D. Cal. Apr. 5, 2016) (collecting cases); *Daniel v. Ford Motor Co.*, No. 11-02890, 2016 U.S. Dist. LEXIS 130745, at *10 (E.D. Cal. Sep. 23, 2016); *Sanchez-Knutson*, 310 F.R.D. at 537; *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006) (commonality existed with respect to existence of defect); *Samuel-Bassett v. Kia Motors Am., Inc.*, 34 A.3d 1, 23-25 (Pa. 2011) (same).

### 3.  The Proposed Class Representative's Claims Are Typical of the Class.

Typicality "requires that the claims of the class representatives be typical of those of the class.  This requirement is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A.*, 126 F.3d at 376 (internal citations and quotations omitted). A named plaintiff's claims, however, need not be identical to those of each class member. *Hamelin v. St. Luke's Healthcare*,

274 F.R.D. 385, 395 (N.D.N.Y. 2011). "When the same unlawful conduct was directed at or affected both the named plaintiffs and the prospective class, typicality is usually met." *V.W. v. Conway*, No. 16-1150, 2017 U.S. Dist. LEXIS 24395, at \*32 (N.D.N.Y. Feb. 22, 2017) (internal citation omitted). This is so "irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993).

The claims of all class members, including Mr. Tomassini, rely on the same legal theories against a common defendant that "involve the same alleged defect … found in vehicles of the same make and model." *Edwards v. Ford Motor Co.*, 603 F. App'x 538, 540 (9th Cir. 2015); *see also Daffin*, 458 F.3d, at 552 (typicality satisfied when claims were based on the same defect). Therefore, the typicality requirement is satisfied.

### 4.   The Proposed Class Representative Will Fairly and Adequately Protect the Interests of the Class.

Rule 23(a)(4) presents two questions, namely, "whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced, and able to conduct the litigation." *Baffa v. Donaldson,* 222 F.3d 52, 60 (2d Cir. 2000). There are no conflicts between Mr. Tomassini and the proposed class. Mr. Tomassini has no interests antagonistic to absent class members; he is willing to serve as class representative and has demonstrated his commitment by participating in discovery, submitting to a deposition, and agreeing to attend trial to represent a class of similarly situated owners of Class Vehicles. *See* Deposition of Robert Tomassini ("Tomassini Dep.")(Mar. 22, 2016), 196:6-197:14 & 201:18-23, Exh. 52. Prior to his deposition, Mr. Tomassini had expended 30 hours participating in this case in furtherance of the interests of the class. *Id.* at 196:6-14. Further, he is represented by law firms who have demonstrated their commitment to the prosecution of this litigation, and have extensive experience

prosecuting complex class action cases. *See* Resumes of Counsel, Exh. 53. The adequacy test is satisfied.

### 5.   The Proposed Class is Ascertainable.

For damages classes, the Second Circuit has acknowledged an implicit requirement in Rule 23(a) that a class be ascertainable. *In re Petrobas Sec. Litig.*, 862 F.3d 250 (2d Cir. 2017). "[A] class is ascertainable if it is defined using objective criteria that establish a membership with definite boundaries. *Id.* at 264. This is a "'modest threshold requirement' that precludes certification only if a 'proposed class definition is indeterminate in some fundamental way.'" *Vargas v. Howard*, No. 1:15 5101, 2018 U.S. Dist. LEXIS 4883, at *26 (S.D.N.Y. Jan. 10, 2018) (quoting *In re Petrobas Sec. Litig.*, 862 F.3d at 269).

Ascertainability is not a hurdle here. The proposed class is based on readily identifiable, objective criteria. Owners and lessees of Class Vehicles are readily ascertainable by title records maintained both by class members and the State of New York. The identities of class members in vehicle class actions and/or recalls are typically culled from such records, which are obtained by companies that process and disseminate recall notices.

### B.   The Proposed Class Satisfies the Requirements of 23(b).

In addition to satisfying the four prerequisites of Rule 23(a), a class must meet the standards of at least one of the three sub-sections of Rule 23(b) to be certified. Here, Plaintiff seeks certification of the class under both Rule 23(b)(3) for damages and Rule 23(b)(2) for declaratory relief.

