# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ROBERT TOMASSINI, on behalf of himself and others similarly situated, | : : : | |
| | : | Case No. 3:14-cv-01226-MAD-DEP |
| Plaintiff, | : : | |
| vs. | : : | Hon. Mae A. D'Agostino |
| | : | United States District Judge |
| CHRYSLER GROUP LLC (n/k/a FCA US LLC), | : : : | |
| Defendant. | : : | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE THE REPORTS AND TESTIMONY OF PLAINTIFF'S EXPERTS

Elmer Robert Keach, III, Esq.
Law Offices of Elmer Robert Keach III, P.C.
1040 Riverfront Center
P. O. Box 70
Amsterdam, NY 12010
Tel: (518) 434-1718

Gary E. Mason, Esq.
Jennifer Goldstein, Esq.
Whitfield Bryson & Mason LLP
1625 Massachusetts Ave. NW, Ste. 605
Washington, DC 20036
Tel: (202) 429-2290

Daniel C. Calvert, Esq. (*pro hac vice*)
Parker Waichman LLP
27300 Riverview Center Boulevard
Suite 103
Bonita Springs, Florida 34134
Tel: (239) 390-1000

Nicholas A. Migliaccio, Esq.
Jason Rathod, Esq. (*pro hac vice*)
Migliaccio & Rathod LLP
412 H Street N.E., Ste. 302
Washington, DC 20002
Tel: (202) 470-3520

Gary S. Graifman, Esq.
Jay Brody, Esq.
Kantrowitz Goldhamer
& Graifman, P.C.
747 Chestnut Ridge Rd., Ste. 200
Chestnut Ridge, New York 10977
Tel: (845) 356-2570

*Attorneys for Plaintiff and the Putative Class*

<u>TABLE OF CONTENTS</u>

I.    Introduction and Summary of Argument ................................................................2

II.   Standard of Review ...............................................................................................2

III.  Argument .............................................................................................................4

      A.    Defendant's Arguments About Plaintiff's Experts' Qualifications Are Unavailing .....4

            1.   *Mr. Sullivan is well-qualified as an expert* ..............................................4

            2.   *Mr. Pinsonneault is well-qualified as an expert* ........................................6

            3.   *Dr. Lynch is well-qualified as an expert* ................................................7

      B.    The Opinions of Plaintiff's Experts are Relevant, Reliable and Should Not Be
            Excluded ................................................................................................8

            1.   *Mr. Sullivan's opinions are relevant and reliable*......................................8

            2.   *Dr. Lynch's opinions are relevant and reliable* .......................................13

                 a. Dr. Lynch's testimony is based on reliable testing and analysis ...................13

                 b. Dr. Lynch reliably applied the testing and analysis to the case ...................17

                 c. Dr. Lynch's testimony is relevant ...............................................19

            3.   *The opinions of Dr. Lynch and Mr. McLellan on the safety concerns posed by the vehicle are*
                 *relevant and reliable* ...................................................................20-21

            4.   *The damage opinions of Mr. Gaskin and Mr. Pinsonneault are relevant and helpful* ...........24

            5.   *Mr. Gaskins opinions are reliable* ......................................................28

            6.   *Mr. Pinsonneault's opinions are reliable* ...............................................30

IV. Conclusion …………………………………………………………………………... 31

TABLE OF AUTHORITIES

*Argonaut Ins. Co. v. Samsung Heavy Ind. Co., Ltd.,* 929 F. Supp. 159, 172 (N.D.N.Y. 2013) …………...6

*Asad v. Cont'l Airlines, Inc.,* 314 F. Supp. 2d 726, 740 (N.D. Ohio 2004) ………………………...…17

*Bank of N.Y. Mellon Tr. Co v. Solstice ABS CBO II, Ltd.,* 910 F. Supp. 2d 629 (S.D.N.Y. 2012) ……..14

*Barrett v. Black & Decker (U.S.), Inc.,* 2008 U.S. Dist. LEXIS 108787 (S.D.N.Y. Aug. 5, 2008) ……..23

*Borawick v. Shay,* 68 F.3d 597, 610 (2d Cir. 1995) ……………………………………………………12

*Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir. 1996) …………………………………...20

*Brooks v. Outboard Marine Corp.,* 234 F.3d 89, 92 (2d Cir. 2000) …………………………………….16

*Bunt v. Altec Indus.,* F. Supp. 313, 318 (N.D.N.Y. 1997) …………………………………………...…23

*Campbell v. Metro. Prop. & Cas. Ins. Co.,* 239 F.3d 179, 186 (2d Cir. 2001) …………………………12

*Canino v. HRP, Inc.,* 105 F. Supp. 2d 21, 27 (N.D.N.Y. 2000) ………………………………...…......6

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.,* 769 F. Supp. 2d 269, 284 (S.D.N.Y. 2011 ) …14

*Colombo v. CMI Corp.,* 26 F. Supp. 2d 574, 576-77 (W.D.N.Y. 1998) ………………………………12

*Comcast Corp. v. Behrend,* 133 S. Ct. 1426, 1433 (2013) ……………………………………...…25

*Comcast Corp. v. Behrend,* 569 U.S. 27, 29 (2013) ……………………………………………………29

*Cruz v. Kumho Tire Co., Inc.,* 2015 WL 2193796 (N.D.N.Y. May 11, 2015) …………………………......6

*Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 596 (1993) ………………………………………27

*Daubert v. Merrell Dow Pharms.,* 509 U.S. 579, 589 (1993) …………………………………………2, 4

*Daubert v. Merrell Dow Pharms.,* 509 U.S. 579, 593-94 (1993) ………………………………….......3, 5

*Derienzo v. Trek Bicycle Corp.,* 376 F. Supp. 2d 537, 554 (S.D.N.Y. 2005) ……………………..........8

*Engler v. MTD Prods.,* 2015 U.S. Dist. LEXIS 25138 (N.D.N.Y. Mar. 2, 2015) …………………..…15

*Failure Analysis of Localized Corrosion in a Titanium Heat Exchanger,* APTECH Report, AES 94052194-3-1 (p. 11) and *Evaluation of Pitting Corrosion on $SO_2$ Scrubber Mist Eliminator Fin,* APTECH Report AES 92041670-2-1 (p. 11) …………………………………………………………………………5

*Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923) ……………………………………………………12

*Gen. Elec. Co. v. Joiner,* 522 U.S. 134, 146 (1997) …………………………………………...…18

*Great N. Ins. Co. v. Power Cooling, Inc.,* 2007 U.S. Dist. LEXIS 95912 (E.D.N.Y. Dec. 18, 2007) …...20

*Grodzitsky v. Am. Honda Motor Co., Inc.,* 2015 U.S. Dist. LEXIS 64683 (C.D. Cal. Apr. 22, 2015) ….19

*Guido v. L'Oreal, USA, Inc.,* 2014 WL 6603730 (C.D. Cal. July 24, 2014) …………………………....7

*Gussack Realty Co. v. Xerox Corp.,* 224 F.3d 85, 94 (2d Cir. 2000) ……………………………...........17

*Harrison v. Ford Motor Co,* 2013 U.S. Dist. LEXIS 85137 (N.D.N.Y. June 18, 2013) ………………...2

*Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147 (1999) ……………………………………….....2, 4

*Helmer v. Goodyear Tire & Rubber Co.,* 2014 U.S. Dist. LEXIS 37501 (D. Colo. Mar. 21, 2014) …….12

*In re Fosamax Prods. Liab. Litig.,* 645 F. Supp. 2d 164 (S.D.N.Y. 2009) ………………………….....3

*In re Scotts EZ Seed Litig.,* 304 F.R.D. 397 (S.D.N.Y. 2015) …………………………………25, 29

*In re Silicone Gel Breast Implants Products Liab. Litig.,* 318 F. Supp. 2d 879 (C.D. Cal. 2004) …………...7

*In re Visa Check/Mastercard Antitrust Litig.,* 192 F.R.D. 68 (E.D.N.Y. 2000) …………………….....3

*In re U.S. FoodService v. Pricing Litig.,* 729 F.3d 108 (2d Cir. 2013) …………………………………29

*In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.,* 45 F. Supp. 3d 724 (N.D. Ohio 2014) ……………………………………………………………………………………………7, 27

*In re Zurn Pex Plumbing Products Lia. Litig.,* 644 F.3d 604 (8th Cir. 2011) ……………………………..4

*Inland Fastener, Inc. v. S. Holland Metal Finishing Co.,* 2015 IL App (2d) 140947-U, ¶ 30 …………….16

*Jackson v. Jilco Trailer Leasing Co.,* 2016 N.J. Super. Unpub. LEXIS 1516 (Super. Ct. App. Div. June 29, 2016) ……………………………………………………………………………………………...21

*Jarvis v. Ford Motor Co.,* 1999 WL 461813 (S.D.N.Y. July 6, 1999) …………………………………11

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.,* 2006 WL 2128785 (S.D.N.Y. July 28, 2006) ……………………………………………………………………………………………………..7

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.,* 2006 WL 2128785 (S.D.N.Y. July 28, 2006) ……………………………………………………………………………………………………....27

*Kass v. W. Bend Co.,* 2004 WL 2475606 (E.D.N.Y. 2004) …………………………………………...…6

*Keegan v. Am. Honda Motor Co., Inc.,* 284 F.R.D. 504, 515 (C.D. Ca. 2012) …………………………..3

*Khoday v. Symantec Corp.,* 93 F. Supp. 3d 1067, 1082-83 (D. Minn. Apr. 15 2015 ……………….....26

*Kurtz v. Kimberly-Clark Corp.,* 321 F.R.D. 482, 549 (E.D.N.Y. 2017) …………………………………30

*Kurtz v. Kimberly-Clark Corp.,* 321 F.R.D. 482, 551 (E.D.N.Y. 2017) …………………………………25

*Lappe v. Am. Honda Motor Co., Inc.,* 857 F.Supp. 222, 227 (N.D.N.Y. 1994) ………………..…….....6

*Lappe v. Honda Motor Corp. Ltd. Of Japan,* 101 F.3d 682 (2d Cir. 1996) ……………………………....6

*Liriano v. Hobart Corp.,* 949 F. Supp. 171, 178 (S.D.N.Y. 1996) …………………………….........23

*McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1043 (2d Cir. 1995) ……………………….....6, 12, 27

*McLaughlin v. Am. Tobacco Co.,* 522 F.3d 215, 225 (2d Cir. 2008) ………………………………..30

*Millman v. Mitsubishi Caterpillar Forklift Am., Inc.,* 594 F. Supp. 2d 230, 237 (N.D.N.Y. 2009) ……......6

*Northbrook NY, LLC v. Lewis & Clinch, Inc.,* 2012 U.S. Dist. LEXIS 134699 (N.D.N.Y. Sep. 20, 2012) ………………………………………………………………………………………………...3, 8

*Pitre v. Yamaha Motor Co.,* 2014 U.S. Dist. LEXIS 190844 (C.D. Cal. Sep. 14, 2014) ………………21

*Rock v. Arkansas,* 483 U.S. 44, 61, 107 S.Ct. 2704, 2714, 97 L.Ed.2d 37 (1987) ……………………12

*Royal Park Investments SA/NV v. Deutsche Bank Natl. Tr. Co.,* 2018 WL 1750595 (S.D.N.Y. Apr. 11, 2018) ……………………………………………………………………………………………3

*Sanchez-Knutson v. Ford Motor Co.,* 310 F.R.D. 529, 539 (S.D. Fla. 2015) ……………………………..7

*Santoro ex rel. Santoro v. Donnelly,* 340 F. Supp. 2d 464, 473 (S.D.N.Y. 2004) …………………………18

*Significance of Surface Rubbing on Stress Corrosion Cracking Susceptibility for Lw Pressure Rotors an San Onofre Nuclear Generating Station,* APTECH Report AES 01084468-1-1 (p. 7)………......……………………5

*Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 82 (2d Cir. 1997) ……………………………………………...6

*TC Sys. Inc. v. Town of Colonie,* 213 F. Supp. 2d 171, 175 (N.D.N.Y. 2002) ……………………7, 31

*Valente v. Textron, Inc.,* 931 F. Supp. 2d 409, 432 (E.D.N.Y. 2013) ………………………………...…16

*Visteon Glob. Techs., Inc. v. Garmin Intl., Inc.,* 2016 WL 5956325 (E.D. Mich. Oct. 14, 2016) ………..26

*Waggoner v. Barclays PLC,* 875 F.3d 79, 106 (2d Cir. 2017) ……………………………………………25

*Warner Chilcott Labs. Ir., Ltd. v. Impax Labs., Inc.,* 2012 U.S. Dist. LEXIS 60386 (D.N.J. Apr. 30, 2012) …………………………………………………………………………………………………16

*Zakaria v. Gerber Prods. Co.,* 2016 U.S. Dist. LEXIS 184861 (C.D. Cal. Mar. 23, 2016) ……………29

Plaintiff Robert Tomassini ("Plaintiff") submits this opposition to Defendant FCA US LLC's ("Chrysler" or "Defendant") Motion to Exclude the Reports and Testimony of Plaintiff's Experts (Doc. # 218) ("Def. Br.). For all of the reasons discussed herein, Defendant's motion should be denied.

## I.      INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff's experts' testimony is offered in support of class certification to demonstrate common issues for Plaintiff's and the putative classes' GBL § 349 claims.[1] In the merits context, their testimony will help the jury determine Chrysler's liability for those claims. Plaintiffs' experts do not need to prove a design defect, nor do they need to offer alternative designs or industry comparisons, calculate the number of vehicles Chrysler repaired, or opine on how long the valve stems and nuts should last. Plaintiff's experts' opinion is that the valve stems and nuts have common materials and suffer from a common defect. His damages' experts will show that class members would have paid less for their vehicles had Chrysler disclosed the defect at the point of sale, and will also calculate the diminution in value pursuant to a common formula for class members. At this stage, Plaintiff's experts' opinions are submitted solely to demonstrate that class certification is warranted. Chrysler's motion should be denied.

## II.     STANDARD OF REVIEW

"[T]he rejection of expert testimony is the exception rather than the rule." *Harrison v. Ford Motor Co.*, Case No. 11-0840, 2013 U.S. Dist. LEXIS 85137, at *23 (N.D.N.Y. June 18, 2013); *see also* Fed. R. Evid. 702, Advisory Committee's Note. Courts permit expert testimony so long as it is "reliable" and "relevant[.]" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993)). Testimony is reliable if it is "based on sufficient facts or data; …the product of reliable principles and methods; and the expert has reliably applied the principles and methods to the

---

[1] Due to page limitations, Plaintiff will not restate and summarize his experts' opinions here. Rather, Plaintiff incorporates by reference the summary of his experts' opinions and testimony as set forth in Plaintiff's Motion for Class Certification (Doc. # 195), and Plaintiff's Reply in Further Support of his Motion for Class Certification (Doc. # 215).

facts of the case." *Id.* The principles and methods that produce the facts or data supporting the expert's opinion are reliable if, for example, they have been tested, peer reviewed, found to have low error rates, and have achieved general acceptance by the scientific community. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 593-94 (1993). To determine whether the expert's testimony reliably applies the principle and methods to the facts of a particular case, courts in this Circuit weigh: (1) whether the expert has developed their opinions expressly for the purpose of testifying or for research independent of the litigation; (2) whether the expert has "unjustly extrapolated from an accepted premise to an unfounded conclusion[;]" and (3) whether the expert has accounted for "obvious alternative explanations" for the problem at issue. *Northbrook NY, LLC v. Lewis & Clinch, Inc.*, Case No. 09-0792, 2012 U.S. Dist. LEXIS 134699, at *11-12 (N.D.N.Y. Sep. 20, 2012).  Experts provide relevant testimony if "[t]he expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." USCS Fed Rules Evid. R 702; *see also In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009).

As recognized earlier this month by a Court in this Circuit, the *Daubert* inquiry is limited at the class certification stage as "courts in this Circuit have applied its standard but found that the *"scope of the Daubert analysis is cabined by its purposes at this stage: the inquiry is limited to whether or not the expert reports are admissible to establish the requirement of Rule 23.*" *Royal Park Investments SA/NV v Deutsche Bank Natl. Tr. Co.*, 14-cv-4394 (AJN), 2018 WL 1750595, at *7 (S.D.N.Y. Apr. 11, 2018) (internal citations removed and some emphasis added); *see also In re Visa Check/Mastercard Antitrust Litig.*, 192 F.R.D. 68, 77-78 (E.D.N.Y. 2000), *aff'd* 280 F.3d 124 (2d Cir. 2001) (finding plaintiff's testimony admissible at class certification because "[t]he admissibility inquiry under *Daubert* and *Kumho Tire* must be adapted to the facts … and to the stage of the proceedings."); *Keegan v. Am. Honda Motor Co., Inc.*, 284 F.R.D. 504, 515 (C.D. Ca. 2012) (stating, in class action involving a vehicle defect, the Court, that "[o]n a motion or class certification, it is not necessary for the expert witness to resolve factual disputes going to the merits of plaintiff's claim or

claims; instead the testimony must be relevant to determining 'whether there was a common pattern and practice that could affect the class as a whole.'"); *In re Zurn Pex Plumbing Products Lia. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011) ("The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony. That interest is not implicated at the class certification stage ....").

### III.   ARGUMENT

#### A.   Defendant's Arguments About Plaintiff's Experts' Qualifications Are Unavailing

##### 1.   Mr. Sullivan is well-qualified as an expert

Defendant attacks Mr. Sullivan's qualifications by inaccurately referring to him as an "expert for hire in cases," clearly a false statement, which Defendant shamelessly repeats twice (Def. Br. at pp. 1, 12). In fact, as set forth in his curriculum vitae ("Sullivan CV," appended as Appendix A to his original expert report ("Sullivan Rep."), Ex. 1). Mr. Sullivan has over 35 years of metallurgical engineering experience in the fields of materials and metallurgy and primarily analysis of failure modes. He holds a Bachelor of Science in Metallurgical Engineering from California Polytechnic State University (1979) and is a Professional Metallurgical Engineer in the State of California (MT1771). He has extensive training on electron microscopy, which is used in the evaluation of fracture surfaces. In his 35 years of professional experience, Mr. Sullivan has investigated hundreds of failures in components, valves, machinery, engines, pressure vessels, nuclear and fossil power plants, chemical plant and refineries (Sullivan Rep. at p. 6). He testified that approximately 70 percent of his consulting time is spent on non-litigation engineering consulting, product design, materials selection and failure analysis. *See* Deposition of Eric V. Sullivan, P.E. ("Sullivan Dep.")(July 18, 2017), at pp. 72-73, Ex. 2. He has had "hundreds and hundreds of cases that [he has] worked on and . . . done failure analysis for." Sullivan Dep. at p. 98).[2] A review of his extensive "Selected Reports, Publications and Invited Lectures" (pp. 3 through 13 of Sullivan CV) lists a

---

[2]   Based on the context of questioning, it is clear that use of the term "cases" by Sullivan at his deposition, referred to *events of failure investigated* and not litigation, as it was within the discussion of his "Selected Reports, Publications and Invited Lectures."

number of reports and/or publications on failure analysis of metallic components due to cracking, fracturing or corrosion.[3] Earlier in his career as a metallurgical engineer for Bechtel Corp., he was responsible for procedures for vendors with regard to fabrication, testing and nondestructive examination of parts for use in nuclear power plants. *See* Sullivan Dep. pp. 98-99). This also included corrosion analysis. *Id.*. He has been qualified to testify in federal court previously. *See* p. B2 of Sullivan CV; Sullivan Dep. at pp. 106-107). Defendant's counsel's other basis to attack his qualifications is the claim that he previously had not "worked with any TPMS components or valve stems." *See* Def. Br. at 12. Both of Defendant's groundless challenges must be rejected.

