**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ROBERT TOMASSINI,** *on behalf of himself and*
*all others similarly situated*,

                                 **Plaintiff,**

      **vs.**                                   **3:14-cv-1226**
                                                     **(MAD/DEP)**

**FCA US LLC,**

                                 **Defendant.**
_____

**APPEARANCES:**                         **OF COUNSEL:**

**LAW OFFICES OF ELMER**          **ELMER ROBERT KEACH, III, ESQ.**
**ROBERT KEACH III, P.C.**
One Pine West Plaza
Suite 109
Albany, New York 12205
Attorneys for Plaintiff

**PARKER WAICHMAN LLP**         **JORDAN L. CHAIKIN, ESQ.**
27300 Riverview Center Boulvard   **DANIEL C. CALVERT, ESQ.**
Suite 103
Naples, Florida 34134
Attorneys for Plaintiff

**MIGLIACCIO & RATHOD LLP**     **JASON S. RATHOD, ESQ.**
412 H Street Northeast           **NICHOLAS A. MIGLIACCIO, ESQ.**
Washington, District of Columbia 20002
Attorneys for Plaintiff

**WHITFIELD BRYSON &**           **GARY E. MASON, ESQ.**
**MASON, LLP**                    **JENNIFER S. GOLDSTEIN, ESQ.**
1625 Massachusetts Ave., NW, Suite 605
Washington, District of Columbia 20036
Attorneys for Plaintiff

**KANTROWITZ, GOLDHAMMER &**  **GARY S. GRAIFMAN, ESQ.**
**GRAIFMAN, P.C.**              **JAY I. BRODY, ESQ.**
747 Chestnut Ridge Road, Suite 200
Chestnut Ridge, New York 10977
Attorneys for Plaintiff

**POPE, SCHRADER & POPE, LLP**   **ALAN J. POPE, ESQ.**

2 Court Street, 4th Floor
P.O. Box 510
Binghamton, New York 13902
Attorneys for Defendant

**THOMPSON COBURN LLP**          **SHARON B. ROSENBERG, ESQ.**
One US Bank Plaza                              **KATHY A. WISNIEWSKI, ESQ.**
St. Louis, Missouri 63101                    **STEPHEN A. D'AUNOY, ESQ.**
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On September 8, 2014, Plaintiff Robert Tomassini commenced this putative class action in

state court, and Defendant FCA US LLC ("Chrysler") removed to the Northern District of New

York on October 8, 2014. *See* Dkt. No. 1. Plaintiff's only remaining claim is for deceptive

business practices under New York General Business Law ("NYGBL") § 349 arising out of

Chrysler's alleged failure to disclose a defect in the valve stems of certain Chrysler minivans. *See*

Dkt. No. 23 at 24. Presently before the Court are Plaintiff's motion for class certification, and

Chrysler's motion to preclude expert testimony. *See* Dkt. Nos. 194, 218.[1] For the following

reasons, Plaintiff's motion is denied, and Chrysler's motion is denied as moot.

## II. BACKGROUND

**A.      Plaintiff's Minivan**

In January 2012, Plaintiff purchased a used model-year 2010 Town and Country minivan

(the "Minivan") from JJT, a wholesale vehicle business owned by a friend. *See* Dkt. No. 146 at 2.

---

[1] Chrysler also submitted a motion to deny class certification on August 23, 2017. *See* Dkt. No. 173. As the Court stated in its March 14, 2018 Order, the Court has considered all arguments raised in Chrysler's motion to deny class certification in deciding Plaintiff's motion for class certification. *See* Dkt. No. 212 at 3.

At the time Plaintiff purchased the Minivan, it had been driven for 36,631 miles, and Plaintiff understood that the manufacturer's basic limited warranty had expired. *See id.* The Minivan was equipped with a Tire Pressure Monitoring System ("TPMS"), which measures the air pressure in the tires and reports low pressure to the driver. *See id.* at 10. Since purchasing the Minivan, Plaintiff has experienced two instances of valve stem failure, which he attributes to corrosion of the valve stems. *See id.* at 10. The first leak occurred in August 2013 when the Minivan had been driven for 47,000-plus miles. *See id.* at 11. On that occasion, the TPMS unit illuminated alerting Plaintiff to low tire pressure, but the "valve stem connector" snapped off when Plaintiff attempted to put air in the tire. *See id.* at 11-12. The tire maintained air pressure long enough for Plaintiff to drive the Minivan to a repair shop, which replaced the TPMS unit at a cost of $120.35. *See* Dkt. No. 116-13 at 131. The valve stem and the TPMS unit that were removed from the Minivan were not preserved. *See id.* at 129, 131.

On or before June 9, 2014, Plaintiff noticed that the right rear tire of the Minivan was soft while it was parked in his home garage. *See* Dkt. No. 117 at 13. When Plaintiff removed the valve stem cap, he noticed that the valve was "corroded." *See id.* Plaintiff did not attempt to put air into the tire because he was concerned that the stem might snap off. *See id.* at 13; Dkt. No. 116-13 at 139. He brought the Minivan to an auto repair shop and decided to replace the Chrysler TPMS unit with a simple, rubber valve stem that does not function with the TPMS. *See* Dkt. No. 116-13 at 144, 146, 149, 215. Plaintiff called two Chrysler service centers, Binghamton Chrysler and Royal Chrysler. *See id.* at 145. Plaintiff asked both if there was a replacement TPMS unit for the Minivan, and both responded that the TPMS unit had been redesigned and improved for some vehicles but not Plaintiff's vehicle. *See id.* at 145. After the TPMS unit was removed from Plaintiff's vehicle, he sent it to his attorney for analysis. *See id.* at 147.