### 1.   The Class Meets the Requirements of 23(b)(3).

Rule 23(b)(3) authorizes certification where: (1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for the fair and efficient adjudication of

the controversy." Fed. R. Civ. P. 23(b)(3). For the foregoing reasons, the Class meets the predominance and superiority requirements and should be certified.

### i. Common Issues of Law and Fact Predominate Over Individual Issues.

The predominance inquiry asks "whether proposed classes are sufficiently cohesive to warrant adjudication by representation," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997), and it is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (internal citation and quotations omitted). In other words, the "mere existence of individual issues will not be sufficient to defeat certification. Rather, the balance must tip such that these individual issues predominate." *Sykes*, 780 F.3d at 87. Common issues predominate when they "will be the most complex and costly to prove, while the individual issues and the information needed to prove them will be simpler and more accessible to individual litigants." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 760 (7th Cir. 2014). Because Plaintiff primarily relies on common evidence to establish Chrysler's liability under § 349, the class satisfies the predominance requirement. *See Tyson Foods, Inc.*, 136 S. Ct., at 1045 (internal quotation marks and brackets omitted) (a "common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof.").

"Courts have repeatedly held that § 349 claims based upon omissions, nondisclosures and deceptive corporate policy are well suited for class certification." *Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418, 435 (S.D.N.Y. 2009). Section 349 "is a broad, remedial statute designed to address the numerous, ever-changing types of false and deceptive business practices which plague

consumers in New York State." Mem. Op., at p.8 (quotations omitted). To establish a prima facie case under § 349, "a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000). A defendant's conduct that "ha[s] a broad impact on consumers at large" is consumer-oriented. *State Autobahn, Inc. v. Progressive Ins. Group Co.*, 102 A.D.3d 5, 12 (2d Dep't 2012). Conduct is material when it is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (citing *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (1995)). Materiality under § 349 is an objective inquiry and, importantly, the "Supreme Court has held materiality 'is a question common to all members of the class' when, as [with § 349], the materiality of an alleged misrepresentation is judged according to an objective standard." *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 408-10 (S.D.N.Y. 2015) (quotations omitted) ("The alleged misrepresentations and omissions, whether material or immaterial, would be so equally for all investors composing the class."). Neither proof as to reliance, nor as to the intentions of defendants is required. *See Oswego*, 85 N.Y.2d at 26.

    This Court's November 23, 2016 Order denying Defendant's Motion for Summary Judgment demonstrates that the central issues in this litigation can be adjudicated across the class. In that Order, this Court found that "the evidence in the record does not establish[] that the terms of the bargain were fully disclosed …" Mem. Op., at p. 11. The Court rejected Defendant's mischaracterizations and noted that, properly framed, the relevant issue concerns "Defendant's failure to disclose that it manufactured vehicles with inferior material causing undetectable cracks that have lead to devastating and unexpected failure." *Id.* at p.11; *see also id.*, at p.12 ("It was the non-

31

disclosure of a known defect in the materials used in the TPMS unit, i.e. the use of a metal deter-mined to be failing due to stress corrosion cracking, that Plaintiff is alleging as the omission.").

The Court's analysis of the relevant elements of the GBL § 349 claim to Plaintiff Tomassini apply with equal force to the class.

### a. Common Evidence Will Demonstrate That Chrysler's Conduct Was Consumer-Oriented.

First, Defendant cannot contest that it engaged in consumer-orientated behavior when, despite its prior knowledge, it failed to disclose to class members the presence of defective TPMS valve stems and nuts in minivans that it manufactured. Defendant did not contest this issue in its motion for summary judgment and Plaintiff submits that it cannot credibly do so at this stage either.

### b. Common Evidence Will Demonstrate That Chrysler's Failure to Disclose the Defect was a Deceptive Act and That it was Material.