The issues in this case revolve around the use of an improper metal alloy which is uniformly susceptible to stress corrosion cracking. Mr. Sullivan's metallurgical background and his ability to utilize various modes of analysis concerning the cause of metallic failures due to corrosion and in particular stress corrosion cracking are clear and demonstrate he is eminently qualified to render his opinion in this case. As this Court has stated:

> The Tire Defendants' argument that Mr. Derian is not qualified because he does not have experience specifically pertaining to medium truck tires is unavailing. "[A]ssuming that the proffered expert has the requisite minimal education and experience in a relevant field, courts have not barred an expert from testifying merely because he or she lacks a degree or training narrowly matching the point of dispute in the lawsuit." *Canino v. HRP, Inc.,* 105 F.Supp.2d 21, 27 (N.D.N.Y.2000) (citations omitted). "[W]here ... well-trained people with somewhat more general qualifications are available, it is error to exclude them." *Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 82 (2d Cir.1997).

*Cruz v Kumho Tire Co.,* 8:10-CV-219 MAD, 2015 WL 2193796, at *6 (N.D.N.Y. 2015).

Mr. Sullivan's opinions herein "'stay within the reasonable confines of his subject area.'" *Id.* (quoting from *Lappe v. Am. Honda Motor Co., Inc.,* 857 F.Supp. 222, 227 (N.D.N.Y.1994), *aff'd sub nom.*

---

[3] As to the latter, see pp. 7 & 11 of Sullivan CV, citing to professional studies: *Significance of Surface Rubbing on Stress Corrosion Cracking Susceptibility for Low Pressure Rotors an San Onofre Nuclear Generating Station,* APTECH Report AES 01084468-1-1 (p. 7); *Failure Analysis of Localized Corrosion in a Titanium Heat Exchanger,* APTECH Report, AES 94052194-3-1 (p. 11) and *Evaluation of Pitting Corrosion on $SO_2$ Scrubber Mist Eliminator Fin,* APTECH Report AES 92041670-2-1 (p. 11).

*Lappe v. Honda Motor Corp. Ltd. of Japan*, 101 F.3d 682 (2d Cir. 1996) (internal citation omitted).

Defendant's argument amounts to nothing more than the type of "'quibble' over an expert's experience, academic training, and other alleged shortcomings" that the Second Circuit has held "go to the weight and credibility of an expert's testimony instead of the admissibility of his opinions." *Millman v. Mitsubishi Caterpillar Forklift Am., Inc.*, 594 F. Supp.2d 230, 237 (N.D.N.Y. 2009) (quoting *McCulloch v. H.B. Fuller Co*, 61 F.3d 1038, 1043 (2d Cir. 1995). In assessing expert qualifications, "[l]iberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications." *Argonaut Ins. Co. v. Samsung Heavy Ind. Co., Ltd.*, 929 F.Supp. 159, 172 (N.D.N.Y. 2013) (internal citation omitted); *see also, Lappe*, 857 F.Supp. at 227 (expert qualified to testify on auto design even though he did not design automobiles); *Kass v. W. Bend Co.*, 2004 WL 2475606, at *4–5 (E.D.N.Y.2004) (expert's lack of familiarity with UL coffee maker standards, and design went to the weight of his testimony, not admissibility).

### 2. Mr. Pinsonneault is well-qualified as an expert

As an expert in economics and econometric statistics, Pinsonneault is well qualified to rebut Defendant's economist Dr. Robert McCormick's and Dr. Christine Wood's criticisms of Gaskin's conjoint analysis and to assess whether damages can be measured on a class-wide basis. *See generally* Expert Report of Gregory A. Pinsonneault (May 23, 2016) ("Pinsonneault Rep."), Ex. 3. First, "conjoint analysis is a subdiscipline of economics," and therefore firmly in Pinsonneault's expertise. *In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*, 45 F. Supp. 3d 724, 756 (N.D. Ohio 2014) (holding that expert's qualifications as an economist and econometrician qualified him to testify regarding a conjoint analysis). While asserting that Pinsonneault's expertise in conjoint analysis is lacking, Defendant cites

6

nothing supporting this proposition, and, even if it were true, expertise in "very specialized area" of conjoint analysis is "of little consequence to questions of admissibility." *Id.* (internal citation omitted).[4]

Second, the methods on which Pinsonneault relies are well-established, including in auto cases, and Chrysler cites no opinions by Pinsonneault that require special expertise in the auto market. *See, e.g., Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 539 (S.D. Fla. 2015). Indeed, Chrysler defines the relevant field of expertise far too narrowly. *Guido v. L'Oreal, USA, Inc.*, 2:11-CV-01067-CAS, 2014 WL 6603730, at *10 (C.D. Cal. July 24, 2014). It is "not important" that Pinsonneault does not have specific training in the automotive industry "because his opinions involve financial rather than industry specific analysis." *See Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 04CIV.7369, 2006 WL 2128785, at *6 (S.D.N.Y. July 28, 2006); *see also TC Sys. Inc. v. Town of Colonie*, 213 F. Supp. 2d 171, 175 (N.D.N.Y. 2002) (finding expert qualified despite no experience in telecommunications because his opinions involved economic principles for which he was qualified). At most, a "lack of specialization affects the weight of the expert's testimony, not its admissibility." *In re Silicone Gel Breast Implants Products Liab. Litig.*, 318 F. Supp. 2d 879, 889 (C.D. Cal. 2004).[5] Ultimately, there is no merit to Defendant's apparent position is that Pinsonneault must be to be an expert in the specific areas of conjoint analysis and the auto market, especially when the experts whose opinions Pinsonnealt critiques have no such expertise.[6]

### 3. Dr. Lynch is well-qualified as an expert

---

[4] Whatever point Defendant is trying to make in reference to Pinsonneault's knowledge of conjoint analysis and "rational economic actors" is belied by the full context of the cited testimony, preceded not a by direct inquiry into Pinsonneault's knowledge of conjoint analysis but rather a lengthy and confusing hypothetical which quite clearly conflated various concepts and therefore led to some understandable confusion.

[5] It is also of no consequence that some of Pinsonneault's conclusions require relying on Gaskin to perform a reliable conjoint analysis since "generally, extrapolation [from another's data and analysis] is an acceptable method." *Northbrook NY, LLC v. Lewis & Clinch, Inc.*, No. 7:09-CV-0792 (GTS/TWD), 2012 U.S. Dist. LEXIS 134699, at *17 (N.D.N.Y. Sep. 20, 2012); *see also   Bank of N.Y. Mellon Tr. Co.*, 910 F. Supp. 2d at 644-45 (collecting authority).

[6] Moreover, a higher level of expertise is required of defense experts Drs. Wood and McCormick, who purport to critique the substance of the conjoint analysis, whereas Pinsonneault's opinion is limited to the method's principles, acceptance and use by economists, and translation into a damages model.

Chrysler contends that Dr. Lynch is not qualified to develop an opinion about the TPMS failure because he has never worked with a TPMS, specifically, before. Def. Br. at 12. Chrysler's position runs counter to the law in this Circuit. In comparable cases, individuals with Dr. Lynch's metallurgical and engineering background have assisted the jury in evaluating materials selection defects. *See, e.g., Derienzo v. Trek Bicycle Corp.*, 376 F. Supp. 2d 537, 554 (S.D.N.Y. 2005)  (finding expert in metallurgy and materials science qualified to opine on "a fatigue crack" caused by "excess weld metal" in a bicycle). The nature of Dr. Lynch's expertise does not require that he be familiar with any one part. Rather, he is a metallurgist opining about the propriety of manufacturing a particular part out of a particular aluminum alloy.

Dr. Lynch's is well-qualified to render his opinions. He holds PhD & MS degrees in Metallurgy and Materials Science, and a BS in Metallurgical Engineering, all from Lehigh University. Expert Report of Dr. Richard F. Lynch ("Lynch Rep.")(Feb. 15, 2016), Ex. 4. He is knowledgeable in product manufacture, materials processing and fabrication, surface treatments, material testing and forensic failure analysis. *Id.* He has conducted hundreds of forensic failure analyses on a wide range of materials, including metals, non-metallic materials, and coatings for corrosion protection. *Id.* His 45 years of professional experience include research and marketing positions with an automotive component producer, market development in corrosion resistance materials, and corrosion testing evaluation for metals and coatings. *Id.* Accordingly, he is well-qualified to render his opinions.

**B.  The Opinions of Plaintiff's Experts are Relevant, Reliable and Should Not Be Excluded**

**1.  Mr. Sullivan's opinions are relevant and reliable**

Mr. Sullivan's opinion herein is offered in support of *class certification*, an essential fact, as the procedural posture of the case affects the *Daubert* analysis.  Mr. Sullivan has demonstrated extensive support for his opinions, in both his reports and in his deposition testimony, all of which Defendant ignores.  His report (Sullivan Rep. at pp. 7-8) clearly supports his opinion that the TPMS units of the class vehicles herein used a 2000 series aluminum alloy ("Series 2000"), that the TPMS units are defective

8

because that alloy is highly susceptible to Stress Corrosion Cracking if exposed to the two other necessary elements and that those two other elements – stress and environmental factors such as sodium chlorides used on roads. Because those are virtually omnipresent, the TPMS units on the class vehicles are highly susceptible to Stress Corrosion Cracking ("SCC").[7]  He further opined that the only reasonable method to prevent SCC of the TPMS valve stems would be to change the type of material to a more resistant alloy and that "it is apparent that Chrysler Corporation also recognized that a change in material type was needed to prevent SCC of the TPMS valve stems."  Sullivan Rep. at 8.  Mr. Sullivan combined his expertise and a number of methods to verify his findings.  He used a laboratory analysis consisting of examination of samples using a Scanning Electron Microscope (SEM) to determine that the fractures present in the broken valve stem were SCC failures.  Second, he visually observed corrosion and deposits on the external surface of the failed valve stem.  Third, he did a metallurgical examination to confirm that the stem was made with aluminum and copper in sufficient amount to confirm that the stems were made of Series 2000 aluminum alloy.