In June 2014, Plaintiff searched the internet for information on corrosion of the valve stems and TPMS units on Defendant's vehicles, and he found that other consumers were making similar complaints about corrosion and valve stem failure. *See* Dkt. No. 117 at 14. On June 9, 2014, Plaintiff called Defendant to report that he had a valve stem leak and he was looking for an explanation for that failure. *See id.* at 143, 155. Plaintiff was advised that the cracked valve stem was the result of living in a high salt area. *See* Dkt. No. 116-11. Defendant advised Plaintiff on June 24, 2014, that, according to available information, there were no recalls or technical service bulletins regarding his concern. *See id.* Defendant also advised Plaintiff that the Minivan was designed, engineered, and built in this way and any additional information was either unavailable or considered proprietary. *See id.*

## B. The Proposed Class

Plaintiff defines the proposed class as "all persons who purchased and/or leased Chrysler and Dodge Minivans manufactured after June 10, 2009 through May 25, 2010, in the State of New York." Dkt. No. 202 at 1.[2] Plaintiff asserts that the vehicles manufactured during that time period were equipped with defective valve stems, which were made of a metal alloy that was particularly susceptible to corrosion. *See id.* According to Defendants, 8,326 class vehicles were originally purchased or leased as new vehicles in New York. *See* Dkt. No. 209-1 at ¶ 38. But due to the resale of class vehicles in New York State—including over 300 vehicles resold multiple times—there are approximately 17,000 potential class members. *See id.* at ¶ 39.

### 1. The Alleged Defect

---

[2] FCA US was formed on April 28, 2009, and began operations on June 10, 2009, prior to which it did not design, manufacture or sell any vehicles. *See* Dkt. No. 209-1 at ¶ 6.

All of the vehicles in question were manufactured with valve stems and nuts made of an aluminum AL2000 metal alloy, which contains copper. *See* Dkt. No. 209-11 at 7. Plaintiff's experts agree that all AL2000 valve stems are susceptible to corrosion, and that the corrosion is worsened by exposure to salty conditions. Eric V. Sullivan, a metallurgical engineer, opined that "all members of the class have this materials defect present because all of the TPMS devices have valve stems composed of an aluminum alloy that is susceptible to [stress corrosion cracking]." *See* Dkt. No. 196-42 at 8. Similarly, Dr. Richard F. Lynch, who is also a metallurgical engineer, indicated that every vehicle in this class is subject to corrosion because the TPMS is made from corrosion susceptible aluminum alloys and is operated in a "salt belt" state and will experience progressive intergranular and/or stress corrosion cracking corrosion, which will ultimately lead to corrosive fracture and TPMS failure. Dkt. No. 196-44 at 3-4.

On May 26, 2010, Chrysler switched from the AL2000 alloy to an AL6000 alloy, and Plaintiff does not claim that the AL6000 valve stems were defective. *See* Dkt. No. 215 at 4. Chrysler argues, however, that it took other steps that addressed any corrosion problems even before it began using the AL6000 alloy. In October 2009, Chrysler began using a "T4" heat treatment that "improved the stress corrosion resistance of the valve stems." Dkt. No. 209-11 at 5. A month later, Chrysler redesigned the TPMS component to be taller, lighter, and independent of the valve stem, which improved serviceability. *See* Dkt. No. 209-1 at ¶¶ 16-17. Based on those changes, Chrysler claims that it reduced the chances of stress corrosion-related issues by as much as 85% and reached a "clean point." *See id.* But Plaintiff argues that, far from solving the problem, there is no evidence that the T4 heat treatment or the new TPMS component were any more robust in preventing corrosion. *See* Dkt. No. 215 at 7. In fact, Plaintiff's own van likely had T4 heat treated valve stems. *See* Transcript of May 16, 2018 Proceedings at 31.

Plaintiff and Chrysler provide different estimates of the valve stems' failure rates.

Chrysler estimates that the average rate of replacement at five years or 60,000 miles was 4.5%-

6.5% per valve stem. *See* Dkt. No. 209-1 at ¶¶ 26-27.[3] This was considered the projected

maximum failure rate because Chrysler expected vehicle tires to be replaced at five years, at

which point corroded valves stems would also be replaced. *See id.* Plaintiff, on the other hand,

claims that the actual failure rate is far higher, and that Defendant's stated failure rate is not

supported by the discovery documents. *See* Dkt. No. 215 at 4-5. According to Plaintiff, the

actual failure rate is 18%-25% per valve stem at five years under normal use. *See* Dkt. No. 202 at

7.

Plaintiff and Chrysler also disagree as to whether the failure of the valve stems poses a

safety risk. Chrysler reviewed customer complaints relating to broken valve stems and found that

there were no reported incidents of accidents, injury, or loss of vehicle control. *See* Dkt. No. 209-

11 at 8. According to Earl J. Bibb, a Senior Product Analysis Specialist at Chrysler,[4] an internal

investigation also determined that leaking or broken valve stems "did not affect vehicle safety."