The question of "[w]hether a reasonable consumer acting reasonably would be misled by Defendant's omission that the aluminum alloy used was failing due to stress corrosion cracking" is common to both Plaintiff Tomassini and the class. *Id.*, at p.12.  Under the operative objective in-quiry, it can reasonably be inferred that the reasonable consumer does not consider the possibility that their tire valve stems and nuts can corrode and fracture, causing an air-out. *See* Deposition of Steven P. Gaskin ("Gaskin Dep.")(July 25, 2017), 153:2-7, Ex. 54 ("I've done a lot of car research into the purchase decision process, and they never talk about tire valves and wonder if they would rust. I don't think it's really on people's radar. It's one of those things you assume will work."). Plaintiff therefore submits that the failure to disclose such a defect is misleading. A factfinder's de-termination about whether Plaintiff is right or wrong on this matter will be common to the class, and will predominate over individualized issues. *See In re Amla Litig.*, No. 16-cv-6593, 2017 U.S.

Dist. LEXIS 175950, at *35 (S.D.N.Y. Oct. 24, 2017) (finding common issues predominate in defect-based suit under § 349); *Gold v. Lumber Liquidators, Inc.*, No. 14-cv-05373-RS, 2017 U.S. Dist. LEXIS 193891, at * 18-27 (N.D. Cal. Nov. 15, 2017) (finding common issues predominate under multiple state consumer protection laws in suit concerning omission-based defect); *Mazzanti*, 2017 U.S. Dist. Lexis 32903, at * 8 (same).

In addition, "[c]ommon evidence will be essential to each class member's claim of defect." *Mazzanti*, 2017 U.S. Dist. LEXIS 32903, at * 8. The abundant common evidence *from Chrysler itself,* detailed above, proves a class-wide omission of defect, and includes but is not limited to:

- A presentation first sent by Defendant's supplier, Continental, in January 2009 to Chrysler explaining that the valve stems and nuts in the minivans used AL2000 as the metal alloy, and AL2000 had "inferior" corrosion resistance.

- An April 2010 email from a Chrysler engineer and expert in metal materials, stating that the "2011 alloy that [is] being used now is definitely prone to stress corrosion cracking (SCC), while 6000 series is not susceptible to this type of corrosion."

- Internal reports based on lab testing and field incidents that pinpointed stress corrosion cracking from use of AL2000 as the cause of fractures in the minivans' TPMS valve stems and nuts.

- Chrysler's warranty databases, which showed that tens of thousands of AL2000 TPMS valve stems and nuts have been replaced, and hundreds in New York alone during the Class Period.

- Chrysler's forecast of projected failures, which estimated that there would be as high as a *100 percent failure rate* for the minivans' valve stems and nuts in the field within five years.

- The numerous complaints received by Chrysler of broken valve stems caused by the defect.

- Chrysler's own recommendation to provide an extended warranty to its customers to cover TPMS units and subsequent rejection because "[t]he supplier did not have the capacity and the price tag was approx. $400M."

- Chrysler's refusal to tell customers about the defect.

*See supra* at Section II.A. Moreover, Plaintiff will rely on its class-wide expert evidence that use of AL2000 in the minivans' valve stems and nuts constituted a common material defect in salt belt states that has uniformly led to Stress Corrosion Cracking.

33

Plaintiff Tomassini will submit identical evidence for himself and the class to establish the materiality of the omission: "that the alleged defect was a matter of safety, quality, durability, and performance." Mem. Op., at p.15. For example, the CAIR records and NHTSA records document volumes of instances in which customers experienced "blowouts" at highway speeds, crashed into a curb, lost control of their vehicles and went off road, nearly collided with other vehicles, or found themselves stranded in extreme weather as a result of the TPMS valve stem and nut fracturing on their vehicles. *See* Exh. 28; Exh. 29; *see also* Compl., Exhibit A. Further, one of Chrysler's fleet customers – GE Capital – grounded its vehicles because of the safety threats presented by the defective TPMS valve stems and nuts. Exh. 33, at MCPS037989.

NHTSA has also compelled other manufacturers to issue safety recalls for vehicles with similar problems, and Chrysler itself has recalled vehicles on safety grounds that posed less danger to drivers. For example, Chrysler recently recalled certain vehicles due to problems with their TPMS units, noting "[i]ncorrect tire pressure monitoring could cause the vehicle operator to drive the vehicle without knowing of a low tire pressure condition. Driving a vehicle with a low tire pressure condition could cause tire failure and/or a crash without warning." *See* Sullivan Dep., at 333:11-334:25. The safety defect related to the AL2000 valve stem, however, presents a more serious risk because "driving with a low tire pressure is probably not as quite as severe as a complete air-out. … [It's] a less severe condition than would be experienced when the stem of a TPMS sensor fails." *See id.*, at 334:1-13; *see generally* McLellan Rep., at 4-6; McLellan Dep., at 225:12-229:5.