He further confirmed this by reviewing documents provided in discovery by Chrysler demonstrating that stems on the TPMS units of class vehicles during that period of time were Series 2000.  Using his expertise as a metallurgical engineer, he opined that the Series 2000 alloy is susceptible to SCC when exposed to chloride environments because of the amount of copper present in the alloy. Significantly, he confirmed support for his opinion in Chrysler's own documents which also corroborated that the stems in the class vehicles were made of Series 2000 and that Chrysler's own examinations of failed stems concluded that the stems analyzed suffered from SCC, pinpointing the cause as use of the Series 2000 alloy.  He examined internal emails from Chrysler's own engineers containing admissions that "…millions of vehicles built since 2002 M/Y (each with 4 or 5 TPS)…" are

_____

[7] The stress, more specifically tensile stress, is inherently present in all TPMS units.  The ubiquitous presence of salts on the roads during the winter months in New York State is commonly known.

susceptible to the same type of failure. Sullivan Rep. at 11.  He further reviewed Chrysler's own internal analysis of failure rates which demonstrated that 25% of the units would fail due to SCC and that over the course of time 100% would fail due to SCC.  *See* Doc. # 195 at p. 7. He further confirmed reports from tire shops confirming failures due to broken stems consistent with SCC (*e.g.*, rather than mechanical failure or impact failure).  In addition, he confirmed reports from Transport Canada which investigated failed TPMS units.

Sullivan noted in his rebuttal report that industry-accepted literature establishes that the Series 2000 alloys are susceptible to SCC, citing the ASM Handbook on Properties and Selection of Nonferrous Alloys…" which gives a "D Rating" for susceptibility to SCC to the 2011 aluminum alloy in the T4 condition. *See* Rebuttal Report of Eric V. Sullivan (May 23, 2016), at p. 11, Sec. 3.2.4, Ex. 5. According to the ASM Handbook, only materials with an A or B rating are recommended for use where chlorides are typically present. *Id.*  This lent further support to his opinion that the Series 2000 was susceptible SCC due to the presence of copper regardless of a T4 or T6 heat treatment (as to the heat treatments, he noted "one is bad and one is worse") (Sullivan Dep. at pp. 143-145, 266).

At his deposition (Sullivan Dep. at pp. 122-23), Sullivan confirmed that he relied upon Chrysler's own Lab Reports, such as Lab Report No.'s 135639 and 137860 (App. C & D to Sullivan Rep.), which confirmed that Chrysler also came to the conclusion that failures of TPMS stems analyzed were caused by SCC due to the use of the Series 2000 alloy, which Chrysler also acknowledged has a susceptibility to corrode (Sullivan Dep. at pp. 120-123; 165-66; 186-189).  He confirmed that as support, he also used Chrysler's own assessment that the useful life of the TPMS unit should be 10 years (Sullivan Dep. at p. 126).  His SEM analysis confirmed the existence of SCC and the SEM analysis and chemical analysis demonstrated the presence of chlorides in the residue, lending further support to his opinion of the presence of road salts as the causative agent (Sullivan Dep. at pp. 166-168).  He reviewed emails and documents from Chrysler which also (i) confirmed that the TPMS units were failing due to use of Series

10

2000; (ii) determined that the appropriate remedy was to transition to the Series 6000 alloy (Sullivan Dep. at pp. 172-174; 198-199); and (iii) admitted that the warranty claims were running high for valve stem fractures, indicating that approximately 25% would fail at 60 months (Sullivan Dep. at pp. 328-329), confirming widespread failures (Sullivan Dep. at pp. 320, 326; 328-337).

In *Jarvis v. Ford Motor Co.,* 92 cv-2900 (NRB), 1999 WL 461813 (S.D.N.Y. July 6, 1999), the court found the opinion reliable where plaintiff's expert relied on Ford's own internal documents which "indicate[d] that, at the very least, Ford believed that a cruise control problem could cause a sudden acceleration event and thus lend support to Sero's finding." *Id.* at *7. Here Sullivan and Plaintiff's other experts relied on much more: In addition to review of Chrysler's numerous internal documents analyzing the TPMS stem failures and determining it was SCC corrosion that caused the failures and discussing why the failure rate was so high and what the remedy was, Sullivan physically examined failed stems, analyzed them with a SEM, did a chemical analysis[8], and referred to the hundreds of documented failures, and consulted industry standards noting Series 2000 alloy's inappropriateness for circumstances where chlorides were present. Notably, in *Keegan,* as here, an experienced expert relied, in pertinent part, upon the defendant car company's internal documents analyzing the issue of premature wear. The *Keegan* Court found the expert's testimony, which relied upon Honda's own documents, admissible and held that defendant's challenges "go to the weight, not the admissibility." *Id.* at 520.

As this Court has previously noted, objections similar to those raised by Defendant here "are precisely the kind of matters that should be left for the jury to consider in assessing the weight to be

---

[8] Defendant faults Sullivan for not analyzing a larger sample size, but this argument, too, goes to the weight, not the admissibility of his analysis. Notably, other courts have accorded this criticism little weight when, as here, other substantial evidence supports the expert's findings. *See, e.g., Helmer v. Goodyear Tire & Rubber Co.,* Civil Action No. 12-cv-00685, 2014 U.S. Dist. LEXIS 37501, at *5 (D. Colo. Mar. 21, 2014) (granting class certification and relying on plaintiff's materials engineer expert over defendant's objection that "his analysis was limited to one section of hose which was destroyed after testing ….").

given to [the expert's] testimony." *Cruz v. Kumho Tire Co., Inc., supra* at *10. (internal citations omitted).[9]

Likewise, "disputes regarding the nature and strength of an expert's credentials, an expert's use or

application of his or her methodology, or the existence or number of supporting authorities for an

expert's opinion go to the weight, not the admissibility of the expert's testimony." *Cruz, supra* at

*5 (citing *McCulloch v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir.1995)); *see also, Argonaut Ins. Co., supra,* at

169–70. As noted in *Lappe v Am. Honda Motor Co., Inc., supra* at 228, while weaknesses in the methodology

and investigation of an expert might lead the trier of fact to discount his opinions:

> "[T]his court will do no more than prescribe 'vigorous cross-examination, presentation
> of contrary evidence, and careful instruction on the burden of proof [which] are the
> traditional and appropriate means of attacking shaky but admissible
> evidence.'" *Daubert,* 509 U.S. at ——, 113 S.Ct. at 2798 (quoting *Rock v. Arkansas,* 483
> U.S. 44, 61, 107 S.Ct. 2704, 2714, 97 L.Ed.2d 37 (1987)).

Thus, Defendant's assertion that Sullivan's opinion lacks reliability because he did no testing (Def. Br. p.

15), is not only untrue but, as the case law makes clear, not required.  Similarly, the claim that he ignored

the testing of others (Def. Br. 16) is equally untrue as he supported his opinions with Chrysler's internal

emails, documents, including statements of high failure rates, and Lab Reports.[10]  Defendant further

claim Sullivan's opinion is unreliable because he did not investigate the failure rates. (Def. Br. at p. 17).

---

[9] Moreover, the Second Circuit has held that "by loosening the strictures on scientific evidence set
by *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), *Daubert* reinforces the idea that there should be a
presumption of admissibility of evidence." *Borawick v. Shay,* 68 F.3d 597, 610 (2d Cir.1995). As such,
"gaps or inconsistencies" in an expert's reasoning, or arguments that an expert's conclusions are wrong,
"go to the weight of the evidence, not to its admissibility." *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239
F.3d 179, 186 (2d Cir.2001).

[10] Ironically, it was Defendant's expert who was so far out of the bounds of any reasonable opinion, that
he was forced to both contradict and reject both of Continental's witnesses.  *See* Deposition of David J.
Duquette ("Duquette Dep.") (July 25, 2017), Ex. 6 98-99 & 99-101) and its findings. Duq. Dep.  at pp. 70-71
(testifying that he disagreed with Continental's statement that the corrosion resistance of Series 2000 is
inferior to the 6000 Series, and linked to the higher presence of copper in the 2000 Series (Duquette
Dep. pp. 70-71); *see also* pp. 50-53 (claiming there were no incidents of broken stems merely because he
didn't ask Chrysler for them, they were never provided to him and therefore he never saw them); *see* p. 31
(admitting he never attempted to examine TPMS stems in the case to determine how the copper was
distributed "because there was no good reason to").

In fact, he testified (Sullivan Dep. at pp. 320, 326; 328-337) that he reviewed Chrysler's failure rates and internal emails referring to them as high, which was confirmed by his own investigation of reports of failures.[11]  Finally, Defendant seeks to take issue with Sullivan's opinion that the Stem failure problem is widespread (Def. Br. p. 18).  However, again, Chrysler's own documentation as to failure rates, taken together with the numerous complaints on NHTSA's website and on the internet, and the fact that the presence of stress and environmental chlorides make it a certainty that the Series 2000's high susceptibility would lead to multiple failures, supports his opinion.

In sum, Defendant's attack on Sullivan's opinion are clearly groundless, given his credentials, experience, analysis and review, and giving full import to the context in which it is offered (*e.g.*, the class certification motion). They are mere attempts to challenge the weight of Mr. Sullivan's opinions.  The motion to strike his testimony should be denied.

### 2.  Dr. Lynch's opinions are relevant and reliable

Dr. Lynch's testimony is offered to demonstrate that there are common issues with regard to Plaintiff's GBL §349 claim. Dr. Lynch does not need to prove the existence of a defect. He does not need to calculate the number of vehicles Chrysler repaired or opine on how long the TPMS components should last. At this stage of the litigation, Dr. Lynch's Report is submitted to demonstrate that class certification is warranted – that reliable evidence common to the class support his conclusions that: (1) the aluminum alloy in the TPMS valve stems and nuts in Class Vehicles is susceptible to SCC and that those parts are therefore defective, and (2) Chrysler knew or should have known about the defect. Dr. Lynch's testimony should be permitted in support of class certification because it is reliable and relevant.

### a.  Dr. Lynch's testimony is based on reliable testing and analysis

---

[11] Again, it is ironic Defendant has the temerity to raise this point when their own expert never did an analysis of the failure rate (Duq. Dep. pp. 117-18); refused to acknowledge its import (Duq. Dep. pp. 120-22) and refused to agree with Chrysler's own engineers, who noted the rate was "high." (pp. 127-28).