*See id.* at 8. But Plaintiff asserts that the defective valve stems do present a safety issue. Plaintiff

---

[3] The failure rates cited by Defendant are based on estimates of nine different models of vehicles in the 2009 model year. *See* Dkt. No. 209-1 at 26. Although Defendant argues that the actual failure rate for Class Vehicles was lower, Defendant does not appear to have calculated estimates specific to the Class Vehicles. *See id.*

[4] In a footnote in his reply, Plaintiff argues that the Court should exclude Mr. Bibb's declaration because it constitutes expert testimony and Chrysler did not provide a timely written report in compliance with Federal Rule of Civil Procedure 26(a)(2)(B). *See* Dkt. No. 215 at 3 n.2. Plaintiff concedes, however, that Mr. Bibb was disclosed pursuant to Rule 26(a)(2)(C) as a nonretained expert. *See id.* First, Plaintiff's request is denied because Plaintiff should have filed a motion and given Chrysler an opportunity to respond. Second, the request is also denied because the Court finds that Mr. Bibb was not retained for the purpose of giving expert testimony, and his declaration is based on facts and circumstances known to him. *See Nat. R.R. Passenger Corp. v. Ry. Express, LLC*, 268 F.R.D. 211, 216-17 (D. Md. 2010).

argues that Chrysler never properly tested the potential safety risk of broken valve stems, and Plaintiff also points to specific customer complaints as evidence of the potential safety risk. *See* Dkt. No. 202 at 14-15. In particular, multiple complaints documented in Chrysler's Customer Assistance Inquiry Records ("CAIR") state that tires rapidly deflated while driving at high speeds, though Plaintiff does not point to any complaint of injury or accident resulting from broken valve stems. *See id.* at 10.

### 2. Chrysler's Response

Chrysler received notice of problems with the valve stems from several different sources, including a third-party supplier, Continental Automotive Systems US, Inc. ("Continental"), as well as various Chrysler customers, including some who were employed as Chrysler engineers. *See id.* at 4-10. Chrysler also conducted an internal investigation of the valve stem issue, which led to a proposed solution that Chrysler did not implement because it would be too expensive. *See* Dkt. No. 196-20 at 3; Dkt No. 196-38 at 3. Instead, Chrysler concealed the defect from its customers and provided no information about the problem of valve stem corrosion.

As early as January 27, 2009, Continental informed Chrysler that the AL2000 valve stem was susceptible to corrosion and that Continental planned to switch to the more corrosion resistant AL6000 alloy within a year. *See* Dkt. Nos. 196-2, 196-3. In a report dated July 30, 2009, Continental described detailed testing of valve stems made of AL2000 and AL6000 alloys, as well as the impact of the T4 heat treatment. *See* Dkt. No. 196-14. The report recommends that Chrysler use T4 heat treatment on all valve stems made of AL2000 alloy, and that Chrysler eventually switch to the more corrosion resistant AL6000 alloy. *See* Dkt. No. 196-14 at 11.

Chrysler's customers also put Chrysler on notice of problems with the valve stems. First, Chrysler's warranty database revealed 162 claims in New York State of "broken or cracked" valve

stems or nuts, and 352 claims for "leaks" in cars manufactured during the class period. *See* Dkt. No. 202 at 4. Second, Chrysler's CAIR records show that numerous customers complained of problems with their valve stems. *See* Dkt. No. 194 at 9-10. Third, Chrysler engineers who owned Class Vehicles reported problems with their valve stems. *See* Dkt. Nos. 196-21, 196-22, 196-23. Fourth, GE Capital, a large fleet customer, informed Chrysler that it was "considering grounding [its] units" until Chrysler established a plan for dealing with the valve stems and TPMS. *See* Dkt. No. 196-33 at 2.

Chrysler also conducted its own investigation "to find and fix the cause" of "broken or cracked valve stems" that dealers had been finding. Dkt. No. 196-7 at 2. As part of the project, Chrysler collected and tested broken or cracked valve stems. *See id.* By April 19, 2010, Chrysler had determined that the AL2000 alloy "is definitely prone to stress corrosion cracking, while [the] 6000 series is not susceptible to this type of corrosion." Dkt. No. 116-3 at 2. Eventually, Chrysler employees created a draft Customer Satisfaction Notification, which recommended that Chrysler provide an extended warranty for the TPMS sensor. *See* Dkt. No. 196-20 at 3. But Chrysler decided not to extend the warranty because of the significant cost—estimated at $300-$400 million—and the lack of production capacity. *See* Dkt. No. 196-38 at 2. Instead, Chrysler concealed the defect from its customers. *See* Dkt. 194 at 16-17.

## C.    Procedural History

On September 8, 2014, Plaintiff commenced this putative class action in New York Supreme Court, Broome County, by the filing of a summons and class action complaint with the Broome County Clerk. *See* Dkt. No. 1-1 at 1-2. Defendant removed to the Northern District of New York on October 8, 2014, pursuant to the Class Action Fairness Act. *See* Dkt. No. 1-2. After a Rule 12(b)(6) motion, Plaintiff's only remaining cause of action was for unfair and

deceptive trade practice in violation of NYGBL § 349. *See id.* at ¶¶ 55-81. Chrysler moved for summary judgment, and that motion was denied. *See* Dkt. No. 155.

Plaintiff claims that Defendant has concealed or failed to notify the public of the existence and nature of the TPMS defect, or of the possible safety issues presented by the defect. *See* Dkt. No. 1-1 at ¶ 7. Plaintiff seeks damages and "a declaratory judgment requiring [Defendant] to warn all purchasers and potential purchasers of Chrysler Minivans about the defective TPMS valve stems." *Id.* at ¶¶ 64-65, 81, 85. Presently before the Court are Plaintiff's motion for class certification and Defendant's motion to preclude expert testimony. Because the Court denies the motion for class certification regardless of the admissibility of Plaintiffs' experts' testimony, the Court does not address Chrysler's motion to exclude expert testimony.