The Court has already found that "Plaintiff has submitted evidence that the alleged defect was a matter of safety, quality, durability, and performance, and accordingly, there is a genuine question of material fact raised on whether Defendant's practice was materially deceptive." Mem.

Op., at p.15. Additional evidence adduced since the Court's order further fortifies Plaintiff's common proof that the defect compromised the safety of consumers and drivability of the vehicles. Plaintiff will present this evidence to the factfinder, who will resolve the issue of materiality on a class basis. *See id.* at p.12 ("Whether a reasonable consumer acting reasonably would be misled by Defendant's omission that the aluminum alloy used was failing due to stress corrosion cracking is a genuine question of material fact for a jury and not for the Court's resolution"); *see also Ackerman v. Coca-Cola Co.*, 2010 WL 2925955, at *17 (E.D.N.Y. July 2, 2010) ("whether a practice is deceptive, fraudulent, or unfair is generally a question of fact which requires consideration and weighing of evidence from both sides"); *Atik v. Welch Foods, Inc.*, 2016 WL 5678474, at *8 (E.D.N.Y. Sept. 30, 2016) (noting that "[u]sually [the reasonable consumer] determination is a question of fact." ).

### c.  Common Evidence Will Demonstrate That the Class Suffered Common Injuries.

In regard to injury, the court noted that Plaintiff has asserted two separate injuries: (1) paying more for the minivan than he would have had he known of the defect and (2) expending money to replace the defective valve stems. *See* Mem. Op., at p.16. For the premium price injury—incurred "when a plaintiff paid more for a good than he or she would have paid but for the deceptive practice of the defendant," *id.* at p.20—the Court found that it was enough that "Plaintiff submitted evidence that Defendant knew of the defect … prior to Plaintiff's purchase …." *Id.* at p.16. As to replacement cost, the Court found "that there is sufficient circumstantial evidence to render it reasonably probable that Defendant manufactured the valve stem and TPMS unit that had to be replaced." *Id.* at p.18.

Those class members who paid for replacement stems out of their own pockets—*i.e.*, those damages caused by Defendant's post-sale consumer fraud—should receive reimbursement.  As for

diminution of value damages, Plaintiff will rely on common expert evidence and evidence of Defendant's prior knowledge to show that each class member "paid more for a good than he or she would have paid but for the deceptive practice of the defendant." *Id*. at p.20. At the class certification stage, Plaintiff need only disclose a suitable methodology for measuring the price premium injury on a class-wide basis. *In re Scotts EZ Seed Litig*., 304 F.R.D., 410 n.7. Conjoint analysis has "previously been approved in consumer class actions as [a] reliable metholog[y] available for calculating the price premium attributable to a product characteristic." *Kurtz*, 2017 U.S. Dist. LEXIS 44576, at *164-65 (collecting authority). Here, Plaintiff has retained an expert in conjoint analysis, Mr. Gaskin, who has disclosed the survey method he will use to determine the diminution in value that class members experienced at the point of sale. *See supra* Section II.B.5. This methodology has survived a *Daubert* challenge in another auto defect case that was certified as a class action. *See Sanchez-Knutson v. Ford Motor Co*., 181 F. Supp. 3d 988, 994-96 (S.D. Fla. 2016) (court refused to limit Mr. Gaskin's testimony and found that a jury could use his results to determine class-wide damages).[11] Mr. Gaskin testified that his experience designing and completing the conjoint analysis after class certification in the *Sanchez-Knutson* case gives him even greater confidence that he could do the same here, particularly because the methodologies are "essentially the same" and the defects are of a similar kind. *See* Gaskin Dep., at 306:21-308:5 & 323:16-324:8.