Dr. Lynch's testimony is reliable because it is based on sufficient facts and data established using reliable principles and methods of evaluation. In the context of engineering testimony, experts "may rest on scientific foundations or on the personal knowledge or experience of the engineer," and "14xtrapolate[ions] from existing data." *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 284 (S.D.N.Y. 2011). So long as the expert testimony is based upon "good grounds… it should be tested by the adversary process-competing expert testimony and active cross-examination-rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d, at 173. Even where the expert relies on testing "conducted by independent consultants[,]" rather than the expert himself, the facts and data can provide sufficient evidence for the expert's individual analysis. *Cedar Petrochemicals, Inc.*, 769 F. Supp. 2d at 285. The fact that Dr. Lynch relied in part on Mr. Sullivan's test results does not render his opinions inadmissible. *See Bank of N.Y. Mellon Tr. Co. v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629 (S.D.N.Y. 2012) ("An expert is permitted to rely on assistance from others who work with him.").[12]

Dr. Lynch reviewed photographs of TPMS samples under a scanning electron microscope (SEM) and chemical analysis of the TPMS samples performed by Plaintiff's expert, Eric Sullivan, as well as studies and documents produced by Chrysler to reach his conclusions. Lynch Rep.  These documents include: Chrysler's engineering lab reports concerning the TPMS corrosion failures; change notice worksheets that altered the manufacturing instructions for the TPMS; owner's manual, system, and production requirements for the TPMS; production, development, validation, and design verification plans and reports involving the TPMS; investigations into the safety concern posed by TPMS corrosion by Transport Canada; consumer complaints submitted to the Chrysler; and studies of the TPMS failures

---

[12] Unlike the expert in *In re TMI Litig.*, 193 F.3d 613, 714 (3d Cir. 1999), Dr. Lynch has independently evaluated "relative strength or weakness of each of the strands of evidence (e.g., [ ] data) available to him."

by Chrysler's supplier – Continental. *Id.* at pp. 8-10. Notably, the lead author of the Continental report testified that the testing performed by Continental *does not reflect real-world conditions*, and therefore the conclusions of the test are inapplicable to the real world. Doc. # 195 at pp. 19 – 20.

Dr. Lynch did far more than simply read documents and think about the case, as Chrysler contends (Def. Br. at 4). Dr. Lynch's opinion that the TPMS components in Class Vehicles suffer from corrosion and failure is based on several different, scientifically reliable pieces of evidence. Dr. Lynch reviewed photographs of the TPMS components at issue at the microscopic level in Mr. Sullivan's report, *id.* at p. 4, and additional photographs of TPMS components studied by Continental and Chrysler itself, Deposition of Dr. Richard F. Lynch ("Lynch Dep.") at pp. 135, 179-182, 196-197, 226, Ex. 7. The pictures taken by Continental and Chrysler provide reliable evidence of corrosion. *See Engler v. MTD Prods.*, Case No. 13-575, 2015 U.S. Dist. LEXIS 25138, at *34 (N.D.N.Y. Mar. 2, 2015) (finding that Plaintiff's expert could opine on the cause of a brake failure, in part, based on pictures).

Indeed, Dr. Lynch observed corrosion on the components parts and corroborated his observations with Mr. Sullivan and Chrysler's chemical analysis of the components, Lynch Rep. at p. 4. Studies internal to Chrysler (Doc. #s 196-13, 196-14) connected the material used to manufacture the TPMS components with the observed SCC and salt spray testing performed by Chrysler's parts-manufacturer (Continental, Doc. # 196-14) confirmed that the metal used to manufacture the TPMS components could not withstand corrosive elements that Dr. Lynch maintains is less severe than real-world conditions. Lynch Rep. at p. 4; Lynch Dep., at 168, 184-185. Dr. Lynch confirms that the testing performed by Chrysler and Continental corresponds with the type of testing performed to assess SCC, *id.* at pp. 77-78; *see also Inland Fastener, Inc. v. S. Holland Metal Finishing Co.*, 2015 IL App (2d) 140947-U, ¶ 30 (salt spray testing appropriate in these circumstances); *Warner Chilcott Labs. Ir., Ltd. v. Impax Labs., Inc.*, Case No. 08-06304, 2012 U.S. Dist. LEXIS 60386, at *103 (D.N.J. Apr. 30, 2012) (finding EDS to be a "well-known, widely accepted analytical test methodology"). Dr. Lynch also reviewed the accepted

15

technical literature on the metal alloys used in the manufacturing of the TPMS and the respective heat treatments employed to corroborate Sullivan, Chrysler, and Continental's findings of SCC due to the use of particular metals in the TPMS components. *Id.* at pp. 51-52, 250-259; Lynch Rep. at p. 8. Collectively, the reports upon which Dr. Lynch relied to form his opinions involved analysis of over 2,500 TPMS components. Lynch Dep. at p. 185. Given the evidence known to Chrysler from its studies and the studies of Continental, as well as the well-established metallurgical principles for these alloys and heat treatments, Dr. Lynch opines that Chrysler knew or should have known about the SCC defect.[13]

Chrysler disputes the scientific validity of Sullivan's findings and, by extension, maintains that Dr. Lynch did not base his opinions on scientifically reliable data. *See* Def. Br. at pp. 14-15. Even if that were true, which it is not, Dr. Lynch relies on a number of sources beyond Sullivan's testing and analysis, including Chrysler and Continental's own studies, to arrive at his conclusions. Chrysler makes the argument that Continental's study does not support Dr. Lynch's position because it shows that when the cap is in place, the TPMS components do not corrode. Def. Br. at 16. However, as Dr. Lynch explained in both his deposition and rebuttal report, Doc. 116-14, at pp. 6-7, the real-word conditions that corrode the metal valve stem below the cap cause the SCC to manifest below the cap; moreover, the caps themselves often become bent and misshapen in the driving process, allowing the corrosive elements to enter the stem. Therefore, the fact that a perfectly maintained cap may not corrode in a laboratory setting does not defeat Dr. Lynch's conclusions; nor did this finding stop Continental from recommending that Chrysler change the metal used to manufacture the TPMS. *See* Ex. 8 at MCPS002405.

Chrysler primarily disputes the reliability of the facts and data underlying Dr. Lynch's opinions because Dr. Lynch relied on other experts and documentation to evaluate the TPMS, rather than performing his own tests. But Rule 703 of the Federal Rules of Evidence does not require Dr. Lynch to

---

[13] For this reason, *Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000) and *Valente v. Textron, Inc.*, 931 F. Supp. 2d 409, 432 (E.D.N.Y. 2013), relied upon by Chrysler, are inapposite, because here it is clear that significant testing has taken place.

rely on his own testing in formulating his opinion. "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703. The fact that an expert did not personally collect the data or observe the tests, does not affect the relevance or reliability of the testimony. *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94 (2d Cir. 2000); *see also Bank of N.Y. Mellon Tr. Co.,* 910 F. Supp. 2d at 644-45. Courts have read Rule 703 to mean that experts may rely on "facts outside the record and not personally observed, but of the kind that experts in his or her field reasonably rely on in forming opinions." *Asad v. Cont'l Airlines, Inc.*, 314 F. Supp. 2d 726, 740 (N.D. Ohio 2004) (citations omitted). Trained engineering experts, like Dr. Lynch, "commonly extrapolate from existing data" compiled by others and incorporate the data into testimony based on "scientific foundations" and their own "personal knowledge or experience." *Cedar Petrochemicals, Inc*, 769 F. Supp. 2d, 284 (citing *Santoro ex rel. Santoro v. Donnelly*, 340 F. Supp. 2d 464, 473 (S.D.N.Y. 2004) ); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)  ("Trained experts commonly extrapolate from existing data.").

Because Chrysler cannot dispute that Dr. Lynch derived his "conclusions on reliable results from tests conducted by independent consultants and observed by representatives of numerous interested parties[,]" Chrysler's argument that Dr. Lynch's sources were not sufficient goes to the weight, rather than the relevance or admissibility, of his testimony. *Cedar Petrochemicals, Inc.*, 769 F. Supp. 2d, at 285.

### b.  Dr. Lynch reliably applied the testing and analysis to the case

As described above, Dr. Lynch reasonably applied the evidence and testing of the TPMS components at issue, compiled by independent sources, to the instant case. He relied on corrosion testing of thousands of TPMS components in Class Vehicles to opine on the susceptibility of TPMS components in Class Vehicles to corrode. *Supra* at pp. 15 - 16. Dr. Lynch observed pictures of corrosion on at least ten TPMS components before he concluded that the Class Vehicles suffered from corrosion.

*Id.* Based on Chrysler and Continental's own multiple reports, Dr. Lynch also concluded that the materials and heat treatments used in the TPMS caused the failures at issue. *Id.*

Chrysler attempts to argue that Dr. Lynch has not reliably applied the evidence to the facts of this case, Def. Br. at pp. 4-5, but has failed to show that Chrysler "unjustly extrapolated from an accepted premise to an unfounded conclusion" or failed to account for "obvious alternative explanations" for the problem at issue. *Northbrook NY, LLC*, 2012 U.S. Dist. LEXIS 134699, at *11-12. This is not a case where an expert applied a completely unrelated test to a case or did not explain his rational. Chrysler conflates the weight of the Dr. Lynch's opinion with its reliability. *Cedar Petrochemicals, Inc.*, 769 F. Supp. 2d, at 285. The evidence presented is sufficient to support Dr. Lynch's conclusion that the materials used to manufacture the TPMS components cannot withstand the corrosive elements to which they are exposed. As a result, the TPMS components are susceptible to corrosion and fail. Whether additional elements speed this process does not deny that the material itself is a cause of the corrosion; the likelihood of alternative causes merely go to the weight of Dr. Lynch's evidence. These additional elements also do not jeopardize class certification so long as Dr. Lynch opines on a common issue that predominates – whether the TPMS valve stems and nuts are subject to premature corrosion and failure.