### III. DISCUSSION

**A.      Standing**

Under Article III of the United States Constitution, a federal court may only exercise subject matter jurisdiction over cases in which the plaintiff has standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff bears the burden of establishing the three "irreducible constitutional minimum" elements of Article III standing. *See id.* "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

To establish an "injury in fact," a plaintiff must show that he or she suffered "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical."'" *Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). To be "particularized," an injury must affect the plaintiff "in a personal

and individual way," and to be "concrete" an injury "must be 'de facto'; that is, it must actually exist." *Spokeo*, 136 S. Ct. at 1548. As for the "actual or imminent" requirement, a plaintiff must allege a non-speculative injury. *See Lujan*, 504 U.S. at 583-84.

### *1. Absent Class Member Standing*

In the class action context, it is widely agreed upon that a named plaintiff must have standing in order to bring claims on behalf of a class. *See Javier H. v. Garia-Botello*, No. 02-CV-523, 2011 WL 4344045, *3 (W.D.N.Y. Sept. 14, 2011) ("A class action cannot be sustained without a named plaintiff who has standing"). It is less clear, however, whether all other members of the class must also have standing in order for a class to be certified. Indeed, there is a circuit split on the question. *See In re Deepwater Horizon*, 753 F.3d 516, 521 (5th Cir. 2014) (Clement, J., dissenting) (noting that the different approaches to absent class member standing, "sometimes used by the same circuit, reveal the deep confusion in this area of class action standing").

On the one hand, a number of circuits have held that absent class members do not need to have standing. *See Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 367 (3rd Cir. 2015) ("Quite simply, requiring Article III standing of absent class members is inconsistent with the nature of an action under Rule 23"); *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1198 (10th Cir. 2010) ("Rule 23's certification requirements neither require all class members to suffer harm or threat of immediate harm nor Named Plaintiffs to prove class members have suffered such harm"); *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 676 (7th Cir. 2009) ("What is true is that a class will often include persons who have not been injured by the defendant's conduct. . . . Such a possibility or indeed inevitability does not preclude class certification").

Although courts in those circuits do not require that absent class members have standing, they still consider the issue when deciding a motion for class certification. *See Neale*, 794 F.3d at 368-69.  As the court explains in *Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524, 533 (C.D. Cal. 2011),

> the majority of authority militates in favor of the following rule, which this Court adopts: where the class representative has established standing and defendants argue that class certification is inappropriate because unnamed class members' claims would require individualized analysis of injury or differ too greatly from the plaintiff's, a court should analyze these arguments through Rule 23 and not by examining the Article III standing of the class representative or unnamed class members.

*Id.*; *see also* 1 William B. Rubenstein, *Newberg on Class Actions* § 2:3 (5th ed.) (Westlaw 2018) ("[T]he problem of un-injured absent class members is a problem of Rule 23, not of Article III"). Courts have taken different approaches to incorporating absent class member standing issues into Rule 23 analysis, but many courts have addressed the issue in their analysis of predominance under Rule 23(b)(3).  *See Neale*, 794 F.3d at 368-69.

The Second Circuit, on the other hand, takes a different approach.  In *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006), the court stated that "[t]he filing of a suit as a class action does not relax [the] jurisdictional requirement" that a plaintiff must have standing. Therefore, "no class may be certified that contains members lacking Article III standing."  *Id.* The court in *Denney* treated it as settled law that absent class members must have standing, and the court did not explain how exactly district courts should apply that rule.  *See id.*  Similarly, the Eighth Circuit, citing *Denney*, stated that "a class cannot be certified if it contains members who lack standing," but the court did not provide detailed instruction to district courts.  *See Avritt v.*

*Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010).[5]  Some courts have suggested that

*Denney* does not impose a distinct Article III analysis, and that it actually considers standing

within the confines of Rule 23 analysis.  *See Neale*, 794 F.3d at 368; *Kohen*, 571 F.3d at 677; *see*

*also* 1 *Newberg on Class Actions* § 2:3.

Since *Denney*, the Second Circuit has not elaborated on how district courts should address

the question of whether absent class members have Article III standing.  Nevertheless, the

language in *Denney* is clear enough: a proposed class must "be defined in such a way that anyone

within it would have standing." *Denney*, 443 F.3d at 264.  Consistent with that language, the

majority of district courts in the Second Circuit have analyzed the standing of absent class

members as an Article III question, rather than an issue that can be addressed when reviewing the

Rule 23 requirements governing class actions.  *See, e.g.*, *Kempner v. Town of Greenwich*, 249

F.R.D. 15, 17 (D. Conn. 2008) ("Before addressing the class certification rule, the court finds that

the proposed class cannot be certified because it contains members who do not have standing

under Article III of the Constitution"); *but see Royal Park Invs. v. Wells Fargo Bank*, No. 14-CV-

9764, 2018 WL 1831850, *4 (S.D.N.Y. Apr. 17, 2018) (considering the standing of absent class

members when analyzing the predominance requirement of Rule 23(b)(3)).  The Court follows

---

[5] The state of the law regarding absent class member standing is particularly unsettled in the Ninth Circuit.  In *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007), the court stated that it would "consider only whether at least one named plaintiff" meets the requirements of Article III standing.  *Id.*; *accord Stearns v. Ticketmaster Corp.*, 665 F.3d 1013, 1021 (9th Cir. 2011).  But in a later case, the Ninth Circuit stated that "[n]o class may be certified that contains members lacking Article III standing."  *See Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 594 (9th Cir. 2012) (quoting *Denney*, 443 F.3d at 264).  Although the court's statement in *Mazza* appears to be in tension with *Bates*, the court does not address that issue.  *See Moore v. Apple Inc.*, 309 F.R.D. 532, 541 (N.D. Cal. 2015) (collecting cases addressing the tension between *Mazza* and *Bates*).

that approach in this case and addresses the question of absent class member standing before reaching Rule 23 analysis.