Plaintiff will also rely on common evidence, and reasonable inferences, to show that the class has been damaged as measured by the "cost of replacement of the defective TPMS unit[s]." Mem. Op., at p.17.  Plaintiff's experts and Defendant's own internal Weibull forecast agree: the TPMS valve stems and nuts in Class Vehicles were destined to fail prematurely. *See generally* Lynch Rep.; Sullivan Rep.; Exh. 19. Plaintiff's expert and Defendant's employee also agree that

---

[11] Moreover, here, unlike in *Sanchez-Knutson*, Plaintiff has also retained an economist to rebut Defendant's objections about the propriety of conjoint analysis for measuring damages on a class-wide basis in a product defect suit.

the cost to replace four defective TPMS units is $375. *See* McClellan Rep., at 7; *see also* Defendant's Notice of Removal (D.E. No. 1).  The same evidentiary inferences that the Court applied with Mr. Tomassini's vehicle apply to the Class Vehicles: "[T]here is sufficient circumstantial evidence to render it reasonably probable that Defendant manufactured the valve stem and TPMS unit that had to be replaced." Mem. Op., at p.18;[12] *Tyson Foods, Inc.*, 136 S. Ct. at 1048-49 ("just and reasonable" inferences are permitted at the class certification stage).[13]

In sum, the court's reasoning in denying summary judgment with respect to Plaintiff Tomassini will apply with equal force across the Class, demonstrating that common issues predominate. Because Plaintiff can establish liability for Chrysler's violation of § 349 using common evidence, common issues predominate.

### ii.    The Class Action Mechanism is Superior to Other Available Methods for the Fair and Efficient Resolution of This Case.

Rule 23(b)(3) lists the factors used in assessing whether a class action is the superior method of adjudication: the interest of class members in individually controlling the litigation; the extent of any other litigation concerning the controversy; the desirability of concentrating the litigation in one forum; and the management difficulties likely to be encountered at trial. Here, each factor confirms that a class action is superior to hundreds, if not thousands, of individual actions.

Class members lack any significant interest in controlling this litigation. In view of the relatively modest damages in relation to the cost of litigation, pursuing a claim individually is unlikely to be economically feasible in most cases. Not surprisingly, Plaintiff knows of no other similar litigation that is single-plaintiff. Even if class members pursued their own claims, it would not be efficient to do so. *See*, *e.g.*, *Helmer v. Goodyear Tire & Rubber Co.*, No. 12-00685, 2014

---

[12] Under § 349, Plaintiff and the Class can also receive statutory damages, which are readily calculable. *See* Mem. Op., at p.17 n.3.
[13] While the "just and reasonable" inference standard is typically relied on in wage and hour cases, the Court stated similar inferences could be drawn with respect to other causes of action, depending on the circumstances.

U.S. Dist. LEXIS 37501, at *30 (D. Colo. Mar. 21, 2014) (class action superior in product defect case); *see also In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 U.S. Dist. LEXIS 180914, at *283 (finding class action superior because "it will spare all parties and the court itself the substantial costs and effort of repetitive litigation, while also ensuring the consistent adjudication of each plaintiffs' claim."). Hence, it makes sense to focus the litigation in one forum, allowing one judge and jury to decide the key issues once. As such, this case meets the superiority requirement.

## 2.   The Class Meets the Requirements of 23(b)(2).

Despite knowing that the TPMS stems and nuts were manufactured from defective materials, Chrysler continued to conceal this information and refused to inform consumers about the AL2000 valve stems and nut's susceptibility to corrosion and catastrophic failure. Plaintiff, therefore, seeks a declaratory judgment requiring Chrysler to warn all purchasers and potential purchasers of class vehicles about the TPMS valve stems and nuts. Compl. ¶28. "[W]here a plaintiff seeks both declaratory and monetary relief, the court may certify a damages-seeking class under Rule 23(b)(3), and an injunction-seeking class under Rule 23(b)(2)." *Seekamp*, 2012 U.S. Dist. LEXIS 33295, at *28-30 (internal citations and quotations omitted). Rule 23(b)(2) permits certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Certification of Rule 23(b)(2) classes was "intended for cases where broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury." *Seekamp*, 2012 U.S. Dist. LEXIS 33295, at *20 (quoting *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 162 (2d Cir. 2001)); *see also In re Amla Litig.*, 2017 U.S. Dist. LEXIS 175950, at *41.