Chrysler also maintains that Dr. Lynch cannot offer the opinion that there are numerous and widespread reports of failures because he does not know the failure rate or complaint rate of the valve stems. Def. Br. at 6. Chrysler is wrong. As Dr. Lynch testified, he supported his opinions with Chrysler's *own internal documents detailing the high projected rate of failure. See* Lynch Dep. at 131 − 32, 142 − 43, 306 − 307, Ex. 7. As detailed in Plaintiff's class certification brief, these documents evidence an exceedingly high failure rate, potentially as high as 100% at five years in service. *See* Doc. # 195 at 7. Thus, Defendant's attack on Dr. Lynch's failure to conduct testing to determine a failure rate is clearly groundless.[14]

---

[14] For this same reason, Chrysler's reliance upon *Grodzitsky v. Am. Honda Motor Co., Inc.*, No. 2:12-CV-1142-SVW-PLA, 2015 U.S. Dist. LEXIS 64683, at *15-17 (C.D. Cal. Apr. 22, 2015) is misplaced,

Chrysler also disputes whether Dr. Lynch can conclude that more fractures will occur the longer the vehicles remain ins service without knowing whether the complaints are increasing or decreasing. *Id.* Again, Chrysler conflates the weight of Dr. Lynch's testimony with the reliability and, for that matter, the requirements of Dr. Lynch at class certification. Dr. Lynch relies on testing performed on thousands of parts by both Chrysler and its supplier and consumer complaints discussing persistent backorders of the part, which only come from New York, as well as the technical literature on the nature of SCC and his own extensive knowledge of and experience with metals to opine on the inevitability of TPMS failure due to corrosion in the fleet, along with Chrysler's projected failure rates. Metallurgical science confirms that SCC is progressive and continuous and should impact all of the Class Vehicles that contain this metal; there is no dispute that these vehicles suffer from SCC, and Chrysler's own analysis projects an increasing failure rate over time. The volume of evidence confirms that Chrysler devoted significant resources to study and address a widespread problem in the fleet. Dr. Lynch reasonably relies on these reports and analysis, the nature of the defect, and the consumer complaints from New York to address the issue to determine that the defect is widespread. Chrysler's contention that the failure rate was lower than its own internal predictions does not impact the reliability of Dr. Lynch's opinion, but solely its weight, and does not change the fact that his opinion clarifies common issues for class certification.

Chrysler has not shown that Dr. Lynch's conclusions are "wholly speculative or conjectural... to the extent [Chrysler] contends they are still based on unfounded assumptions, such contentions 'go to the weight, not the admissibility, of the testimony.'" *Great N. Ins. Co. v. Power Cooling, Inc.*, Case No. 06-CV-874, 2007 U.S. Dist. LEXIS 95912, at *34 (E.D.N.Y. Dec. 18, 2007) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). Chrysler's "mere disagreement" with Dr. Lynch's conclusions "is insufficient to render [his] opinions inadmissible *ipsie dixit.*" *Bd. Of Trs. Of the Aftra Ret. Fund*, 2011

_____

because Chrysler itself employed a "systematic means of identifying a common defect" in identifying the common defect and determining projected failure rates.

U.S. Dist. LEXIS 144382, at *44.

### c. Dr. Lynch's testimony is relevant

Dr. Lynch's expert testimony is relevant because his background in metallurgy and materials sciences, as well as his experience assisting with the materials selection and design of auto parts, will help the jury understand the facts and data to determine critical issues such as whether the Class Vehicle TPMS valve stems and nuts fail due to a materials defect and whether Chrysler knew about it.

Dr. Lynch's specialized knowledge in metallurgy, metallurgical engineering, materials science, and the design and production of automobile components will assist the jury in determining whether the TPMS corrosion failures in Class Vehicles are due to Chrysler's decision to manufacture its TPMS components out of improper materials. As discussed *supra*, Dr. Lynch has conducted hundreds of forensic failure analyses on a wide range of materials, including ferrous and non-ferrous metals like the ones used to manufacture Santa Fe brake components. Lynch Report, p. 2. He has specifically performed corrosion analyses of these materials. *Id.* Dr. Lynch has even engaged in the same methods of study, including "Electron Dispersive Spectroscopy", "conventional means of chemical analysis", and "mechanical testing[,]" that Mr. Sullivan, Chrysler, and Continental used to analyze TPMS components. *Id.* Dr. Lynch's past experience allows him to analyze the facts and data from sophisticated technical testing performed on TPMS components by Chrysler and Continental and inform the jury's understanding of the corrosion defect. *Pitre v. Yamaha Motor Co.*, Case No. 14-08238, 2014 U.S. Dist. LEXIS 190844, at *18 (C.D. Cal. Sep. 14, 2014) (finding that Plaintiffs can sufficiently allege that Defendant manufacturer knew, or should have known, about a coating defect "readily ascertainable from engineering tests available to the Defendants at the time of design and manufacturing"). Dr. Lynch's opinion on the common issue of whether Chrysler knew or should have known about a materials defect

in the TPMS valve stems and nuts and failed to disclose it to purchasers will help the jury determine

Chrysler's liability for engaging in deceptive trade practices under GBL § 349. His testimony is relevant.[15]

### 3. The opinions of Dr. Lynch and Mr. McLellan on the safety concerns posed by the vehicle are relevant and reliable

Chrysler wrongly moves to strike David McLellan and Dr. Lynch's testimony on the safety risk

posed by the corrosion defect. Importantly, Mr. McLellan and Dr. Lynch's opinions on this issue do not

necessarily bear on class certification because, as this Court pointed out, the common issue of materiality

in a GBL §349 claim does not require a showing that a defect poses a safety risk. Doc. # 155 at p. 15

(indicia of materiality). Nonetheless, both McLellan and Lynch offer limited but sufficient testimony that

bears upon the materiality of the corrosion defect.

Mr. McLellan limits his opinion to the safety *risk* posed by the common corrosion failure in this

case. Chrysler completely mischaracterizes Mr. McLellan's report in this case, stating – "McLellan…

opines that, in the event of a TPMS failure on the Subject Vehicles, the tire 'will almost instantly deflate

(*e.g.*, a rapid 'air out'),' and that the failure is 'almost guarantee[d]' to occur as 'highway speeds.'" Def. Br.

at 6 (citing Expert Report of David R. McLellan ("McLellan Rep."), Ex. 9 at p. 4). Mr. McLellan,

however, opines solely that the valve stem and its nut "*can* fail catastrophically due to road salt corrosion"

and that "[*w*]*hen* this failure occurs… the tire's 35 psi air envelope will almost instantly deflate (e.g., a

rapid "air out")" *Id.* (emphasis added). McLellan's logical conclusion in both his primary and

supplemental report are as follows: "the identified common materials failure of the TPMS valve stem

and nuts while a Class Vehicle is in motion poses a common and class-wide safety risk to owners and

lessees of the Class Vehicles, their passengers, and other drivers on the road." *See* Supplemental Report

---

[15] In *Jackson v. Jilco Trailer Leasing Co.*, No. A-4853-13T3, 2016 N.J. Super. Unpub. LEXIS 1516, at *25 – 26 (Super. Ct. App. Div. June 29, 2016), which was not a class action, the court noted that Dr. Lynch's expertise as a metallurgist is extensive and impressively credentialed, and solely disallowed him to comment before a *jury* on "the design choices made here by the manufacturer". Moreover, the court allowed Dr. Lynch to testify as a metallurgist about the "material-based physical characteristics of the rivets and their observed condition."

of David R. McLellan, at 2 (June 2, 2017), Ex. 10. McLellan defers to Dr. Lynch and Mr. Sullivan as to

the underlying materials defect within the Class Vehicles. *See* Deposition of David R. McLellan

("McLellan Dep.") (July 27, 2017) at pp. 299, 313-314, Ex. 11. He opines about the safety risk posed by a

common corrosion defect in the TPMS systems.

McLellan does not go so far as to opine that every corroded TPMS stem will lead to an instant

air out and catastrophic failure. Based on Chrysler's reports and internal communications about safety

issues posed by the TPMS stems and hundreds of consumer complaints that discussed losing air in tires

at highway speeds, becoming stranded, and even going off the road or hitting curbs, McLellan opined

that the common defect poses a common safety risk to consumers, including the risk of an air out. Ex. 9

at pp. 4, 6. McLellan spends the remainder of his opinion discussing the science behind how an air out

takes place and the dangers posed by an air out in a given situation.

Mr. McLellan is more than qualified to provide his opinion. Mr. McLellan is a renowned

engineer who worked for General Motors for thirty-three years as the Assistant Staff Engineer for the

Camaro and Nova chassis systems, where he lead a team of engineers responsible for the redevelopment

of the Camaro, including the chassis and brake systems. *Id.* at p. 1. He later became the Engineering

Director for the Corvette. *Id.* In that capacity, Mr. McLellan was responsible for the design, engineering,

testing, and manufacturing of the entire Corvette, including the power train, chassis, electrical and body

components. *Id.* He holds a Master of Science in Management from MIT and a Bachelor of Science in

Mechanical Engineering from Wayne State University. *Id.*

Chrysler objects to McLellan's testimony primarily he has not run testing to show that Class

Vehicles will, in fact, experience an air out or that the air out is dangerous to consumers. However,

McLellan's opinion is premised on air outs and dangerous deflations on the highway that occurred in the

real world, according to NHTSA records, due to the TPMS valve stem failures. Real world experiences

combined with the professional experience of the expert provide a reliable basis to proffer an expert

opinion. *See Barrett v. Black & Decker (U.S.), Inc.*, No. 06 CIV 1970 (SCR)(MDF), 2008 U.S. Dist. LEXIS 108787, at *16 (S.D.N.Y. Aug. 5, 2008) (opined on design safety of product based on one incident and professional experience); *Bunt v. Altec Indus.*, 962 F. Supp. 313, 318 (N.D.N.Y. 1997) (same); *Liriano v. Hobart Corp.*, 949 F. Supp. 171, 178 (S.D.N.Y. 1996) (same). Mr. McLellan has ample experience with vehicle dynamics as the General Motors proving grounds where "he did a huge amount of testing" and learned "a great deal about the limit of control of vehicles". McLellan Dep. at 207 – 208, Ex. 11. Moreover, Mr. McLellan testified while he was the chief engineer for the Corvette he made the decision to include a tire pressure monitoring system on the vehicle without *doing any testing* on deflation rates. *Id.* at 294. He made this decision based upon the inherent risk of an aired-out tire and did not need to test or know the air out rate because "it wouldn't have told us much." *Id.* at 297 – 298. Accordingly, testing of the air-out rate is not necessary here either. To the extent that Chrysler ran testing on proving grounds using experienced drivers to simulate an air out that did not pose a safety risk, McLellan Dep. pp. 291-293, and wants to argue that it negates the professional and real-world experiences upon which McLellan bases his testimony, it again goes to its weight and not its admissibility.