The Second Circuit does not require that "each member of a class submit evidence of personal standing." *Id*. Instead, "only one of the named Plaintiffs is required to establish standing in order to seek relief on behalf of the entire class." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 241 (2d Cir. 2007). In other words, "[i]n a class action, once standing is established for a named plaintiff, standing is established for the entire class." *Kendall v. Emps. Ret. Plan of Avon Prods.*, 561 F.3d 112, 118 (2d Cir. 2009).[6] But this is not the end of the Article III standing inquiry. Even if one of the named plaintiffs has established standing on behalf of the entire class, the reviewing court must still examine the class definition. "Ultimately, the Article III standing inquiry must be examined through the prism of the class definition; in this Circuit, a class cannot be certified if any person captured within the class definition lacks Article III standing." *Calvo*, 2018 WL 1633565, at *2 (citing *Denney*, 443 F.3d at 263).

### 2. Standing of the Putative Class

Although Chrysler does not contest Tomassini's standing, it argues that class certification must be denied because the proposed class definition encompasses class members who lack standing to sue in their own right. *See* Dkt. No. 209-11 at 21. The proposed class definition is

---

[6] This statement in *Kendall* could be understood to mean that the Article III standing inquiry is complete once the named plaintiff establishes standing. *See City of Westland Police & Fire Retirement Sys. v. Metlife, Inc.*, No. 12-CV-256, 2017 WL 3608298, *16 (S.D.N.Y. Aug. 22, 2017). But the Court reads *Kendall* to be consistent with *Denney*, and to mean only that the evidentiary burden for the putative class has been met once the named plaintiff establishes standing. Nevertheless, separate and apart from that requirement, a court must analyze the class definition to ensure that it is not so broad as to clearly include absent class members who lack standing.

"all persons who purchased and/or leased Chrysler and Dodge Minivans manufactured after June 10, 2009 through May 25, 2010, in the State of New York." Dkt. No. 202 at 1. As of February 28, 2018, Chrysler estimated that there were 8,326 such vehicles originally purchased or leased in New York, 2,495 of which were resold to New York residents, and 356 of those vehicles were resold to a third owner in New York. *See* Dkt. No. 209-1 at ¶¶ 38-39. Additionally, there were 6,297 vehicles that were originally sold outside of New York but then resold to a used vehicle purchaser in New York. *See id.* In all, there were a total of 17,474 class vehicles. But that is not a final number; the class continues to grow each time a Chrysler or Dodge van manufactured between June 10, 2009 and May 25, 2010, is resold in New York.

Of these potential class members, Chrysler objects to the standing of three different groups: (1) individuals who purchased vehicles with AL2000 valve stems and had them replaced with AL6000 valve stems for free under warranty; (2) individuals who resold their vehicles before experiencing any problems with their valve stems; and (3) individuals who purchased their vehicles used after the AL2000 valve stems had already been replaced with AL6000 valve stems. *See* Dkt. No. 209-11 at 21.

As for the first and second groups, those individuals have standing because they purchased vehicles with AL2000 valve stems. The Court already addressed this issue in the November Order and explained that "allegations that a plaintiff purchased a product at an inflated price as a result of the defendant's deception is a sustainable injury under Section 349." Dkt. No. 155 at 19 (citing *Goldemberg v. Johnson & Joshnson Consumer Cos.*, 8 F. Supp. 3d 467, 471 (S.D.N.Y. 2014)). An inflated-price injury "occurs when a plaintiff paid more for a good than he or she would have paid but for the deceptive practices of the defendant." *Id.* at 20 (citing *Belfiore v. Proctor & Gamble Co.*, 311 F.R.D. 29, 62-63 (E.D.N.Y. 2015)). Regardless of whether the valve

stems were replaced for free under warranty or the vehicle was resold before any valve stem problems occurred, individuals who purchased a vehicle with defective valve stems have an inflated price claim and would be entitled to at least statutory damages.

But the third group—individuals who purchased used vehicles after the AL2000 valve stems had been replaced with AL6000 valve stems—does not have standing. Plaintiff does not argue that the AL6000 valve stems were defective; therefore, those individuals did not suffer an inflated-price injury. Indeed, since they never owned a vehicle with the allegedly defective valve stems, it is not clear how those individuals could have suffered any injury that could provide standing in this case. The question, then, is whether there are members of the proposed class who purchased vehicles in which all four of the original valve stems were replaced with AL6000 valve stems.

In his declaration, Mr. Bibb asserts "it is a fact that used vehicles were sold in New York with replacement TPMS components which had [AL6000] valve stems." Dkt. No. 209-1 at ¶ 41. Chrysler cites two instances "by way of example only." *Id.* First, a minivan originally sold in August 2010 had its TPMS system replaced in March 2013. *See id.* When the vehicle was resold in June 2014, it was equipped with AL6000 valve stems. *See id.* Similarly, a separate minivan originally sold in December 2009 had its valve stems replaced with the AL6000 version in August 2012, and it was resold in May 2013. *See id.*

Although Chrysler provides just two examples of class vehicles that were sold in New York with AL6000 valve stems, there are inevitably many more. Chrysler provides a variety of reasons why a vehicle's valve stems might need to be replaced, including accidents, leaks, and corrosion. *See* Dkt. No. 209-1 at ¶ 32. Additionally, the TPMS components can also fail for a variety of reasons, including problems with the antenna, the battery, or other sub-components.