Because Chrysler manufactured the defective TPMS from the same materials with treatments similarly susceptible to corrosion and uniformly refused to disclose the defect, and has refused to act on grounds that apply generally to the class, specifically by refusing to disclose the defect, this case satisfies the requirements of Rule 23(b)(2) and the Class should also be certified thereunder. *See supra* Factual Background, Section II.

### 3.   In the Alternative, the Class Meets the Requirements of 23(c)(4).

Rule 23(c)(4) provides that: "When appropriate, an action may be brought or maintained as a class action with respect to particular issues." The Second Circuit has held that "a court may employ Rule 23(c)(4)[] to certify a class on a particular issue even if the action as a whole does not satisfy Rule 23(b)(3)'s predominance requirement." *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006). District Courts within this judicial circuit have routinely held that this approach is viable. *See, e.g.*, *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 589 (S.D.N.Y. 2013), *aff'd*, 602 Fed. Appx. 3 (2nd Cir. N.Y. 2015) (granting Rule 23(c)(4) class certification for a liability only class). Thus, should this Court find that the proposed class does not meet the predominance requirement for damages purposes (Plaintiff believes it does[14]), it should certify a Rule 23(c)(4) class for liability purposes only.

Here, certification of the class for liability purposes will clearly advance the litigation in a meaningful way because the resolution of the common questions—including whether the AL2000 valve stems and nuts are defective and whether the Defendant was required to disclose the alleged defect at the time of sale—will only leave the remaining question of how much each individual is

---

[14] In this circuit, under Rule 23(b)(3), "[t]he possibility that damages may have to be determined on an individualized basis is not itself a bar to class certification." *De Carrasco v. Life Care Servs., Inc.*, No. 17-5617, 2017 U.S. Dist. LEXIS 206682, at *6 (S.D.N.Y. Dec. 15, 2017). Hence, even if the court were to find individualized damage assessments are needed, certification is still appropriate under either Rule 23(b)(3) or Rule 23(c)(4).

owed. Accordingly, in the alternative to a damages class, certification of a liability class is appropriate.

## IV. <u>CONCLUSION</u>

Based upon the foregoing, Plaintiff affirmatively satisfies the requirements of Rule 23(a) and Rules 23(b)(2), (b)(3), and in the alternative (c)(4). Class certification is therefore appropriate, and Plaintiff's motion for class certification should be granted.


Dated: January 25, 2018                    Respectfully submitted,


Elmer Robert Keach, III, Esq.
Law Offices of Elmer Robert Keach III, P.C.
1040 Riverfront Center
P. O. Box 70
Amsterdam, NY  12010
Tel: (518) 434-1718

Gary E. Mason, Esq.
Jennifer Goldstein, Esq. (*pro hac vice*)
Whitfield Bryson & Mason LLP
1625 Massachusetts Ave. NW, Ste. 605
Washington, DC 20036
Tel: (202) 429-2290

Daniel C. Calvert, Esq. (*pro hace vice*)
Parker Waichman LLP
27300 Riverview Center Boulevard
Suite 103
Bonita Springs, Florida 34134
Tel: (239) 390-1000

*/s/ Nicholas A. Migliaccio*
Nicholas A. Migliaccio, Esq.
Jason Rathod, Esq. (*pro hac vice*)
Migliaccio & Rathod LLP
412 H Street N.E., Ste. 302
Washington, DC 20002
Tel: (202) 470-3520

Gary S. Graifman, Esq.
Jay Brody, Esq.
Kantrowitz Goldhamer
& Graifman, P.C.
747 Chestnut Ridge Rd., Ste. 200
Chestnut Ridge, New York 10977
Tel: (845) 356-2570


***Attorneys for Plaintiff and the Putative Class***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 25th of January, 2018, a true and complete copy of the forego-ing Plaintiff's Motion for Class Certification was served via the Court's ECF system to the follow-ing:

Stephen A. D'Aunoy, Esq.
SDAunoy@thompsoncoburn.com
Kathy A. Wisniewski, Esq.
KWisniewski@thompsoncoburn.com
Alan Pope, Esq.
apope@psplawfirm.com

*Attorneys for Defendant*

By:        /s/ Jason S. Rathod

Jason S. Rathod

Counsel for Plaintiff