Real world evidence of a safety risk is not negated by alternative testing – particularly when, as McLellan maintains, running a test in a proving ground with a car handled by a professional driver does not inform experts about the safety risk of an air out to a civilian. *See* McLellan Dep. at p. 293. McLellan need only demonstrate a common risk to consumers by a defect that has repeatedly caused air outs and related, dangerous situations. *See, e.g.,* McLellan Dep. at p. 311.[16] Moreover, as Mr. McLellan referred to

---

[16] Dr. Lynch also read hundreds of reports of corrosion in TPMS components by consumers both directly to Chrysler and to the NHTSA and Transport Canada to form his opinion that a corroding valve stem poses a safety problem for consumers. *See, e.g.,* Lynch Dep. pp. 54, 198-199. Dr. Lynch, like Mr. McLellan, did not opine that every vehicle with the corrosion defect experiences a dangerous air out. He did, however, restate the widespread reports of air outs due to TPMS failure from these various sources and said that they "…*can* result in the unavoidable loss of control by the driver and potentially dangerous crashes." Lynch Report at p. 2. Lynch opines that these air outs occur, specifically, due to the fracture of the aluminum valve stem, specifically, *id.* at pp. 2-3. He based his opinion on widespread reports from

in his deposition, there are multiple prior NHTSA investigations, sanctioned recalls, or findings relating to broken valve stems or nuts and/or tire deflation that detail the inherent safety risk, buttressing his opinions. *See* Doc. # 195 at 12. These same materials buttress Dr. Lynch's statement that the failure of a TPMS valve stem or nut can lead to an unsafe condition.

Finally, Mr. McLellan's opinion that the TPMS valve stems and nuts are expected to last the life of a vehicle, McLellan Dep. at 300 – 301, is amply supported by Defendant's own documents, *see* Doc. # 195 at 9, and as such is reliable and admissible.

### 4. The damages opinions of Mr. Gaskin and Mr. Pinsonneault are relevant and helpful

At the class certification stage when seeking certification of a Rule 23(b)(3) damages class, plaintiffs need not actually have completed a comprehensive damages analysis, but rather, merely show that "damages *are capable* of measurement on a classwide basis." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) (emphasis added); *see also Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017) (affirming propriety of plaintiff's damages model over various objections because "*Comcast* does not suggest that damage calculations must be so precise at this juncture."). Indeed, at this stage, Plaintiff need only propose a "suitable damages methodology for establishing injury on a classwide basis." *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 410 n.7 (S.D.N.Y. 2015).

Plaintiff has disclosed choice-based conjoint analysis, which is a well-accepted methodology for determining classwide damages based on diminished value. *See, e.g.*, *Sanchez-Knutson*, 310 F.R.D. at 539; *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 551 (E.D.N.Y. 2017) (conjoint analyses are "adequate for proving classwide causation at the certification stage, and have previously been approved in consumer

---

customers and engineers *as well as his own observation of the failed valve stems* in the various testing settings discussed *supra* – sometimes at the microscopic level. As previously stated, Dr. Lynch has the professional background to opine on the method of failure of the vehicles at issue. *Supra* at 8. The fact that the failures involved air outs does not change that analysis. Further, Dr. Lynch's experience as a metallurgical engineer allows him to opine on the potential consequences of failed metals even to the extent that such failure implicates safety concerns.

class actions as reliable methodologies available for calculating the price premium attributable to a product characteristic."). Briefly, a consumer survey will be used to reveal the value that purchasers would have assigned to the defect at the point of purchase. This figure can be calculated as a percentage, which can then be applied to the purchase price of the Class Vehicles to yield a damages figure for the diminution in value of a Class Vehicle with the defect disclosed at the point of purchase. By way of example, if the percentage of diminution in value is 46.7%, as it was in *Sanchez-Knutson*, then that could be applied to the sales price to determine a class member's damages. Gaskin, who possesses expert knowledge in marketing, consumer choice, and survey design, will assist the trier of fact by explaining how such a methodology would work. *See generally* Declaration of Steven P. Gaskin ("Gaskin Decl."), Ex. 12. Pinsonneault, who possess expert knowledge in economics, will assist by rebutting the criticisms of Gaskin's method by Defendant's economist, and reinforcing that the diminution in value figure yielded by the method would have resulted in a change in market price across the class, the amount of which can be discerned by multiplying the percentage of diminution in value from the conjoint analysis with the purchase price. *See* Ex. 3. Hence, the "helpfulness" prong of Rule 703 is easily satisfied. Defendant's arguments, which forgo reference to *Daubert*, Rule 702, or applicable case law, have no legal basis.

As an initial matter, it is not disputed that Gaskin is an authority with respect to conjoint analysis. Likewise, the permissibility and relevance of a conjoint analysis as a method for calculating economic damages is well settled. *See, e.g., Sanchez-Knutson*, 310 F.R.D. at 539; *Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1082-83 (D. Minn. 2015), *as amended* (Apr. 15, 2015) (collecting cases). Nothing more need be established at this stage to permit Gaskin's testimony. *See Sanchez-Knutson*, 310 F.R.D. at 539 (holding that Gaskin's proposed—but not yet performed—conjoint analysis damages model was sufficient for purposes of class certification). As established in the analogous *Sanchez-Knutson* case, a choice-based conjoint analysis is relevant in and of itself, even without an economist's further testimony. *See* Deposition of Steven P. Gaskin ("Gaskin Dep.")(July 25, 2017), Ex. 13, at pp. 296-307; *See also Guido*,

2014 WL 6603730, at *7-8 (acknowledging acceptance and reliability of conjoint analysis and allowing

testimony on the subject by expert who, *like Gaskin*, had an educational background in management and

had published papers on conjoint analysis and consumer decision-making).

Chrysler's argument that further testimony by an economist is necessary relies entirely on a single

unpublished, out-of-circuit, non-class patent case, which is clearly distinguishable in that the already-

conducted analyses of both experts were plagued by the same patent-specific apportionment issue. *See*

Mot. At 22 (citing *Visteon Glob. Techs., Inc. v. Garmin Intl., Inc.*, 10-CV-10578, 2016 WL 5956325, at *17

(E.D. Mich. Oct. 14, 2016). Defendant's vague incantation of a "disconnect" and its emphasis on *economic*

damages cannot overcome the weight of authority favoring admission of the damages opinions.

Unable to identify methodological flaws or favorable case law, Defendant instead relies solely on

semantics, citing deposition testimony purportedly evidencing Gaskin's and Pinsonneault's conflicting

views or insufficient knowledge.  The larger context of the cited testimony, as well as the expert's reports,

generally dispel the concerns Defendant raises, but, regardless, these concerns are matters of weight, not

admissibility. They do not go to the core methodology in question but to the propriety of specific

decisions and assumptions made—or, more accurately, which Chrysler says will be made—in applying

the methodology.  The very format of Defendant's arguments, citing purported conflicts among the

experts, or knowledge gaps, show that these are matters for cross examination, not exclusion. As

instructed in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof are the traditional and appropriate means of attacking shaky but

admissible evidence." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993). Accordingly, "[t]he

Court [should] allow Gaskin to testify to his conclusions reached by applying a conjoint analysis, and

Defendant[] may cross-examine Gaskin to attempt to address the weaknesses they perceive in his

analysis." *Khoday*, 93 F. Supp. 3d 1083; *see also Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*,

04CIV.7369(LTS)(HBP), 2006 WL 2128785, at *7 (S.D.N.Y. July 28, 2006) (holding that whether

economist's analysis employed proper behavioral assumptions and accounted for major variables went "to the weight of the testimony rather than the quality of the expertise or the reliability of the economic methodology"); *In re Whirlpool*, 45 F. Supp. 3d at 755 (holding that propriety of expert's assumptions as to product facts and consumer preferences bore on the weight of his testimony and should be explored with examination); *McCulloch v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) (holding defendant's quibble with expert's academic training in specific studies, and with other alleged shortcomings (including inability to answer certain questions testing his knowledge) "were properly explored on cross-examination and went to his testimony's weight and credibility").

Anyway, Defendant's criticisms are baseless and frequently nothing more than gross distortions. The roles of the experts are well-defined. Mr. Gaskin's conjoint analysis will reveal – in percentage terms – how much less class members would have paid at the point of purchase had the defect been disclosed. *See* Response by Steven P. Gaskin to the Report of Robert E. McCormick, PH.D, 4/22/2016, ("Gaskin Rebuttal Rep."), Ex. 14. Mr. Pinsonneault will rebut the challenges to the method proffered by Drs. Wood and McCormick, who have *no* experience with conjoint analysis, and opine that the amount of diminution in value for class members can be calculated by multiplying this percentage with the purchase price. *See* Deposition of Gregory Pinsonneault ("Pinsonneault Dep."), July 20, 2017, Ex. 15.

Further, with Mr. Gaskin, Defendant stresses that he purportedly "offers no clue of how he could [describe the defect and its risks]," *see* Def. Br. at 24, yet he described at-length in his deposition exactly how he will approach this issue, including by looking at how this and similar risks are characterized by the National Highway Traffic Safety Administration ("NHTSA") and Defendant's documents "because … the defendant would not be biased against themselves. And NHTSA is an even-handed sort of judge of these things." *See* Gaskin Dep. at 145:3-25; 295:18-296:9. In a similar vein, it is also simply not true that Mr. Gaskin has left out so much detail that it is "[i]mpossible to evaluate the helpfulness and reliability" of his approach when he describes at-length his approach to the various

stages of his proposed conjoint analysis, including how he will engage in explanatory research (Gaskin Dep. at 101-103); design the survey (pp. 103-105); program the survey (pp. 105-106); conduct a pretest with respondents to see if any changes needed to be made to the survey (pp. 106-107); identify the group of survey respondents (pp. 108-109); run the survey (p. 110); and analyze the data to isolate the effect of the defect on purchasing price (pp. 110-116). Defendant also tries to argue that Mr. Gaskin has only spent eight hours on the case, but that was nearly the length of his full-day deposition alone, and therefore ignores the work from himself and his staff that went into his declaration and rebuttal declaration. With Mr. Pinsonneault, Defendant similarly relies on distortions to try and discredit his opinions. Defendant faults Mr. Pinsonneault for not consulting real-world data, rather than Mr. Gaskin's conjoint survey, to assist in determining damages, but Mr. Pinsonneault clearly explained the soundness of Mr. Gaskin's simulated approach given that "we don't have that [data] here. … Because [the defect] wasn't disclosed, consumers couldn't actually place an appropriate value on the feature." Pinsonneault Dep. at 150:22-151:9.