*See id.* at 30. For all vehicles manufactured between June 10, 2009 and October 2009—when Chrysler began manufacturing the class vehicles with an updated TPMS system—the failure of just one valve stem could necessitate the replacement of the entire TPMS component. *See id.* at ¶ 31. Finally, the failure rate of the valve stems was expected to max out at five years because that is when Chrysler expected car owners to change their tires, at which point corroded valve stems would be replaced. *See* Dkt. No. 196-19 at 3. Therefore, there are likely many vehicle owners who, for one reason or another, replaced all of their vehicle's valve stems before reselling the vehicle to an individual in New York.

Where a plaintiff's class definition includes a significant number of individuals who do not have standing, a court must deny the motion for class certification. *See Calvo v. City of New York*, No. 14-CV-7246, 2017 WL 4231431, *7 (S.D.N.Y. Sept. 21, 2017) (denying class certification because the proposed class definition included vehicle owners who had not suffered an injury in fact); *Burton v. Nationstar Mortg., LLC*, No. 13-CV-307, 2014 WL 5035163, *8 (E.D. Cal. Oct. 8, 2014) (denying class certification because the class was defined so broadly as to include many individuals without standing). Even the Seventh Circuit, which does not impose a strict Article III standing requirement for absent class members, stated that if "a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification." *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 824 (7th Cir. 2012). In this case, well over half of the putative class members purchased their vehicles used, and many of them likely purchased vehicles without any AL2000 valve stems.

The Court also notes that Plaintiff has been aware of the potential standing issue throughout the pendency of this case. In a June 2015 decision, the Court stated that it "agrees

with the proposition that a class cannot be certified where its members lack standing." Dkt. No. 23 at 22 (citing *Denney*, 443 F.3d at 263-68). The Court went on to state that it would consider the issue when Plaintiff filed his motion for class certification. *See id.* Nonetheless, Plaintiff's proposed class definition includes absent class members who clearly lack standing.

Plaintiff suggests that the Court could narrow the proposed class to exclude any class members without standing. *See* Dkt. No. 215 at 12. When confronted with an overly broad class definition, a court has the discretion to modify the class definition. *See Guariglia v. Procter & Gamble Co.*, No. 15-CV-4307, 2018 WL 133536, *13 (E.D.N.Y. Mar. 14, 2018). Generally, courts "have the discretion 'to construe the complaint or redefine the class to bring it within the scope of Rule 23.'" *Mazzei v. Money Store*, 288 F.R.D. 45, 55 (S.D.N.Y. 2012) (quoting *Cokely v. N.Y. Convention Ctr. Operating Corp.*, No. 00-CV-4637, 2004 WL 1152531, *2 n.3 (S.D.N.Y. May 21, 2004)). Indeed, a number of district courts in this circuit have narrowed class definitions to exclude putative class members without standing, rather than outright denying a motion for class certification. *See Strauch v. Comput. Scis. Corp.*, 322 F.R.D. 157, 180-81 (D. Conn. 2017); *Moreno v. Deutsche Bank Ams. Holding Corp.*, No. 15-CV-9936, 2017 WL 3868803, *11 (S.D.N.Y. Sept. 5, 2017); *Janes v. Triborough Bridge & Tunnel Auth.*, 889 F. Supp. 2d 462, 466-68 (S.D.N.Y. 2012).

In this case, however, there is no obvious modification to the class definition that would solve Plaintiff's standing problems without introducing other problems fatal to Plaintiff's motion. Narrowing the class to include only individuals who purchased or leased new vehicles would resolve the standing concern because it would ensure that all class members purchased vehicles with AL2000 valve stems. But that definition would exclude the named class representative in this case, who bought his car used. Alternatively, narrowing the class to only vehicles that were

purchased with AL2000 valve stems would also solve Plaintiff's standing problem. But such a definition would create individualized questions of fact that would predominate over common questions, and the Court would not certify the class under Rule 23(b)(3), as the Court explains in the following section. Accordingly, Plaintiff's motion for class certification is denied. Even if the Court were to follow the lead of other courts and consider the standing issue as part of its Rule 23 analysis, Plaintiff's motion for class certification would be denied.

## B.    Rule 23 Analysis

Generally, where a plaintiff lacks standing, the court does not have subject matter jurisdiction and should not reach the merits of a case. *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 54 (2d Cir. 2016). In the class action context, the relationship between Article III standing and a court's ability to reach the merits of a case is substantially more complex. *See Neale*, 794 F.3d at 358-61 (examining the relationship between the Article III standing of absent class members and a court's authority to engage in Rule 23 analysis, which "may overlap with merits-based questions"). Because of the unsettled nature of the law on this point, and because the Court considers the possibility of modifying the proposed class definition, the Court will address some of the issues that would arise if the Court reached Rule 23 analysis.

"Before certifying a putative class, a district court must decide that it satisfies not only Rule 23(a)'s prerequisites of numerosity, commonality, typicality, and adequacy of representation, but also one of the three criteria of Rule 23(b)." *Royal Park Invs.*, 2018 WL 1831850, at *4. In this case, Plaintiff claims that he has met the requirements of two different subsections of Rule 23(b): 23(b)(2) for the purposes of injunctive relief, and 23(b)(3) for the purposes of money damages. *See* Dkt. No. 202 at 29. Under Rule 23(b)(2), certification is appropriate where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so

that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). A Rule 23(b)(3) class may be certified if "the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Where a plaintiff seeks both declaratory and monetary relief, the court may separately certify a damages-seeking class under Rule 23(b)(3), and an injunction-seeking class under Rule 23(b)(2)." *Mazzanti v. Gen. Elec. Co.*, No. 13-CV-1799, 2017 WL 923905, \*3 (D. Conn. Mar. 7, 2017).