Defendant's construction of the "fit" requirement to discard preemptively a fundamentally sound methodology based on a hypothetical cross examination testing the expert's prior knowledge is a novel but entirely baseless approach.  In all, Plaintiff's damages experts have proposed an accepted and properly tailored methodology for calculating class-wide damages, and no more is required at this stage.

### 5.  Mr. Gaskin's opinions are reliable

Defendant's assertion that Gaskin has not designed a survey is misleading. The methodology of his choice-based conjoint analysis is set forth in his Declaration (Gaskin Decl. ¶¶ 8-15), rebuttal report and his deposition, and the level of detail with which it is described is sufficient for class certification purposes.[17]  Notably, Defendant's contentions in this regard rely almost entirely on a few cases from the

---

[17] Defendant's contention that Gaskin cannot "appropriately design a survey that would take into account the relevant aspects of the alleged defect" is an entirely different point. This assertion is clearly disputing

Central District of California. As noted by cases in *this* Circuit, however, requiring such minutiae for damage models at this stage is *directly at odds with Second Circuit precedent. See In re Scotts EZ Seed Litig.*, 304 F.R.D. at 414; *id* at 414 n. 11 (noting that requiring plaintiffs to show damages "in the level of detail required by *ConAgra*" would contravene Second Circuit's interpretation of *Comcast Corp. v. Behrend*, 569 U.S. 27, 29 (2013), requiring "only that 'courts should examine the proposed damages methodology at the certification stage to ensure that it is consistent with the classwide theory of liability and capable of measurement on a classwide basis.'") (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 123 n. 8 (2d Cir. 2013)). Accordingly, Defendant's arguments relying on a few cases provincial to the Central District of California ought not be accorded deference given the law in this Circuit.[18] Under applicable Second Circuit case law, Mr. Gaskin adequately describes his proposed choice-based conjoint analysis, a methodology which is, as explained above, a well accepted means of measuring classwide damages. This analysis will yield part-worths which, in turn, reveal diminished value due to the defect, in the same manner employed by Gaskin and approved by the Court in the *Sanchez-Knutson* case involving an auto defect, as well as several other cases.

Defendant's additional arguments about Gaskin's methodology are simply run-of-the-mill criticisms of conjoint analysis that corporate defendants present, and lose, in almost every case. These criticisms, many of which are based on misunderstanding the methodology's mechanics, are addressed in his rebuttal declaration. Gaskin does not ignore individual class members. His conjoint analysis, like any,

---

not the core methodology of the analysis but specific assumptions and controls. As established in the various authorities cited above, such specific concerns are matters of weight and credibility, not admissibility, and are appropriately addressed via cross-examination.

[18] Tellingly, even in the Central District of California, several decisions accepting conjoint analysis to measure classwide damages, even when the survey has not yet been conducted. *See Zakaria v. Gerber Prods. Co.*, No. LA CV15-00200 JAK (Ex), 2016 U.S. Dist. LEXIS 184861, at * 42-45 (C.D. Cal. Mar. 23, 2016) (collecting authority). Chrysler also conveniently ignores that the Northern District of California recently relied on Mr. Gaskin's disclosed methodology in granting class certification in a case involving undisclosed malware preloaded on laptop computers. *See In re Lenovo Adware Litig.*, No. 15-md-02624-RMW, 2016 U.S. Dist. LEXIS 149958, at *75 (N.D. Cal. Oct. 27, 2016).

will yield part-worths that differ for each consumer, reflecting the consumers' relative preference for certain attributes over others.  *See* Gaskin Rebuttal Rep. ¶¶ 4, 20-22, 25-27. Based on product attributes identified by purchasers and presenting full and actual product profiles, Gaskin's analysis will simulate real-world purchase scenarios to the extent feasible under the circumstances.[19] Contrary to Defendant's mischaracterization, Mr. Gaskin's damages model also accounts for supply-side factors – and therefore properly models market forces to yield damages in the form of diminution in value – by using real-world prices and recognizing that past sales are a matter of historical fact. *See* Gaskin Dep. at 161:16-23, 186:7-12; *In re Lenovo Adware Litig.*, 2016 U.S. Dist. LEXIS 149958, at *74 (rejecting this critique of Gaskin's method).[20] Importantly, these additional criticisms are not of the general methodology but of specific implementation choices and, accordingly, at most concern the weight and credibility of his testimony.

### 6.   Mr. Pinsonneault's opinions are reliable

As an initial matter, Pinsonneault plainly states that his primary role in this case is responding to the criticisms of defense experts Robert McCormick and Christine Wood. *See, e.g.*, Pinsonneault Rep. ¶ 1. The criticisms proffered by these defense experts go to the fundamental tenets of conjoint analysis—principally, that product attributes are capable of discrete valuation, regardless of individualized factors,[21] and that conjoint analyses are accepted and relied upon by economists. Pinsonneault, applying his training and expertise in economic and econometrics, rebuts these points.

---

[19] Defendant's mention of the Second Circuit's rejection of a conjoint analysis in *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 225 (2d Cir. 2008), see Def. Br. at 27 n.7, is entirely irrelevant here. In *McLaughlin*, the Second Circuit rejected the proffered conjoint analysis as a class-wide proof of reliance for a RICO claim, not as a proposed damages methodology for a § 349 claim. *See Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 549 (E.D.N.Y. 2017) (distinguishing *McLaughlin*).

[20] Even assuming, for the sake of argument, that Mr. Gaskin's method only discerned changes in demand, and not supply, that would be of no moment since Defendant's own economist stated that the supply-side was fixed. *See* Pinsonneault Rep. at ¶¶ 22-23. Hence, the only changes to price would come from changes to the demand side. *See id.*; Pinsonneault Dep. at 86:21-87:5.

[21] While McCormick asserts he is not opining on the general merits of survey data and conjoint analysis, many of his key opinions are of the nature that individualized factors, such as each purchaser's unique circumstances, priorities, and purchase environment, make value and damages calculations a necessarily individualized analysis.  This proposition is antithetical to the principles of conjoint analysis.

As Chrysler points out, Pinsonneault has not undertaken a statistical analysis or assessed the vehicle market, but the relevance of such tasks to his opinion is entirely unclear.  Neither McCormick's nor Woods's opinion is based on any data or statistical theory that Pinsonneault might assess. Both defense experts rely only on hypotheticals—scattershot speculation concerning what individualized factors might be present or what other hurdles might face the proposed conjoint analysis. Such speculation, by its very nature, cannot be affirmatively disproven, but it need not be anyhow. It is well-accepted among economists that a conjoint analysis is a reliable means of discerning attribute value and calculating damages, notwithstanding individualized considerations. *See* Pinsonneault Rep. ¶¶ 15-16, 18-19, 21, 25-26. Furthermore, an assessment of the vehicle market is not necessary for purposes of the conjoint analysis. The circumstances and preferences of vehicle purchasers will be necessarily reflected in the conjoint analysis, and Pinsonneault's opinion as to the acceptance of conjoint analyses among economists and the fallacies in Drs. McCormick's and Woods's opinions are adequately founded in economic theory. *See, e.g., TC Sys. Inc. v. Town of Colonie*, 213 F. Supp. 2d 171, 175 (N.D.N.Y. 2002) (finding industry-specific analysis unnecessary where testimony was based on broader economic principles and expert sufficiently qualified in that field). In general, these arguments and those that follow regarding Pinsonneault's purported lack of knowledge are matters of weight and credibility, properly addressed on cross-examination.  If indeed Pinsonneault has done "basically nothing" in this case, the same must be said of the experts he seeks to rebut, Drs. McCormick and Woods, who offer nothing more than idle speculation.  These defense experts' opinions are essentially that the principles underlying conjoint analysis are faulty and it is not an accepted means of determining classwide economic damages. Pinsonneault responds directly to these arguments, clarifying that the concerns raised are adequately addressed in the conjoint method and that such practices are generally accepted by economists.

## IV.   **CONCLUSION**

For the reasons stated herein, Defendant's motion should be denied in its entirety.

31

Dated:April 30, 2018                                    Respectfully submitted,


                                                        _/s/ Nicholas A. Migliaccio_
Elmer Robert Keach, III, Esq.                           Nicholas A. Migliaccio, Esq.
Law Offices of Elmer Robert Keach III, P.C.             Jason Rathod, Esq. (*pro hac vice*)
1040 Riverfront Center                                  Migliaccio & Rathod LLP
P. O. Box 70                                            412 H Street N.E., Ste. 302
Amsterdam, NY  12010                                    Washington, DC 20002
Tel: (518) 434-1718                                     Tel: (202) 470-3520

Gary E. Mason, Esq.                                     Gary S. Graifman, Esq.
Jennifer Goldstein, Esq.                                Jay Brody, Esq.
Whitfield Bryson & Mason LLP                            Kantrowitz Goldhamer
1625 Massachusetts Ave. NW, Ste. 605                    & Graifman, P.C.
Washington, DC 20036                                    747 Chestnut Ridge Rd., Ste. 200
Tel: (202) 429-2290                                     Chestnut Ridge, New York 10977
                                                        Tel: (845) 356-2570

Daniel C. Calvert, Esq. (*pro hac vice*)
Parker Waichman LLP
27300 Riverview Center Boulevard
Suite 103
Bonita Springs, Florida 34134
Tel: (239) 390-1000

*Attorneys for Plaintiff and the Putative Class*


## CERTIFICATE OF SERVICE

I hereby certify that on this 30th of April, 2018, a true and complete copy of the foregoing Plaintiff's Motion for Class Certification was served via the Court's ECF system to the following:

Stephen A. D'Aunoy, Esq.
SDAunoy@thompsoncoburn.com
Kathy A. Wisniewski, Esq.
KWisniewski@thompsoncoburn.com
Alan Pope, Esq.
apope@psplawfirm.com

***Attorneys for Defendant***

By:                              */s/ Jason S. Rathod*
                                 Jason S. Rathod

                                 Counsel for Plaintiff