In a motion for class certification, a plaintiff must establish the Rule 23 requirements by a preponderance of the evidence. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014) ("[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)"). The determination of whether the plaintiff has satisfied his or her burden "may sometimes overlap with merits issues, though the determination as to a Rule 23 requirement is not binding on the trier of fact in its determination of the merits." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015); *see also Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013) ("Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied"). District courts are afforded broad discretion in class determination questions. *See Wynn v. N.Y.C. Hous. Auth.*, 314 F.R.D. 122, 125 (S.D.N.Y. 2016).

### 1. Rule 23(b)(3) - Predominance

A district court may certify a class under Rule 23(b)(3) only if "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "This 'predominance' requirement is satisfied if: (1) resolution of any material 'legal or factual questions . . . can be achieved through generalized proof,' and (2) 'these [common] issues are more substantial than the issues subject only to individualized proof.'" *In re Petrobras Secs.*, 862 F.3d 250, 270 (2d Cir. 2017) (alteration in original) (quoting *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016)).

"The requirement's purpose is to 'ensure[] that the class will be certified only when it would achieve economies of time, effort and expense, and promote uniformity of decisions as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Mazzei*, 829 F.3d at 272 (quoting *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010)). "[W]hen individual rather than common issues predominate, the economy and efficiency of class-action treatment are lost and . . . the risk of confusion is magnified." *Royal Park Invs. SA/NV v. Wells Fargo Bank, N.A.*, No. 14-CV-9764, 2018 WL 739580, *12 (S.D.N.Y. Jan. 10, 2018) (alterations in original). "In determining whether the predominance requirement has been met, courts must consider both affirmative claims and potential defenses." *In re IndyMac Mortgage-Backed Secs. Litig.*, 286 F.R.D. 226, 236 (S.D.N.Y. Aug. 17, 2012).

In this case, there are two main issues that lead the Court to conclude that individual issues predominate over common ones: (1) the question of whether individual class members owned vehicles with the AL2000 valve stems; and (2) the individualized calculation of damages.

### a. Standing

Since a proposed class must "be defined in such a way that anyone within it would have standing," *Denney*, 443 F.3d at 264, the Court must eventually determine whether each member

of the proposed class has standing, *see In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013) (holding that the predominance requirement demands that plaintiffs "show that they can prove, through common evidence, that all class members were in fact injured").  In some cases, the individualized questions involved in making that determination will predominate over common questions of law and fact.  *See Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 779 (8th Cir. 2013) (holding that the "individual questions necessary to determine" whether absent class members had standing "overwhelm questions common to the class"); *Royal Park Invs.*, 2018 WL 739580, at *12 ("The individualized inquiries required to ensure that all class members have Article III standing overwhelm any questions common to the proposed class").

Here, in order to ensure that each potential class member has standing, the Court will need to determine whether each individual purchased a vehicle with at least one AL2000 valve stem. Since more than half of potential class members purchased their vehicles used—and many used vehicles were resold a second time—it will be difficult, if not impossible, to determine whether a vehicle had original valve stems at the time it was resold.  Even if each used vehicle purchaser were to provide an affidavit, the purchaser may not actually know whether the valve stems had been replaced, or which type of replacement stems were used.  The individualized inquiry necessary to determine whether individual used car purchasers have standing in this case would overwhelm questions common to the proposed class.  *See Royal Park Invs.*, 2018 WL 739580 at *12 (finding that the plaintiff's proposed class did not satisfy the predominance standard, in part because the court would be required to "engage in fact-intensive, individualized inquiries to determine which potential class members" had standing); *Branch v. Gov't Emps. Ins. Co.*, 323 F.R.D. 539, 552 (E.D. Va. 2018) (finding that the plaintiff failed to satisfy the predominance

requirement partially because individuals with standing "cannot be identified without individualized inquir[y]").

### b. Damages

It has long been the rule in this circuit that "individualized damages determinations alone cannot preclude certification under Rule 23(b)(3)." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 409 (2d Cir. 2015) (citing *Seijas v. Repub. of Arg.*, 606 F.3d 53, 58 (2d Cir. 2010)). Nonetheless, the Second Circuit has recognized that courts may consider damages questions "at the certification stage when weighing predominance issues." *Id.*; *see also Royal Park Invs.*, 2018 WL 1831850, at *5 (holding that individual issues predominated over class issues in part because "individualized inquiries necessary to distribute damages among investors . . . would dwarf the only common question identified in this case").

Here, a great deal of individualized inquiry would be necessary in order to calculate damages for different class members. For new car purchasers, the Court would need to determine the amount of the inflated price damages at the point of purchase, but that is just the beginning. New car purchasers who resold their vehicles would be entitled to different amounts of damages depending on whether they replaced some or all of the original valve stems prior to selling their vehicle, and whether any repairs were covered under warranty. Additionally, depending on which TPMS component was in use at the time, a single broken valve stem may have required the replacement of the entire TPMS component. The Court will face similar problems in calculating damages for used car purchasers, whose damages will depend on the number of original valve stems on the car at the time of purchase. Furthermore, it is also possible that some used car purchasers were aware of the valve stem issues and negotiated the vehicle's resale price

accordingly. Answering these questions would entail a great deal of difficult, individualized inquiry for each class member, which weighs against a finding of predominance.

### 2. Rule 23(b)(2) - Injunctive Class

Plaintiff also seeks to certify a class for injunctive and declaratory relief under Rule 23(b)(2). In particular, Plaintiff seeks an injunction requiring Chrysler to "warn all purchasers and potential purchasers of Chrysler Minivans about the defective TPMS valve stems." Dkt. No. 1 at ¶ 85. Defendant argues that Plaintiff may not certify a Rule 23(b)(2) class because injunctive relief would not redress any injury suffered by Plaintiff. The Court agrees.

As the Court noted above, a plaintiff seeking to represent a class must have standing. *See Vaccariello v. XM Satellite Radio, Inc.*, 295 F.R.D. 62, 68 (S.D.N.Y. 2013). Furthermore, "[f]or each form of relief sought, a plaintiff 'must demonstrate standing separately.'" *Singleton v. Fifth Generation, Inc.*, No. 15-CV-474, 2017 WL 5001444, *15 (N.D.N.Y. Sept. 27, 2017) (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016)). "[A] plaintiff seeking injunctive relief 'must show the three familiar elements of standing: injury in fact, causation, and redressibility.'" *Greene v. Gerber Prods. Co.*, 262 F. Supp. 3d 38 54-55 (E.D.N.Y. 2017) (quoting *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011)).

"'[T]o meet the constitutional minimum of standing' for injunctive relief, a plaintiff 'must carry the burden of establishing that 'he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct.'" *Greene*, 262 F. Supp. 3d 38, 54 (E.D.N.Y. 2017) (quoting *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)); *see also Nicosia*, 834 F.3d at 239 ("Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of injury") (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111-12 (1983)). "Although past injuries may provide a basis to seek money

damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way." *Nicosia*, 834 F.3d at 239.

Plaintiff was injured when he paid an inflated price for the Minivan because Chrysler withheld information about a defect in the valve stems of his Minivan. But Plaintiff is now aware of the defective valve stems, he no longer has any of the defective valve stems on his vehicle, *see* Dkt. No. 215-1 at ¶ 5, and Chrysler stopped manufacturing the vehicles in question on May 26, 2010. Moreover, there is no indication that Plaintiff plans to buy another minivan manufactured with the defective valve stems. Therefore, Plaintiff does not have standing to pursue injunctive relief because a favorable decision would not redress his injuries. *See In re Avon Anti-Aging Skincare Creams & Prods. Marketing & Sales Practices Litig.*, No. 13-CV-150, 2015 WL 5730022, *8 (S.D.N.Y. Sept. 30, 2015) ("Plaintiffs are unlikely to buy the class products again, and do not allege otherwise in their complaint. Accordingly, they lack standing to seek a forward-looking injunction").

The Court recognizes that there is a split in authority on the question of whether to permit a plaintiff to pursue injunctive relief in such situations. Some courts in this circuit have found that a plaintiff has standing to seek injunctive relief against deceptive advertising even if he or she has no plans to purchase the product in question again. *See In re Amla Litigation*, 282 F. Supp. 3d 751, 769 (S.D.N.Y. 2017); *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 67 (E.D.N.Y. 2015); *Ackerman v. Coca-Cola Co.*, No. 09-CV-395, 2013 WL 7044866, *17 (E.D.N.Y. July 18, 2013). These courts argue that to bar those plaintiffs from pursuing injunctive relief would prevent nearly all plaintiffs from pursuing injunctive relief in false advertising cases. As Judge Jack B. Weinstein explained in *Belfiore*, "[t]he only way a consumer could enjoin deceptive conduct would be if he were made aware of the situation by suffering injury. But once the

consumer learned of the deception, he would voluntarily abstain from buying and therefore could no longer seek an injunction." *Belfiore*, 311 F.R.D. at 67.

While the Court understands this dilemma, it cannot overlook Plaintiff's lack of Article III standing. *See Langan v. Johnson & Johnson Consumer Cos., Inc.*, No. 13-CV-1470, 2017 WL 985640, *11 (D. Conn. Mar. 13, 2017) ("Regardless of the salutary purpose of consumer protection statutes, they cannot alter the bedrock requirement for federal constitutional standing"), *rev'd on other grounds*, ___ F.3d ___, 2018 WL 3542624 (2d Cir. July 24, 2018); *In re Avon*, 2015 WL 5730022, at *8 ("Article III does not permit this sort of public policy exception"). Moreover, the unavailability of injunctive relief does not "wholly defeat the deterrent purpose of such consumer protection statutes to the extent that they may otherwise authorize suits for money damages and in addition may allow for injunctive actions to proceed in state courts that are not subject to federal constitutional standing requirements." *Langan*, 2017 WL 985640, at *11. Indeed, the majority of district courts in this circuit have found that consumers in Plaintiff's situation do not have Article III standing. *See Davis v. Hain Celestial Grp., Inc.*, 297 F. Supp. 3d 327, 338 (E.D.N.Y. 2018); *Greene*, 262 F. Supp. 3d at 54-55; *Langan*, 2017 WL 985640, at *10-*11; *Singleton*, 2017 WL 5001444, *15-*16; *In re Avon*, 2015 WL 5730022 at *8; *Tomasino v. Estee Lauder Cos. Inc.*, 44 F. Supp. 3d 251, 255-56 (E.D.N.Y. 2014); *Vaccariello*, 295 F.R.D. at 68. Therefore, the Court finds that Plaintiff lacks standing to bring a claim for injunctive relief, and the motion for certification of a Rule 23(b)(2) class must be denied.

## V. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Plaintiff's motion for class certification (Dkt. No. 194) is **DENIED**; and the Court further

**ORDERS** that Defendant's motion to preclude expert testimony (Dkt. No. 218) is **DENIED as moot**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: August 6, 2018
      Albany, New York

**Mae A. D'Agostino**
**U.S. District Judge**