## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| ROBERT TOMASSINI, individually, and THOMAS HROMOWYK, individually and on behalf of himself and others similarly situated, | : : : : | Case No. 3:14-cv-01226-MAD-ML |
|  | : | Hon. Mae A. D'Agostino |
| Plaintiff, | : | United States District Judge |
|  | : |  |
|  | : |  |
| vs. | : |  |
|  | : |  |
| CHRYSLER GROUP LLC (n/k/a FCA US LLC), | : : |  |
|  | : |  |
| Defendant. | : |  |

### FCA US LLC'S MEMORANDUM IN OPPOSITION TO
### PLAINTIFF THOMAS HROMOWYK MOTION FOR CLASS CERTIFICATION

**COUGHLIN & GERHART, LLP**
Alan J. Pope
apope@cglawoffices.com
Bar Enroll No. 301508
99 Corporate Drive
P.O. Box 2039
Binghamton, New York  13902
Phone:  (607) 723-9511

**THOMPSON COBURN LLP**
Kathy A. Wisniewski
kwisniewski@thompsoncoburn.com
Stephen D'Aunoy
sdaunoy@thompsoncoburn.com
Thomas L. Azar, Jr.
tazar@thompsoncoburn.com
Sharon B. Rosenberg
srosenberg@thompsoncoburn.com
One US Bank Plaza
St. Louis, Missouri  63101
Phone:  (314) 552-6000
Fax:  (314) 552-7000

*Attorneys for FCA US LLC*

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION .............................................................................................................. 1

II.    RELEVANT FACTUAL BACKGROUND........................................................................ 3

       A.    General Overview Of Proposed Class Members. .................................................... 3

       B.    General Overview Of The Class Vehicles. .............................................................. 4

       C.    The Three Different TPMS Components/Valve Stems In The Class
             Vehicles.................................................................................................................... 4

       D.    General Facts Relevant To FCA US's Knowledge.................................................. 5

       E.    Proof That Valve Stems Do Not Create Safety Issues............................................ 6

       F.    TPMS Component And Valve Stem Replacements. ................................................ 9

       G.    The Admissions Made By Plaintiff's Experts. ..................................................... 11

       H.    The Testimony Of FCA US's Expert.................................................................... 13

       I.     Consumers' Purchasing Decisions......................................................................... 13

       J.     Facts Relevant To Plaintiff Thomas Hromowyk. ................................................. 15

             1.     Vehicle Purchase and History.................................................................... 15

             2.     Plaintiff's Involvement in Litigation. ....................................................... 17

III.   ARGUMENT.................................................................................................................... 18

       A.    The Lack Of A Legally Viable Class..................................................................... 19

       B.    Plaintiff Has Failed to Prove The Rule 23(a) Requisites....................................... 23

       C.    The Rule 23(b)(3) Predominance Requisite Is Lacking. ....................................... 28

       D.    No Proof Of Superiority As Required By Rule 23(b)(3)....................................... 37

       E.    The Issue Of Liability Cannot Properly Be Certified Under Rule 23(c)(4). ........ 38

IV.    CONCLUSION................................................................................................................. 39

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akaosugi v. Benihana Nat'l Corp.*, 282 F.R.D. 241 (N.D.Cal. 2012) ...........................................27

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) .............................................................26

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013) ...............................2, 19

*Atik v. Welch Foods, Inc.*, 2016 WL 5678474 (E.D.N.Y. 2016) ...................................................23

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52 (2d Cir. 2000).....................26, 28

*Baron v. Pfizer, Inc.*, 840 N.Y.S.2d 627 (2007) ..........................................................................19

*Beck v. Status Game Corp.*, 1995 WL 422067 (S.D.N.Y. 1995)....................................................28

*Brecher v. Republic of Argentina*, 806 F.3d 22 (2d Cir. 2015).....................................................22

*Bristol Vill., Inc. v. Louisiana-Pacific Corp.*, 170 F. Supp. 3d 488 (W.D.N.Y. 2016) ...............................................................................................................................21

*Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998) ..........................30

*Browe v. Evenflo Co.*, 2015 WL 3915868 (D.Minn. 2015) ..........................................................26

*Calvo v. City of New York*, 2017 WL 4231431 (S.D.N.Y. 2017)...................................................19

*Chin v. Chrysler Corp.*, 182 F.R.D. 448 (D.N.J. 1998) ................................................................36

*Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013) ......................................................................35

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) .....................................................................21, 36

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) .........................................................19

*Emilio v. Sprint Spectrum L.P.*, 2017 WL 3208535 (S.D.N.Y. 2017)...............................25, 26, 28

*Falcon v. Philips Elec. N.Am. Corp.*, 304 Fed.Appx. 896 (2d Cir. 2008) ....................................27

*Frank v. DaimlerChrysler Corp.*, 741 N.Y.S.2d 9 (2002)............................................................20

*Fullwood v. Wolfgang's Steakhouse, Inc.*, 2014 WL 6076733 (S.D.N.Y. 2014) ..........................22

*Gould v. Helen of Troy Ltd.*, 2017 WL 1319810 (S.D.N.Y. 2017) ...............................................21

*Grodzitsky v. American Honda Motor Co., Inc.*, 2014 WL 718431 (C.D.Cal. 2014) ...................................................................................................................24

*Haag v. Hyundai Motor America*, 330 F.R.D. 127 (W.D.N.Y. 2019).................................. *passim*

*In re Am. Int'l Group, Inc. Secs. Litig.*, 689 F.3d 229 (2d Cir. 2012) ..........................................18

*In re Avon Anti-Aging Skincare Creams & Prod. Mktg. & Sales Practices Litig.*, 2015 WL 5730022 (S.D.N.Y. 2015)..............................................................................34

*In re Canon Cameras*, 237 F.R.D. 357 (S.D.N.Y. 2006) ......................................................19, 20

*In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II)*, 2012 WL 379944 (D.N.J. 2012)..........................................................................................................33

*In re General Motors LLC Ignition Switch Litig.*, 257 F.Supp.3d 372 (S.D.N.Y. 2017) ............................................................................................................20

*In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006) ............................................33

*In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011) ..............................................................................................................27

*In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 209 F.R.D. 323 (S.D.N.Y. 2002) ......................................................................................................29

*In re Scotts EZ Seed Litig.*, 304 F.R.D. 397 (S.D.N.Y. 2015) ......................................................23

*In re Whole Foods Mkt. Grp., Inc. Overcharging Litig.*, 397 F.Supp.3d 406 (S.D.N.Y. 2019) ......................................................................................................19

*Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418 (S.D.N.Y. 2009)................................................22

*Kail v. Wolf Appliance, Inc.*, 2017 WL 3608242 (E.D.N.Y. 2017) ....................................................3

*Koch v. Christie's International PLC*, 785 F.Supp.2d 105 (S.D.N.Y. 2011) ................................31

*Lebowitz v. Dow Jones & Co.*, 508 Fed.Appx. 83 (2d Cir. 2013) ................................................30

*Lieb v. Am. Motors Corp.*, 95 F.R.D. 507 (S.D.N.Y. 1982) ..........................................................26

*Luppino v. Mercedes Benz USA*, 2017 WL 6015698 (3d Cir. 2017)................................................30

*Marshall v. Hyundai Motor America*, –F.R.D.–, 2019 WL 2678023 (S.D.N.Y. 2019) ............................................................................................................ *passim*

*Miller v. Fuhu, Inc.*, 2015 WL 7776794 (C.D.Cal. 2015) ............................................................36

*Mooradian v. FCA US, LLC*, 2017 WL 4869060 (N.D. Ohio 2017)......................................27, 33

*Myers v. Hertz Corp.*, 624 F.3d 537 (2d Cir. 2010)......................................................................18

*Opperman v. Kong Techs., Inc.*, 2017 WL 3149295 (N.D.Cal. 2017) ...........................................36

*Oscar v. BMW of N. Am., LLC*, 2012 WL 2359964 (S.D.N.Y. 2012)...............................23, 34, 36

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85
    N.Y.2d 20, 647 N.E.2d 741 (1995)...........................................................................................31

*Pagan v. Abbott Laboratories, Inc.*, 287 F.R.D. 139 (E.D.N.Y. 2012) ...................................19, 20

*Rapcinsky v. Skinnygirl Cocktails, L.L.C.*, 2013 WL 93636 (S.D.N.Y. 2013)..............................25

*Royal Park Investments SA/NV v. Bank of New York Mellon*, 2017 WL 3835339
    (S.D.N.Y. 2017)........................................................................................................................22

*Royal Park Investments SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F.Supp.3d 387
    (S.D.N.Y. 2018)........................................................................................................................29

*Ruzhinskaya v. Healthport Techs.*, LLC, 311 F.R.D. 87 (S.D.N.Y. 2015)....................................22

*Singleton v. Fifth Generation, Inc.*, 2017 WL 5001444 (N.D.N.Y. 2017) .....................................36

*Spagnola v. Chubb Corp.*, 264 F.R.D. 76 (S.D.N.Y. 2010) ...........................................................37

*Spratley v. FCA US LLC*, Case No. 3:17-cv-00062 (N.D.N.Y.) .............................................17, 18

*Statler v. Dell, Inc.*, 775 F.Supp.2d 474 (E.D.N.Y. 2011)..............................................................20

*Statler v. Dell, Inc.*, 841 F. Supp. 2d 642 (E.D.N.Y. 2012)...........................................................21

*Sweener v. Saint-Gobain Performance Plastics Corp.*, 2018 WL 748742
    (N.D.N.Y. 2018) .................................................................................................................29, 30

*Vaccariello v. XM Satellite Radio, Inc.*, 295 F.R.D. 62 (S.D.N.Y. 2013) .....................................20

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .......................................................25, 29, 30

*Weinstein v. eBay, Inc.*, 819 F. Supp. 2d 219 (S.D.N.Y. 2011).....................................................32

*Wilder v. News Corp.*, 2015 WL 5853763 (S.D.N.Y. 2015) ..........................................................22

*Woods v. Maytag Co.*, 2010 WL 4314313 (E.D.N.Y. 2010)..........................................................31

**Statutes and Constitutional Provisions**

New York General Business Law § 349................................................................................ *passim*

**Rules**

Fed.R.Civ.P. 23 .................................................................................................. *passim*

N.Y. C.P.L.R. 214(2) .......................................................................................3, 21

**Other Authorities**

http://www.classlawdc.com/defective-products/ ..........................................................14

http://www.tc.gc.ca/eng/motorvehiclesafety/safevehicles-defectinvestigations-
    information-deactivated-1240.htm......................................................................7

https://www.autosafety.org/2009-car-book-best-bets/....................................................4

https://www.autosafety.org/2010-car-book-best-bets/....................................................4

*https://www.wbmllp.com/landing/tire-pressure-monitoring-systems/*...........................14

## I.      **INTRODUCTION**

This case is based on allegations that the Tire Pressure Monitoring System ("TPMS")
components in the "Class Vehicles"[1] have tire valve stems and nuts that prematurely corrode.
This marks the third time that the same proposed class counsel have proffered essentially the
same arguments and theories in support of certification in a case in which it is alleged that a
manufacturer is liable under New York General Business Law § 349 because it sold vehicles
having some component that is "defective" due to its susceptibility to prematurely corrode.[2]  In
the earlier two cases, as here, certification was sought of classes that encompassed individuals
owning vehicles with alleged vehicle defects that had never manifested, there was no evidence
suggesting that every vehicle in the proposed classes needed a repair, and damages were sought
for paying a "price premium" at the point of sale based on the notion that it was "obvious"
"reasonable consumers" would want to know about vehicle components that could corrode and
thus that the market price would be affected.[3]  In both of the earlier cases certification was
denied, in one for a lack of predominance based solely on the uncommon causation and damage

---

[1]The "Class Vehicles" that are the subject of the operative First Amended Complaint are
Chrysler and Dodge Minivans manufactured after June 10, 2009 and through May 25, 2010.  *See*
ECF #243.

[2]*Compare* Memorandum of Law in Support of Plaintiff Thomas Hromowyk's Motion for
Class Certification, ECF #299 ("Pl. Mtn.") *with Marshall v. Hyundai Motor America*, –F.R.D.–,
2019 WL 2678023 (S.D.N.Y. 2019) *and Haag v. Hyundai Motor America*, 330 F.R.D. 127
(W.D.N.Y. 2019).

[3]*Compare* Pl. Mtn., p. 41 fn.13 ("It is obvious that reasonable consumers would want to
know that the TPMS unit on their vehicles could catastrophically fail, and [at] minimum that
they would have to pay $375 to replace them and that the market price for vehicles with a known
defect would be less when such a defect is disclosed") *with Marshall*, 2019 WL 2678023 at *19
(noting the plaintiffs "simply argue, 'It is obvious that reasonable consumers would want to
know that their brakes will progressively degrade and fail as a result of a defect and that the
market price for vehicles with a known defect would be less when such a defect is disclosed'");
*see also Haag*, 330 F.R.D. at 132-33 (rejecting as speculative plaintiff's request that "the Court
[] conclude, as a practical assumption, that persons buying or leasing the Class Vehicles naturally
'would have wanted to know' that their brakes might corrode more quickly than expected, and
that had they been informed of it, they would have demanded a reduction in the price").

issues, and in the other for those same reasons and others too.  Plaintiff presents nothing to this Court which justifies a different outcome here.  In fact, the facts here justifying a denial of certification are even more compelling than were the facts in these earlier two cases.

It is telling that Plaintiff Thomas Hromowyk ("Plaintiff") spends the vast majority of his brief in support of his motion for class certification outlining the evidence which, he argues, supports the merits of the defect theory he pleads.[4]  *See, generally*, Pl. Mtn.  He seems to do this because he has little to offer on the actual Rule 23 requisites which he addresses by simply identifying each standard and then declaring that it is satisfied here.  *Id.*  But, once all the hype about the merits of the defect are ignored, and the focus is shifted to the actual class action requisites (which do ***not*** entail determining the merits of Plaintiff's defect theory[5]), it becomes clear that certification must be denied.

---

[4]FCA US will not waste this Court's valuable resources and use this brief to engage in a currently irrelevant debate about whether a defect does or does not exist, but notes for the record that Plaintiff has grossly exaggerated and misrepresented a significant amount of evidence in his current motion.  By way of example only, Plaintiff declares in his motion that FCA US "predicted a potential 100% failure rate within five years" for valve stems made with an AL2000 alloy.  *See* Pl., Mtn., p. 9.  But, he completely misrepresents the document he relies on for this incredible proposition, as that document proves that the actual predicted maximum failure rate was only between 4.5 and 6.25%.  *See* Declaration of Earl Bibb, attached hereto as Exhibit A, ("Bibb Decl."), ¶ 26.

[5]*See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013) ("Although we have cautioned that a court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied" (internal citation omitted)); Fed.R.Civ.P. 23(c)(1)(A) Adv. Comm. Notes 2003 ("an evaluation of the probable outcome on the merits is not properly part of the certification decision").

## II.   RELEVANT FACTUAL BACKGROUND

### A.   General Overview Of Proposed Class Members.

Plaintiff seeks to certify a class which would encompass "all persons who purchased and/or leased a new [Class Vehicle] in the State of New York and who currently own or lease the Class Vehicle." *See* Pl. Mtn., p. 1.  In other words, Plaintiff wants to represent a class of those who purchased/leased new and still own.  *Id.*  Plaintiff does not place a temporal ownership on the outer end of the equation, *i.e.,* "and still owned as of X date."

FCA US records show that as of February 18, 2018, there were 3,168 individuals who fell within the class defined by Plaintiff, *i.e.,* they bought new and still owned.  *See* Supplemental Declaration of Earl Bibb ("Supp. Bibb Decl."), attached hereto as Exhibit B, ¶ 5.  But, as of early August 2019, the number of individuals who fit within the defined class was down to 2,731.  *Id.* *Id.*  And, by early November 2019, only 2,653 individuals still fell within the class definition.[6] *Id.*

Of the 2,653 individuals who fit the class definition in November 2019, FCA US records indicate that 404 of them originally leased their vehicles but then purchased them outright.  *Id.* at ¶ 7.  And, out of the 2,653 individuals who fit the class definition in November 2019, only *two* purchased/leased their vehicles within the three year statute of limitations applicable to the remaining § 349 claim.[7]  *Id.* at ¶ 6.

---

[6]FCA US records reflect ownership information gathered from third parties and are not necessarily accurate.  In fact, FCA US's random review of the Carfax records for some of the Class Vehicles showed that although FCA US records showed the vehicles were still owned by the original purchaser/lessee, they had actually been disposed of due to accidents or resold, and for some there had been multiple resales.  *See* Supp. Bibb Decl., ¶ 4.

[7]A § 349 claim must be brought within 3 years of its accrual.  N.Y. C.P.L.R. 214(2). And, for a claim premised on allegations that the alleged deceptive acts caused the plaintiff to purchase a defective product or pay more for it, "[t]he clock begins to run … when the plaintiffs purchased the product."  *Kail v. Wolf Appliance, Inc.*, 2017 WL 3608242, *8 (E.D.N.Y. 2017).

**B.**   **General Overview Of The Class Vehicles.**

FCA US began manufacturing the Class Vehicles on June 10, 2009, for the 2009 model-year.[8]   Bibb Decl., ¶ 9.   Since that time, the Class Vehicles have won numerous awards and recognitions.   *Id.* at ¶ 7.   By way of example, model-year 2010 Chrysler Town & Country and Dodge Grand Caravan vehicles won the Best Buy award from *Consumer Digest Magazine*, which is given to the vehicle that provides the most value for the money.   *Id.*   The vehicles also won the "Best Bet" award from *Car Book*, which is based on performance across nine categories including crash rating, safety features, rollover, preventive maintenance, repair costs, warranty, fuel economy, complaints, and insurance costs, with the heaviest emphasis placed on safety.[9]   *Id.* "Best Bet" is a publication of the Center for Auto Safety, one of the most outspoken and aggressive consumer advocacy groups in the country, and, significantly, it gave the "repair costs" category for the Grand Caravan and the Town & Country a "10," the most favorable rating possible.   *See* https://www.autosafety.org/2010-car-book-best-bets/.

**C.**   **The Three Different TPMS Components/Valve Stems In The Class Vehicles.**

The Class Vehicles are equipped with TPMS components that have three different types of tire valve stems.   *See* Bibb Decl., ¶¶ 9-18.   Specifically, based on date of vehicle manufacturer, the Class Vehicles were equipped with the following different valve stems/nuts bearing the following part numbers ("PN"):

---

This lawsuit was filed on September 8, 2014, meaning the claims of those who purchased prior to September 8, 2011 are barred by limitations.

[8]FCA US was formed on April 28, 2009, and began operations on June 10, 2009, prior to which it did not design, manufacture or sell any vehicles.   *See* Bibb Decl., ¶ 6.

[9]The nine-category ratings started for model-year 2010, but the model-year 2009 Grand Caravan and Town & Country were rated the highest "best bet" by the Center for Auto Safety in the minivan category.   *See* https://www.autosafety.org/2009-car-book-best-bets/.

*June 10, 2009–September 30, 2009*:  PN 56053031, which incorporated tire valve stems made of a 2000 series alloy subjected to a T6 heat treatment (*i.e.,* the alloy was heated and cooled twice) and a sulfuric acid anodization process to improve strength and stress corrosion resistance was used in the Class Vehicles (*id.* at ¶¶ 9-11);

*October 1, 2009–November 23, 2009*:  PN 56053031, which incorporated tire valve stems made of a 2000 series alloy but with a T4 heat treatment, *i.e.,* a treatment aimed at making the alloy stronger and more stress corrosion resistant than the T6 treatment was used in the class vehicles (*id.* at ¶¶ 12-14); and

*November 23, 2009–May 25, 2010*:  PN 56029527AA was used in the Class Vehicles, and this part incorporated a differently threaded valve stem made from an aluminum 2000 series alloy subjected to both a T4 heat treatment and a sulfuric acid anodization process that was placed into a redesigned housing with a different size, microprocessor, antenna, and was of lighter weight, all of which were believed to improve the units' robustness and corrosion resistance (*id.* at ¶¶ 15-18).

**D.**     **General Facts Relevant To FCA US's Knowledge.**

When, in June 2009, FCA US first began operating the vehicle manufacturing business it had purchased, it used the PN 56053031AD TPMS units which incorporated the same valve stems that were used by numerous other manufacturers and which were made of the same common alloy used in a variety of vehicle and aircraft applications, *i.e.,* a series 2000 alloy.  *Id.* at ¶¶ 9-10.  These units were heat treated in a T6 condition and were subjected to a sulfuric acid anodization process to improve strength and stress corrosion resistance.  *Id.*  However, FCA US was then aware that there had been reports of these tire valve stems failing, and hence it continued the investigation that had been initiated by the prior manufacturer into how improvements could be made.  *Id.* at ¶ 11.

5

Only one month after beginning its vehicle manufacturing operations, FCA US was informed by a supplier that significant testing it had undertaken revealed that a change from a T6 to a T4 heat treatment would improve the stress corrosion resistance of the valve stems and would prevent stress corrosion-cracks/breaks completely unless certain preventable conditions interfered (*e.g.,* over-tightening of the valve core or the omission of a tire valve stem cap). *Id.* at ¶¶ 12-14. FCA US immediately agreed to have the recommended change implemented, and it fully did so less than three months later in October 2009. *Id.*

Even as it made the decision to improve the tire valve stems by switching to a T4 heat treatment, FCA US was continuing to investigate how further improvements could be made. *Id.* at ¶¶ 15-18. This investigation involved significant testing of potentially better parts, the result of which was the introduction on November 23, 2009 of a completely redesigned TPMS component (PN 56029527AA). *Id.* This new component had a redesigned housing, microprocessor, and antenna, it weighed less than its predecessor, and it was taller and had a larger diameter. *Id.* The valve stem was redesigned so that it was now independent of the TPMS body and had a different thread. *Id.* And, although the tire valve stem/nut continued to be subjected to a T4 heat treatment and a sulfuric acid anodization process, it was believed that the many changes implemented resulted in an even more robust component. *Id.* Testing showed that the newly designed component would reduce the chances of stress corrosion-related issues in the field by as much as 85%. *Id.*

**E.**   **Proof That Valve Stems Do Not Create Safety Issues.**

As required by Federal Motor Vehicle Safety Standard 110, FCA US performs tests to ensure that the vehicles it manufactures can be brought to a controlled stop in the event that a tire is compromised to the point of releasing air. Bibb Decl., ¶ 8. For the Class Vehicles, these tests involved putting four valve stems in a single tire and simultaneously pulling them out to create

four holes in the tire. *Id.* These tests are run with tires being deflated in both the front and rear positions of the vehicles. *Id.* Even with four holes in a tire the size of a valve stem, the release of air from the tire is not catastrophic and is sufficiently slow to allow the driver to bring a vehicle to a controlled stop as is required by the regulation. *Id.* In other words, even if a tire had four valve stems and they all simultaneously corroded and fell out, vehicle safety would not be compromised because the driver could still safely pull the vehicle over and stop it.

Outside entities agree that the fact that a faulty tire valve stem can cause a tire to go flat does not create a safety issue. For example, Transport Canada is the government body charged with motor vehicle safety in Canada. In October 2010, it opened an investigation into tire valve stem corrosion in several different manufacturers' vehicles which encompassed vehicles manufactured by FCA US. *See* http://www.tc.gc.ca/eng/motorvehiclesafety/safevehicles-defectinvestigations-information-deactivated-1240.htm. After 5+ years of investigation (in March 2016), Transport Canada deactivated its investigation, which is an action taken when "the evidence collected does not indicate the existence of a safety-related defect." *Id.* In doing so, that agency noted:  between 2009 and 2016 it had received only 89 consumer complaints about tire valve stem corrosion in FCA US vehicles; the tire valve stem failures reported "presented a very low risk to motor vehicle safety"; in all cases where a tire valve stem corroded to the point of malfunction "the driver was able to maintain control of the vehicle and bring it to a stop"; and there were no reports of "collisions, injuries and/or fatalities related to" valve stem corrosion. *Id.*

This finding was entirely consistent with FCA US's own internal findings. On February 24, 2010, ***many months after*** it began operating as a vehicle manufacturer, FCA US received feedback from one of its fleet customers that it had an issue with a TPMS valve stem on one of its vehicles (not a Class Vehicle). Bibb Decl., ¶¶ 21-24. FCA US's internal Safety Office launched an investigation based on this feedback, and decided to include the Class Vehicles as

7

one of many that would be evaluated in the investigation. *Id.* After reviewing engineering data, warranty and field data, and customer complaints, and, in addition, testing components, the investigators found that there were no reported instances of loss of vehicle control, or reported accidents or injuries, associated with tire valve stem issues. *Id.* The investigation was thus closed on May 14, 2010, with a determination that complaints of leaking or broken valve stems did not affect vehicle safety, but the findings were given to FCA US's Corporate Quality department so it could make a determination of whether a voluntary customer satisfaction remedy was warranted. *Id.*

FCA US's quality control department subsequently considered offering an extended warranty on tire valve stems for certain vehicles, including Class Vehicles ***built before November 23, 2009*** (only). *Id.* at ¶¶ 25-29. However, it eventually rejected the idea because an evaluation of warranty claim data did not justify it, and the cost/benefit analysis showed that the already-high overall customer satisfaction ratings with Chrysler Town & Country and Dodge Grand Caravan vehicles would not notably increase based on the issuance of an extended warranty.[10] *Id.* And, it particularly did not justify such relief for the Class Vehicles because the replacement rates for valve stems specifically on these vehicles were actually much lower than the rates calculated for the wider vehicle population. *Id.* More specifically, in March 2010, the replacement rates for valve stems on model-year 2009 Chrysler Town & Country and Dodge

---

[10]The overall customer satisfaction seen at the time is reflected by such things as the Polk Automotive Loyalty Award which was given to FCA US for model-year 2011, 2012, 2013, 2014, 2015 and 2016 Town & Country vehicles. Bibb Decl., ¶ 29. This Loyalty Award is the only fact-based award that measures with actual transaction data when customers are repeat buyers of the same model of vehicle. *Id.*

Grand Caravan vehicles was .55 per 1,000 vehicles, or per 4,000 valve stems, which equates with a rate of failure of around .01%.[11]  *Id.*

**F.      TPMS Component And Valve Stem Replacements.**

TPMS components can require replacement for a number of different reasons, and failures can occur with the portion of the component that measures and transmits air pressure readings.  Bibb Decl., ¶ 30.  That portion of the component is made up of multiple electronic sub-components and an antenna, any of which can malfunction or wear out and cause a need for replacement.  *Id.*  In addition, those electronics are powered by a battery that will, like every battery, eventually run out of power.  *Id.*  When that will happen and require replacement of the component is highly dependent on vehicle usage patterns.  *Id.*

For the older PN 56053031AD TPMS components, replacement of the entire component could be necessitated by a valve stem that fails, breaks or wears out.  *Id.* at ¶ 31.  With the changes made to PN 56029527AA, a valve stem issue no longer required the replacement of the entire TPMS component.  *Id.*  Replacement valve stems, which can be purchased for as little as $7, can be installed into these new TPMS components without replacing the whole unit.  *Id.*

There are multiple reasons that a valve stem might need to be replaced.  *Id.* at ¶ 32.  A valve stem can become damaged by accidents like contact with a curb, or with any other hard object.  *Id.*  A valve stem can develop leaks in the seal where it connects to a vehicle's wheel, or it can develop an internal leak in the valve core that holds the tire's air pressure, even if no stress corrosion is present.  *Id.*  Valve stems can also develop cracks or break due to stress corrosion.

---

[11]Remarkably, warranty claim data for model-year 2009 and 2010 Chrysler Town & Country and Dodge Grand Caravan vehicles sold in New York shows that of the 8,326 vehicles originally sold in New York, which would encompass 33,304 valve stems, there were 229 valve stems replaced for being broken or cracked during the entire warranty period, which is a total warranty replacement rate of .68%.  Bibb Decl., ¶ 27.

*Id.* at ¶ 33.   There are multiple factors that influence whether stress corrosion will occur and whether it will result in a valve stem developing a crack that causes a loss of pressure or breakage.   *Id.*   Testing has shown that the presence or absence of a valve stem cap is a significant factor in whether stress corrosion can occur.   *Id.*   This is one reason FCA US advises customers to always keep the valve stem caps in place.   *Id.*   Indeed, the Owner's Manual for the Class Vehicles indicates in both the Tire Inflation Pressures section, and again in the Tire Pressure Monitor System (TPMS) section, the following:

> **CAUTION!   After inspecting or adjusting the tire pressure, always reinstall the valve stem cap.   This will prevent moisture and dirt from entering the valve stem, which could damage the valve stem.**

*Id.* at ¶ 34 (emphasis in original).

Testing has also shown that the torque on the internal valve stem core is a significant factor in whether stress corrosion can occur.   *Id.* at ¶ 35.   The valve core is regularly removed as part of servicing tires.   *Id.*   If the core is reinstalled with too much torque, it will increase the stress on the component, making stress corrosion cracking or breakage possible.   *Id.*   In addition, whether a vehicle is properly cared for is a significant factor affecting whether stress corrosion can occur on a tire valve stem.   *Id.* at ¶ 36.   The Owner's Manual for the Class Vehicles cautioned owners to keep their vehicles, and specifically the wheels on their vehicles, clean "to prevent corrosion."   *Id.*

Whether a problem with any TPMS component or valve stem was caused by an electronic issue, wear and tear, battery failure, accident damage, seal leak, core leak, missing valve stem cap, over-torqued valve core, or some other cause, can only be determined by an inspection of each vehicle and each TPMS component.   *Id.* at ¶ 37.

**G.**     **The Admissions Made By Plaintiff's Experts.**

*Susceptibility to Stress Corrosion*:   Plaintiff designated Richard F. Lynch and Eric V. Sullivan to testify on his behalf regarding the corrosion "defect" which he alleges to exist.[12] These experts are in agreement that every automotive component part made of a metal alloy will corrode under certain conditions.   Lynch Depo, p. 98.   And, ***they admit that just because a TPMS valve stem may be viewed as "susceptible" to corrosion does not necessarily mean that it ever actually will corrode***.   Sull. Depo, p. 180; Lynch Depo, p. 169.   According to Lynch and Sullivan, a multitude of factors will affect whether a particular TPMS valve stem is susceptible to stress corrosion, including:

- the specific material (alloy) the valve stem is made of regardless of designated "series," because even alloys "within the same series have different susceptibilities to corrosion" (Sull. Depo, pp. 141-43; Lynch Depo, pp. 107-09);
- the type of heat treatment used on the alloy(s) (Sull. Depo, pp. 143-47; Lynch Depo, pp. 108-11);
- the way each batch of an alloy and heat treatment was processed (Sull. Depo, pp. 142-47, 181, 190; Lynch Depo, pp. 116-17);
- the anodization used (Sull. Depo, p. 158; Lynch Depo, pp. 126-28);
- the size, shape, thickness, and diameter of the part, and amount of metal used (Sull. Depo, pp. 147-48; Lynch Depo, p. 114);
- the amount of stress on the component[13] (Sull. Depo, at pp. 129, 132, 140, 285; Lynch Depo, pp. 35-36, 104, 115-16, 137-38, 230);
- mechanical damage (Lynch Depo, p. 104);
- the failure to properly use valve stem caps, or the use of aftermarket metal caps that can chemically react with the valve stem alloy (Sull. Depo, pp. 135, 154, 286-87; Lynch Depo, pp. 25, 122, 137-38);

---

[12]*See* Transcript of July 25, 2017 Deposition of Richard F. Lynch, relevant pages attached hereto as Exhibit C, ("Lynch Depo"); *see also* Transcript of July 18, 2017 Deposition of Eric V. Sullivan, relevant pages attached hereto as Exhibit D, ("Sull. Depo").

[13]Plaintiff's experts admit that even if the amount of stress is just "a little bit higher" (Sull. Depo, p. 132) – such as that from over-torqueing valve stem cores, mechanical load, or tire over-inflation – susceptibility to corrosion can be affected.   *See* Sull. Depo, pp. 129, 132, 140, 285; Lynch Depo, pp. 35-36, 104, 115-16, 137-38, 230.

- owner maintenance practices, including the frequency of tire cleaning (Sull. Depo, pp. 128-29, 195; Lynch Depo, p. 100);

- "[e]very detail about [] environmental exposure,"[14] including exposures to chemicals, bacteria, and substances like iron dust, break pad powders, carbonates and phosphates from fertilizers, sulfates, nitrates, chlorides, car wash detergents and wheel cleaners, and the de-icing salts (Sull. Depo, pp. 130-31, 148-49, 154, 157-58, 195, 234; Lynch Depo, pp. 116, 219-20);

- whether a vehicle is garaged, or stored covered or uncovered (Lynch Depo, p. 122);

- the amount of moisture and humidity a vehicle is exposed to (Sull. Depo, pp. 130-31; Lynch Depo, p. 115); and

- the temperatures a vehicle is exposed to (Sull. Depo, p. 147; Lynch Depo, pp. 114-15).

According to Sullivan, "pretty much everything" a TPMS valve stem is exposed to will affect its susceptibility to stress corrosion, and it is the "combination" of these various factors which is determinative of whether corrosion will occur.   Sull. Depo, pp. 147, 151-52. Furthermore, Lynch admits that "it is virtually impossible for every Chrysler vehicle at issue to have the same experience." Lynch Depo, p. 272.

*Causes of Replacements*:  Sullivan and Lynch agree that because "there are multiple ways that a valve stem can fail" (*e.g.*, mechanical damage, "curb rub," a dead battery, or errors during installation of a new tire), the ***only*** way to know if stress corrosion cracking was the cause of any particular valve stem failure "would be to actually physically look at that particular valve stem." Sull. Depo, pp. 126-27, 139-40, 244; *see also* Lynch Depo, pp. 105-06.

---

[14]According to Sullivan, every detail about environmental exposure "is important" and this is "different for different vehicles." Sull. Depo, pp. 148, 157-58. For example, even the particular types of de-icing salts a vehicle will be exposed to matters and these vary just within New York. Lynch Depo, pp. 163-64, 227. Likewise the concentrations of chemicals involved and length of each such exposure matter. Sull. Depo, pp. 171, 196; Lynch Depo, pp. 121-22. Because chemical exposures play a role, the location of vehicle use matters, because, for example, vehicle use in urban, industrial, and marine areas each result in different chemical exposures. Sull. Depo, p. 154; Lynch Depo, pp. 122, 166, 170-171.

### H.     The Testimony Of FCA US's Expert.

David J. Duquette, Ph.D., the John Tod Horton Professor of Materials Science and Engineering at Rensselaer Polytechnic Institute in Troy, New York, was asked to investigate whether a stress corrosion failure is inevitable for the valve stems utilized on the Class Vehicles, and what factors would affect whether stress corrosion might occur.[15]  He found that stress corrosion failures are not inevitable, and are, in fact, unlikely to occur at all under normal use conditions, *e.g.*, properly installed valve stem caps and normal stresses.  Exhibit E, pp. 6-8, 13. Whether a valve stem is susceptible to stress corrosion, or how susceptible it is to stress corrosion, depends on a number of factors, including whether the alloy was heat treated in a T4 or T6 condition.[16]  *Id.* at pp. 4, 13.  Dr. Duquette agrees with Plaintiff's experts that there are many factors affecting susceptibility to stress corrosion including:  the specific alloy used; installation; stresses on the valve stem from being over tightened after a repair or tire change; over-inflated tires; impact damage; driving conditions; wheel maintenance and care practices; and storage conditions.  *Id.* p. 4, 6-8, 13-14.

### I.     Consumers' Purchasing Decisions.

In making vehicle purchase decisions consumers rely on varied sources of information. *See* April 8, 2016 Expert Report of Christine T. Wood, Ph.D., attached hereto as Exhibit G, p. 4.

---

[15]*See* March 31, 2016 Expert Report of David J. Duquette, Ph.D., attached hereto as Exhibit E, p. 4.

[16]Dr. Duquette did ***not***, as Plaintiff falsely contends, testify that T4 and T6 heat treatments have about the same corrosion resistance.  *See* Pl. Mtn., p. 23.  In making his argument, Plaintiff cites to Dr. Duquette's testimony about regular corrosion, ignoring his testimony about stress corrosion, which is the only type of corrosion at issue here.  *Compare* Transcript of July 25, 2017 Deposition of David J. Duquette, Ph.D., relevant pages attached hereto as Exhibit F, pp. 34-35 (testimony cited by Plaintiff about regular "corrosion") *with id.* at p. 151 ("the T4 condition would have been more resistant to stress corrosion cracking in the same environment that you might expose the T6 condition to"); *see also id.* at pp. 190-91 (alloys in a T4 condition as compared to a T6 condition "have very different properties").

By way of example, consumers may seek information from the internet, television and radio advertisements, consumer magazine advertisements, friends, relatives, business associates, mechanics, dealer brochures, salespeople, and Consumer Reports. *Id.* In addition to varied sources, consumers evaluate varied factors, and place differing importance on those factors in arriving at their ultimate decision to purchase or lease a vehicle. *Id.* at pp. 4, 6. Different individuals vary in the features they find most important, (*e.g.*, appearance, storage, seating capacity, gas mileage, comfort, cost, reputation), and these individual considerations affect a person's interest in, and decision to purchase, a particular vehicle. *Id.* Scientific research shows that one single factor, such as the likelihood of the need to replace a particular component, will not outweigh other factors for all individuals; rather, it will be considered in the context of each individual's needs, goals, and knowledge at the time of the decision. *Id.*

Even if a disclosure about potential valve stem stress corrosion had been made prior to a vehicle purchase, not all putative class members would have noticed or read the disclosure. *Id.* at pp. 8-12, 22. Notably, the internet is commonly used for vehicle purchase research, and information about valve stem corrosion issues was, and is, available on the internet in places such as the National Highway Traffic Safety Administration complaint database, carcomplaints.com, and even websites maintained by Plaintiff's attorneys of record in this case.[17] *Id.* at pp. 11, 22. Since this type of information was, and is, already available online, it is unlikely that additional disclosures by FCA US would provide any new information to those who perform this type of online research. *Id.* In addition, even if a disclosure had been made,

---

[17] *See   https://www.wbmllp.com/landing/tire-pressure-monitoring-systems/* (website of Whitfield Bryson & Mason LLP claiming valve stems on "Chrysler and Dodge Minivans" suffer from a corrosion defect and soliciting plaintiffs to bring claims against FCA US); http://www.classlawdc.com/defective-products/ (website of Migliaccio & Rathod LLP with similar information).

prospective vehicle purchasers who received it would not have placed equal importance on the disclosure or responded the same way. *Id.* at pp. 12-22. Many factors influence the response to a given disclosure including, for example, why the vehicle is being purchased, whether the vehicle is being purchased or leased, and whether the vehicle is new or used. *Id.*

**J.      Facts Relevant To Plaintiff Thomas Hromowyk.**

> *1.      Vehicle Purchase and History.*

Plaintiff purchased his model-year 2010 Dodge Grand Caravan from third-party Mullane Motors *10+ years ago*, on October 21, 2009. *See* Deposition of Thomas Hromowyk, attached hereto as Exhibit H ("Pl. Depo"), pp. 66-67, 149. He understood then and now that it is just a "fact of life" that vehicle components will wear out over time, that salt and debris can damage components or cause them to rust/corrode, and that "on a vehicle with 50, 60, [or] 100,000 miles, parts are going to break." *Id.* at pp. 62, 90, 99. And, he knew that he would be responsible for paying the cost of any repairs after the warranties expired. *Id.* at pp. 88, 90. Plaintiff has used his vehicle consistently throughout his ownership and continues to do so today. *Id.* at pp. 8, 14-15, 93. He admits that even now, after 10+ years and 100,000+ miles of driving, the vehicle is in "real good condition" and he plans to keep on driving it for "another two years." *Id.* at p. 194.

Plaintiff has never communicated with FCA US or any of its authorized dealerships about his vehicle's valve stems or TPMS units, or about any corrosion issue. *Id.* at pp. 84, 89-90, 173-74, 192. Instead, Plaintiff chose to have all the repairs which he claims to be relevant to his claim performed at a private repair shop which was not affiliated in any way with FCA US, *i.e.,* Brownie's Auto Care. These repairs occurred in February 2013, July-August 2015, February 2017, May 2018, and April 2019.

*February 2013*: Plaintiff took his vehicle to Brownie's because he had allowed the tires to become "worn out" to the point that "[t]hey wouldn't pass inspection." *Id.* at pp. 113-15, 118.

By then the vehicle had been driven for 3½ years and 43,807 miles. *Id.* at pp. 114, 118. The tires were replaced, and Plaintiff admits that based on the invoice given to him it "[l]ooks like" new valve stems were put on these tires. *Id.* at pp. 115-22. Plaintiff did ***not*** see any corrosion on, or problem with, the old valve stems removed from his vehicle (which were discarded by the repair shop), and he does not know where Brownie's got the replacement valve stems. *Id.*

*July-August 2015*: When Plaintiff's vehicle was 6 years old and had been driven 70,254 miles, the low tire pressure warning light on it illuminated and Plaintiff took it to Brownie's. *Id.* at pp. 125, 138-40, 152-54. Two alternative repairs were offered – replacement of the entire TPMS or using a "repair kit" for $5.36 – but, Plaintiff was warned that the repair kit "might not hold." *Id.* at pp. 127, 152-54. Still he chose the repair kit and it did not hold, resulting in Plaintiff returning to Brownie's a week later (on August 4, 2015) so the entire TPMS unit could be replaced. *Id.* at pp. 158-61. Plaintiff did not see any corrosion on the components repaired/removed from his vehicle and Brownie's discarded them. *Id.* at pp. 144-45, 162-64.

*February 2017*: More than 7 years after it was purchased, and at 89,749 miles, Plaintiff took his vehicle to Brownie's to have the TPMS unit on the right-front tire replaced after he noticed the nut on the valve stem had "cracked" and there were signs of corrosion on it. *Id.* at pp. 166-68, 170-73. At the time, all the TPMS units on the vehicle were still operating and no tire was leaking air. *Id.* Plaintiff claims that, as instructed by his counsel, he asked Brownie's to save the old TPMS unit that was being removed, but Brownie's denies Plaintiff made any such request. *Id.* at 175-78; Declaration of Jarrod Brown, attached hereto as Exhibit I ("Brown Decl."), ¶ 3-5. Plaintiff claims he took the removed component home and put it in his garage until some later time when his counsel had him mail it to them; however, Brownie's does not believe it returned the removed TPMS unit to Plaintiff. *Id.* What is not disputed is that Plaintiff

16

never told Brownie's about any possible lawsuit or asked it to try to preserve the TPMS unit in its current condition, and Brownie's did not. Pl. Depo., p. 184; Brown Decl., ¶ 3.

*May 2018*:   After 9 years of use, and at 96,556 miles, Plaintiff took his vehicle to Brownie's and asked for a TPMS replacement after noticing that the left-rear valve stem nut was cracking. Pl. Depo., pp. 181-82. He provided no notice to FCA US that he was going to do so, even though his claims were already pending, and, once again, he did not inform Brownie's of his legal claims or ask it to try to preserve the TPMS unit and valve stem in their current condition. *Id.* at p. 184. Plaintiff and Brownie's dispute whether Plaintiff asked for the removed TPMS unit, and whether it was actually returned to him. *Id.*; Brown Decl., ¶ 4.

*April 11, 2019*:   When his vehicle was almost 10 years old and it had been driven 100,703 miles, Plaintiff took it to Brownie's and requested a TPMS replacement after noticing the right-rear valve stem nut had cracked. Pl. Depo., pp. 39, 189-91. As before, no TPMS unit on the vehicle had stopped functioning, and no tire was leaking air. *Id.* Plaintiff admits he did not ask Brownie's to take any precautions to avoid altering or destroying the old TMPS unit, and that he did not notify FCA US of his intent to get the repair. *Id.* at pp. 39-41, 184, 191.

### 2.    *Plaintiff's Involvement in Litigation.*

In or about February 2017, in conjunction with having a second TPMS valve stem replacement, Plaintiff submitted a complaint and his contact information to a website called CarComplaints.com, which resulted in him being contacted by one of his counsel of record in this case via email. *Id.* at pp. 197. Only a couple of weeks later (on March 10, 2017), these counsel added him as a named plaintiff in the case of *Spratley v. FCA US LLC*, Case No. 3:17-cv-00062 (N.D.N.Y.). *See Spratley* Docket at ECF #51. At that time, Plaintiff knew nothing about the counsel who contacted him and he let them represent him only because they had

reached out to him. Pl. Depo., p. 199.  With the *Spratley* case still pending, Plaintiff sought, and

was granted leave, to intervene in this case.  *See* ECF #240.

According to Plaintiff, since signing on with his counsel his communications with them

have been "not a lot," meaning in 2½ years he has spoken with them only three or four times. Pl.

Depo., pp. 198, 211.  He never met his counsel in person until the night before his deposition

(July 28, 2019).  *Id.* at p. 198.  Plaintiff does not know who is making decisions for his case.  *Id.*

at p. 201.  Nor does he know who is responsible for the work in his case.  *Id.*  He believes that he

has no interest in how his counsel might get paid for representing him, and thus he is not "paying

any attention to that."  *Id.* at p. 202.  He thinks he is only representing individuals who have had

an actual problem with a TPMS valve stem, and admits that anyone who never paid for a repair

of such a component is "not typical" of him.  *Id.* at p. 209.  The type of relief he wants is

reimbursement of the costs he incurred to replace the TPMS units/valve stems on his vehicle,

plus the cost of two tires.  *Id.* at p. 213.

## III.   ARGUMENT[18]

A plaintiff bears "the burden of establishing by a preponderance of the evidence that each

of Rule 23's requirements has been met."  *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir.

2010).  In deciding whether to certify, this Court must conduct a "rigorous analysis."  *In re Am.*

*Int'l Group, Inc. Secs. Litig.*, 689 F.3d 229, 238 (2d Cir. 2012) (citations omitted).  But, "Rule 23

---

[18]This Court previously denied a request for certification under Rule 23(b)(2).  *See* ECF #228, pp. 23-25.  In his current motion for certification, Plaintiff references Rule 23(b)(2) in three sentences which are essentially bald declarations that he is seeking certification under that Rule or he meets the requirements of it.  *See* Pl. Mtn., pp. 1, 27, 33.  But, Plaintiff offers absolutely no argument, and cites no law, that supports a Rule 23(b)(2) certification.  Thus, FCA US assumes that Plaintiff simply referred to the Rule as a mistake and does not address it herein.  In the event, the Court is willing to reconsider its prior denial of certification under that Rule, FCA US requests leave to supplement this opposition brief.

grants courts no license to engage in free-ranging merits inquiries at the certification stage."

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

## A.     The Lack Of A Legally Viable Class.

The class proposed by Plaintiff is not legally viable class for at least three reasons.  *First*, it encompasses those who have no legally cognizable "actual injury" as is required to have a viable § 349 claim.[19]  The law is clear that "§ 349 [ ] require[s] that the plaintiff suffer an injury as a result of the deceptive practice."  *In re Whole Foods Mkt. Grp., Inc. Overcharging Litig.*, 397 F.Supp.3d 406, 420 (S.D.N.Y. 2019); *see also Pagan v. Abbott Laboratories, Inc.*, 287 F.R.D. 139 (E.D.N.Y. 2012) ("[A] party seeking a private right of action [must] demonstrate an actual injury"); *Baron v. Pfizer, Inc.*, 840 N.Y.S.2d 627, 629 (2007) ("The Court of Appeals [ ] has rejected this very argument, *i.e.*, 'that consumers who buy a product that they would not have purchased, absent a manufacturer's deceptive commercial practices, have suffered an injury under General Business Law § 349'" (citation omitted)).

Because of this "actual injury" requirement, "proof of malfunction is a prerequisite" to a § 349 claim involving an allegedly defective product.  *In re Canon Cameras*, 237 F.R.D. 357, 360 (S.D.N.Y. 2006).  And, "[i]n the automotive context, New York courts routinely reject the argument that a common defect which never manifests itself ipso facto causes economic loss, and therefore satisfies the 'actual injury' element under § 349—even if reports indicate that components have already failed in certain cases."  *Marshall*, 2019 WL 2678023 at *17 (internal

---

[19]The lack of a legally cognizable § 349 injury suggests that this Court may lack subject matter jurisdiction because Plaintiff has no standing.  This also raises issues on certification as the Second Circuit has made clear that a "class must [ ] be defined in such a way that anyone within it would have standing."  *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263-644 (2d Cir. 2006).  Indeed, this Court expressly recognized that each class member must have standing in his/her own right when it denied certification earlier in this case.  *See* ECF #228, pp. 10-13; *see also Calvo v. City of New York*, 2017 WL 4231431, *3 (S.D.N.Y. 2017) ("a class cannot be certified if any person captured within that definition lacks Article III standing").

punctuation and citations omitted); *see also In re General Motors LLC Ignition Switch Litig.*, 257

F.Supp.3d 372, 429 (S.D.N.Y. 2017) ("all of Bedford Auto's Section 349 claims are subject to

dismissal because New York law requires a manifested defect for a plaintiff to recover on any

claim and its vehicles did not manifest any of the alleged defects"); *In re Canon*, 237 F.R.D. at

360 (finding owner whose product has not actually malfunctioned has no claim under § 349);

*Frank v. DaimlerChrysler Corp.*, 741 N.Y.S.2d 9 (2002) (affirming dismissal of § 349 claim

asserting that vehicle backrests were defective where the backrests in plaintiffs' vehicles had not

actually malfunctioned); *Statler v. Dell, Inc.*, 775 F.Supp.2d 474, 485 (E.D.N.Y. 2011)

(dismissing a plaintiff's claim for "possible safety hazards" related to allegedly defective

computers because the alleged hazards had not actually occurred).

Because § 349 requires the existence of an "actual injury," courts have recognized that

putative classes in product defect cases based on alleged violations of § 349 cannot include those

whose products have not malfunctioned. In *Marshall*, for example, the court denied certification

noting that § 349 claims require an "actual injury" which exists only if an alleged vehicle defect

actually manifested, and it thus would take an individual inquiry "to determine whether class

members suffered any injuries *at all*." 2019 WL 2678023 at *16 (emphasis in original).

Similarly, in *Pagan* the court refused to certify a class of purchasers of infant formula because

the class encompassed persons who could not have not received tainted formula and thus would

"not have suffered any injury at all." 287 F.R.D. at 148-49. The court in *Canon Cameras*

arrived at the same conclusion and denied certification because the putative class included

individuals whose cameras did not malfunction. 237 F.R.D. at 360; *see also Vaccariello v. XM*

*Satellite Radio, Inc.*, 295 F.R.D. 62, 68 (S.D.N.Y. 2013) (refusing to certify a class of satellite

radio subscribers that included those who suffered no injury).

At this stage of these proceedings – the second round of class certification briefing with discovery closed -- Plaintiff's allegation of, and vague and unsupported passing mention of, a "difference in price" or "price premium" damage at the point of sale cannot justify the overly broad class he proffers. *See* Pl. Mtn., pp. 41-42. As support for his claimed "price premium" injury Plaintiff relies entirely on a speculative hope that, at some point in the future, his expert will be able to establish the existence of such damages by use of a not-yet-formulated survey that he now, as of today, has "even greater confidence that he could" develop if given the opportunity to do so. *Id.* This is the exact type of evidence and argument that was offered and rejected in both *Marshall* and *Haag*, where it was found to be too speculative to support certification. *See Marshall*, 2019 WL 2678023 at **18-19; *Haag*, 330 F.R.D. at 132-34. These courts were clearly correct in this finding because at the certification stage a plaintiff cannot rely on allegation and innuendo, but, rather, must produce *evidence* proving the requisites of Rule 23, including proof of an actual and reliable damage methodology showing that damages can be calculated on a class-wide basis. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013). A damage methodology that is entirely dependent on the development of future evidence to show even the existence of an injury clearly does not meet this criteria.

*Second*, the vast majority of the consumers encompassed within the proposed class have no § 349 claim because it is time-barred. Claims brought under § 349 must be brought within 3 years of accrual of the claim. N.Y. C.P.L.R. 214(2); *see also Statler v. Dell, Inc.*, 841 F. Supp. 2d 642, 648 (E.D.N.Y. 2012). When, as here, a plaintiff alleges that a defendant's deceptive acts caused him to purchase a defective product that he otherwise would not have purchased, his § 349 claim accrues upon the date of purchase of the product. *See, e.g., Gould v. Helen of Troy Ltd.*, 2017 WL 1319810, at *3 (S.D.N.Y. 2017); *Bristol Vill., Inc. v. Louisiana-Pacific Corp.*, 170 F. Supp. 3d 488, 498-99 (W.D.N.Y. 2016).

This case was not filed until September 8, 2014.  Thus, the § 349 claims of those who purchased/leased a Class Vehicle after September 8, 2011 are barred by limitations.  And, there are only *two* individuals in the proposed class whose claims are not barred.  *See* Supp. Bibb Decl., ¶ 6.  This Court should join others from within the Second Circuit which have declined to certify a class that is so broad it includes those with time-barred claims.  *See, e.g., Ruzhinskaya v. Healthport Techs.*, LLC, 311 F.R.D. 87, 109 (S.D.N.Y. 2015) (finding "class definition is overbroad" where it includes time-barred claims and directing class definition be modified to encompass only those with timely claims); *Wilder v. News Corp.*, 2015 WL 5853763, *16 (S.D.N.Y. 2015) (finding class cannot include time-barred claims); *Fullwood v. Wolfgang's Steakhouse, Inc.*, 2014 WL 6076733, *8 (S.D.N.Y. 2014) ("the class may not include any members whose claims [are time-barred]"); *Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418, 430 (S.D.N.Y. 2009) ("members of the proposed class who were injured more than three years prior to the date this suit was filed … cannot bring a claim against Best Buy under New York General Business Law").

*Third*, the class definition is too amorphous.  A class cannot have an ever-changing composition.  *See, e.g., Brecher v. Republic of Argentina*, 806 F.3d 22, 25 fn.3 (2d Cir. 2015) (class certification inappropriate where "the identity of class members will remain fluid even following entry of judgment") *Royal Park Investments SA/NV v. Bank of New York Mellon*, 2017 WL 3835339, *4 (S.D.N.Y. 2017) (denying certification where composition of class was fluid). Here, the evidence proves that the class is in a constant state of flux as the number of individuals encompassed within its parameters decreases at a rate of approximately 26 per month, *i.e.,* almost one per day.  *See* Supp. Bibb Decl., ¶ 5.  This precludes certification.

B.    **Plaintiff Has Failed to Prove The Rule 23(a) Requisites.**

*Numerosity*:   Plaintiff asks this Court to infer the numerosity requisite is satisfied because as of February 2018 there were 3,000+ persons in New York who purchased/leased a new Class Vehicle and still owned it. *See* Pl. Mtn., pp. 27-29.  This, of course, ignores the very real issue as to whether there are a sufficient number of persons within the defined class who have a valid § 349 claim, *i.e.,* individuals who have an actual injury, a claim not barred by limitations, and who will still own at the time of judgment.  The evidence shows there may be as few as two persons who have a valid claim.  Thus no inference on numerosity can be justified. Because Plaintiff offers no actual proof of numerosity certification should be denied.

*Commonality*:  This is not a case in which a uniform misrepresentation was made to all consumers as, for example, on a uniform product label.  Yet, throughout his brief, including when he is advocating that commonality exists, Plaintiff repeatedly relies on affirmative representation cases.  *See, e.g.,* Pl. Mtn., pp. 29-30 (*citing Ebin v. Kangaris Foods*, Inc., 297 F.R.D. 561 (S.D.N.Y. 2014) which involved a "100% Pure" label, and *Seekamp v. It's Huge, Inc.*, 2012 WL 860364, *4 (N.D.N.Y. 2012) which involved representations of "legality and beneficialness").[20]   At the same time, Plaintiff does not even attempt to address decisions denying class certification in vehicle defect omission cases like, for example, *Marshall v. Hyundai Motor America*, –F.R.D.–, 2019 WL 2678023 (S.D.N.Y. 2019), *Haag v. Hyundai Motor America*, 330 F.R.D. 127 (W.D.N.Y. 2019), and *Oscar v. BMW of N. Am., LLC*, 2012 WL 2359964, *5 (S.D.N.Y. 2012).

---

[20]*See also, e.g.,* Pl. Mtn., pp. 34, 41 (relying on *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 403-04 (S.D.N.Y. 2015), which involved packaging claims for seed and fertilizer products); Pl. Mtn., p. 38 (relying on *Atik v. Welch Foods, Inc.*, 2016 WL 5678474, *1 (E.D.N.Y. 2016), which involved "fruit content" labels).

Plaintiff's attempt to get this Court to rely on non-vehicle defect cases involving affirmative misrepresentations and ignore actual vehicle defect cases involving omissions should be rejected because they are not the same.  For example, in an affirmative misrepresentation/false advertising case the claim is that a product was advertised as having a characteristic or feature ***that it demonstrably does not have,*** *e.g.,* a representation that a product is 100% pure when it is only 50% pure.  The truth or falsity of the advertised claim does not depend on the individual circumstances of any class member, as all of them paid for something that the product seller said they were getting, but which they did not receive.  However, in an omission-based case like this the situation is entirely different because there is no uniform information to consider.  This makes the assessment of common issues in the former different from the assessment in the latter.

The only common questions that Plaintiff identifies are whether the valve stems and their nuts are defective, and whether they pose a material safety risk.  *See* Pl. Mtn., 30.  But, commonality is lacking even as to these purportedly "common" questions.  It is undisputed that the Class Vehicles had three different types of tire valve stems.  *See* § II.C, *supra.*  The answer to the purportedly "common" question of a defect and material safety risk could be "yes" for one, and "no" for others.  This means that the defect and material safety risk questions are not common.  *See, e.g., Grodzitsky v. American Honda Motor Co., Inc.*, 2014 WL 718431, *6 (C.D.Cal. 2014) (finding common questions listed by the plaintiff were dependent on a common answer to the "defect" question, and, thus, because there was no common answer to the "defect" question, the other identified questions were not common).

Plaintiff attempts to discount changes made to the valve stems in the Class Vehicles, claiming he can present evidence proving that they do not matter.  *See* Pl. Mtn., pp. 23.  Of course, Plaintiff's own experts admit that a valve stem's susceptibility to corrosion-related failures depends on things like heat treatment, size, shape, thickness, and diameter, and these are

some of the very things that account for the differences in the three different valve stems at issue. *See* § II.G, *supra*. In any event, FCA US has an absolute right to defend each version of tire valve stem and TPMS unit put into issue by Plaintiff's claim, and it intends to do just that. Thus, the jury could find that one version of the valve stems had a "defect" while others did not. This defies the very notion of commonality. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("What matters to class certification is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common ***answers*** apt to drive the resolution of the litigation" (emphasis in original)).

*Typicality*: "It is often said of typicality in class actions that 'as goes the claim of the named plaintiff, so go the claims of the class.'" *Emilio v. Sprint Spectrum L.P.*, 2017 WL 3208535, *8 (S.D.N.Y. 2017) (citations omitted). "[W]here a named plaintiff's claims are not typical of those of the class, the Court would do a disservice to the putative class by certifying it with ... the named plaintiff" as its representative. *Id.* In essence, the "typicality requirement concerns the fairness of allowing an entire class's claim to rise or fall with the fate of the named representative's claims; thus, that representative's claims must be typical of the class so as to prevent a false prophet from bearing the standard for an entire class of claims." *Rapcinsky v. Skinnygirl Cocktails, L.L.C.*, 2013 WL 93636, *5 (S.D.N.Y. 2013).

In seeking certification, Plaintiff does next to nothing to convince this Court that the typicality requisite is satisfied, choosing to essentially iterate the standard and declare it is met here. *See* Pl. Mtn., pp. 30-31. Apparently, Plaintiff has no answers to the multitude of reasons why the claims of the putative class should not rise or fall with his claim. For example, the most significant, but certainly not the only, reason that the claims of the class should not rise or fall with Plaintiff's claim is that the defense of evidence spoliation applies to Plaintiff. *See* ECF #281. Typicality is lacking, and "class certification is inappropriate where a class

representative is subject to unique defenses which threaten to become the focus of the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000) (citation omitted). The pervasiveness of Plaintiff's spoliation, and the fact that his account of the events surrounding it conflict with those of another witness, make clear that the spoliation issue will be a focus of litigation involving Plaintiff's own claim. *See* § III.J.1, *supra*.

Plaintiff also fails the typicality test because the claims of the class should not rise or fall with the claim of a representative who, like Plaintiff, has decided to make allegations of a "safety" defect a central theme of his case, yet, nonetheless, has voluntarily chosen to continuously drive his vehicles for years and for tens of thousands of miles with the allegedly "unsafe" tire valve stems still on it. This makes Plaintiff subject to credibility attacks at trial and defeats the typicality requisite. *See, e.g., Browe v. Evenflo Co.*, 2015 WL 3915868, *4 (D.Minn. 2015) ("It is a difficult proposition to accept that the lead plaintiff in a products liability lawsuit seeking class action status can credibly pursue liability while continuing to use the very same product the lawsuit claims is dangerously defective and warrants a pecuniary remedy"); *see also Emilio*, 2017 WL 3208535 at **3, 9 (typicality lacking where proposed representative continued to renew defendant's services and pay for them even after knowing of misrepresented charges).

Finally, courts find typicality lacking where, as here, there are variations in the products at issue. *See Lieb v. Am. Motors Corp.*, 95 F.R.D. 507, 509 (S.D.N.Y. 1982) (where changes were made to vehicle over time "no one vehicle can be considered to give rise to typical claims for the entire class"). Plaintiff is simply not typical of those in the proposed class who purchased vehicles equipped with TPMS units and tire valve stems that differed from those on his vehicle.

Because typicality is lacking, certification should be denied.

*Adequacy*: The adequacy requirement mandates that a named plaintiff "possess the same interest and suffer the same injury as the class members." *Amchem Products, Inc. v. Windsor*,

521 U.S. 591, 625-26 (1997) (citation and internal punctuation omitted). "Adequacy is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011).

It is almost as though Plaintiff's own counsel question his adequacy as they offer that someone new is ready to step in for him if a finding is made that he is atypical or inadequate.[21] *See* Pl. Mtn., p. 32. And, they have good reasons to be concerned that a substitute plaintiff may be necessary. Plaintiff, of course, has significant problems with respect to typicality. *See supra.* And, the fact that he purchased only one of the three different valve stems at issue, and that he wants damages only for already-incurred repair costs and replaced tires, makes clear that his interests and claimed injuries are different than others in the proposed class. *See* Pl. Depo, p. 213. Furthermore, the fact that Plaintiff is charged with spoliation of evidence (*see* ECF #281) leaves him inadequate to represent the class. *See, e.g., Falcon v. Philips Elec. N.Am. Corp.*, 304 Fed.Appx. 896, 897 (2d Cir. 2008) (plaintiff was not adequate representative because disposal of his allegedly defective television put plaintiff in the position of, among other things, having to "defend[] against a charge of spoliation of evidence"); *Mooradian*, 286 F.Supp.3d at 870 (disqualifying plaintiff from serving as a class representative because "[h]is actions have made him an atypical member of the class by giving [defendant] numerous possible defenses against him that would not apply to the class as a whole"); *Akaosugi v. Benihana Nat'l Corp.*, 282 F.R.D. 241, 257 (N.D.Cal. 2012) (finding plaintiff to be an inadequate representative, despite

---

[21]Plaintiff's counsel claim that a "Sindee Baum of Massapequa, New York" is ready to step in for Plaintiff. Pl. Mtn., p. 32. FCA US could not locate a record of anyone in New York by that name owning a vehicle that would be encompassed within the current definition of the class, and the declaration she submits does not provide a vehicle identification number and offers no details at all about her alleged TPMS replacements. Of course, allowing such a substitution would effectively start this case over yet again.

having staved off sanctions for spoliation, because acts giving rise to spoliation motion were "unique" to plaintiff and could affect his ability to protect the class).

Adequacy is also lacking because Plaintiff has "so little knowledge of and involvement in the class action that [he] would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 61 (2d Cir. 2000). Plaintiff's lack of active participation in this case is evidenced by his dearth of communications with his attorneys of record which, he admits, have occurred no more than five times during the 2½ years that his case has been pending. *See* § II.J.2, *supra.* It is also evidenced by his complete ignorance of, and indifference to, who is actually making decisions about his case and the claims of the class, and how much of any recovery will go to the class versus the attorneys' who represent him. *Id.* Instead of demonstrating that he is willing and able to "protect the interests of the class against the possibly competing interests of [his] attorneys," Plaintiff's admissions prove he has simply ceded total control of this case to his attorneys. This makes him inadequate. *See Emilio*, 2017 WL 3208535 at *7 fn.4 (noting that facts which "call[] into question whether [the named plaintiff] or his attorney is in control of this suit [ ] raises adequacy concerns"); *Beck v. Status Game Corp.*, 1995 WL 422067, *7 (S.D.N.Y. 1995) ("This Court finds that the Becks are not adequate representatives because of their lack of familiarity with this suit and the lack of control they have exercised over their attorneys").

## C.   **The Rule 23(b)(3) Predominance Requisite Is Lacking.**

For certification to be proper under Rule 23(b)(3), Plaintiff bears the burden of proving that common questions of fact and law predominate. Plaintiff has not met this burden. Indeed, Plaintiff addresses the predominance requisite by baldly proclaiming that because he "primarily relies on common evidence to establish [ ] liability under § 349, the class satisfies the

predominance requirement." Pl. Mtn., p. 33.   This statement evidences a fundamental misunderstanding of the predominance requirement.  It is not the evidence that *one* party will present that proves a question is common and that there are enough of such questions that they will predominate, but, rather, whether at the end of the day the answers to most of the questions that must be answered will be the same for every class member. *See Wal-Mart*, 564 U.S. at 350. And, here, none of the questions that must be answered to finally resolve the pending § 349 claim – statute of limitations, defect, deception/knowledge, causation, damages – will generate a common answer for all class members.  Thus, predominance is clearly lacking.

*Limitations*:  In his motion, Plaintiff completely ignores the elephant in the room which is the undeniable fact that the claims of all but two of those who would be encompassed within his proposed class are barred by the applicable 3 year statute of limitations. *See* § II.A, *supra.* His failure to address this issue is grounds, in and of itself, to deny certification. *See, e.g., Royal Park Investments SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F.Supp.3d 387, 398-99 (S.D.N.Y. 2018) ("Courts should not grant class certification if 'plaintiffs have offered no reliable means of collectively determining how many class members' claims are time-barred'" (*quoting McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 233-34 (2d Cir. 2008))).

During this litigation, Plaintiff took the position that "equitable tolling" principles can be applied to avoid the limitations bar.  But, even if this is true, application of equitable tolling would only create even more individual issues because it requires a showing that each class member was the recipient of some post-sale "fraudulent misrepresentation" issued by FCA US. *See, e.g., Sweener v. Saint-Gobain Performance Plastics Corp.*, 2018 WL 748742, *4 (N.D.N.Y. 2018).  Thus, this Court should join others which have concluded that when limitations issues affect a significant portion of a defined class, certification should be denied. *See, e.g., In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 209 F.R.D. 323, 353 (S.D.N.Y. 2002)

(denying certification due to statute of limitations defense because to resolve it "countless individual trials ... would follow the classwide trial"); *see also Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 342 (4th Cir. 1998) ("tolling the statute of limitations on each of plaintiffs' claims depends on individualized showings that are non-typical and unique to each" class member because facts supporting tolling were not uniform for all).

*Defect*:  Plaintiff acknowledges that the issue of defect must be subject to common proof. *See* Pl. Mtn., p. 30 (identifying the defect issue as a common question).  And, he acknowledges that there are three differently-designed and manufactured components at issue. *Id.* at pp. 22-23. Unable to address the effect these differences have on the commonality/predominance requisites, Plaintiff simply writes that off as irrelevant. *Id.* at p. 23.  Of course, Plaintiff's experts do not believe that these differences are irrelevant.  *See* § II.G, *supra.*  And, while the documented differences between TPMS/tire valve stems may not matter to Plaintiff, they most definitely matter to FCA US who intends to litigate the issue of defect of each and every one of them separately.  It is beyond dispute that a jury could find that one of these components is defective and that a different one is not.  This, of course, means that the defect issue is not common because the answer to it is not necessarily the same for all those in the proposed class. *See Wal-Mart*, 564 U.S. at 350.  When, as here, the defect issue is not common a denial of class certification is warranted. *See, e.g., Luppino v. Mercedes Benz USA*, 2017 WL 6015698, *3 (3d Cir. 2017) (affirming denial of certification where plaintiffs' admissions showed that an alleged wheel cracking defect was not uniform for all class vehicles).

*Deception/Knowledge*:  The § 349 element of "deception" implicates two different types of knowledge:  FCA US's knowledge of a defect during the time that Plaintiff and putative class members made their vehicle purchases; and Plaintiff and class members' knowledge at the time they made their purchasing decisions. *See, e.g., Lebowitz v. Dow Jones & Co.*, 508 Fed.Appx.

83, 84 (2d Cir. 2013) ("When the terms of a bargain are fully disclosed to the plaintiff prior to acceptance, then there is no deceptive omission giving rise to a Section 349 claim"); *Koch v. Christie's International PLC*, 785 F.Supp.2d 105, 119 (S.D.N.Y. 2011) (consumer who knew wine was counterfeit before he purchased it had no § 349 claim because he could not have been misled or sustained injury due to the deception); *Woods v. Maytag Co.*, 2010 WL 4314313, *16 (E.D.N.Y. 2010) (dismissing § 349 claim for failure to allege facts supporting notion "[d]efendants had knowledge of the defect"); *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 85 N.Y.2d 20, 26, 647 N.E.2d 741 (1995) (indicating that deception involves an assessment of the information possessed by the business).

The deception issue is not common because knowledge is ***un***common.

***FCA US's Knowledge***:  With three differently designed components at issue, FCA US's knowledge about a defect cannot be assumed to have been the same throughout the time that the putative class members were making their vehicle purchases.  In fact, the evidence proves that FCA US's knowledge about whether any of these components were "defective" changed over time, and varied during the period that the Class Vehicles were manufactured and sold.  *See* §§ II.C, II.D, *supra.* What FCA US knew about the potential for tire valve stem stress corrosion failures in June 2009 when the first of the Class Vehicles were sold with the originally designed valve stems (PN 56053031AD/T6 heat treated) is not the same as what it knew about potential tire valve stem stress corrosion when the Class Vehicles were sold later that year with a different valve stem (PN 56053031/T4 heat treated), and its knowledge at both of these times is different than what it knew when the Class Vehicles with the entirely redesigned new TPMS unit and different sized/threaded valve stem (PN 56029527AA) were sold after this.

Notably, Plaintiff's own arguments in support of certification support the fact that FCA US's knowledge of a defect was different during the class period.  Plaintiff argues that

certain "reports" "confirm the existence of a materials defect," and he points to engineering reports *from April 2010* as proof of this. *See* Pl. Opp., pp. 5, 7. Obviously, if knowledge arises out of a report issued in April 2010 it means that FCA US had a different type/level of knowledge before that time. The same is true of Plaintiff's repeated arguments about FCA US receiving reports from owners of "fleet" vehicles. *See* Pl. Mtn., pp. 7, 13, 16, 37. Plaintiff outright says that FCA US "was put on notice" of a defect/safety issue by the report it received from "a major fleet customer" (*id.* at p. 13), but the only report that FCA US ever received from a "fleet" owner about tire valve stem problems came in February 24, 2010. Bibb Decl., ¶¶ 21-24. If this is where and when FCA US got "notice" of a defect, it means FCA US knowledge about the existence of a defect when the Class Vehicles were being sold in the many months prior thereto differed. This, of course, affects the deception issue and means that the answer to it may not be the same for those Class Members who purchased in June 2009 as opposed to those who purchased in March 2010.

*Class Members' Knowledge*: The deception question will also depend on what each putative class member knew at the time of their purchase. *See, e.g., Weinstein v. eBay, Inc.*, 819 F. Supp. 2d 219, 228 (S.D.N.Y. 2011). And, this knowledge varies. Indeed, there are individuals encompassed within the defined class who first leased their vehicles, and then purchased them years later. Supp. Bibb Decl., ¶ 7. Such individuals could have experienced a tire valve stem failure during their lease term, and despite knowing of such a potential problem purchased the vehicle anyway. *See, e.g, id.* at ¶ 9. Furthermore, this Court cannot simply assume that all consumers knew nothing at the time that they purchased their vehicles. Particularly when Plaintiff has unequivocally admitted that, starting in 2009, there was widespread information publicly available in the form of consumer complaints and publications about a government investigation relating to the susceptibility of the subject valve stems to

corrode.   *See, e.g,* ECF #243, ¶¶ 22, 44, 77.   Accepting Plaintiff's admissions, the most

reasonable assumption is that anyone who did even the least bit of research on the vehicles prior

to purchasing one would have known of the alleged corrosion "defect".   This is precisely why

the Second Circuit has recognized that where knowledge is an issue, widespread publicly-

available information defeats predominance because it "thoroughly undermine[s]" an argument

that putative class members uniformly lack knowledge.   *See In re Initial Pub. Offerings Sec.*

*Litig.*, 471 F.3d 24, 43 (2d Cir. 2006); *see also Mooradian v. FCA US, LLC*, 2017 WL 4869060,

*9 (N.D. Ohio 2017) (finding owners should have discovered alleged engine defect as of time

internet complaints were posted); *In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II)*,

2012 WL 379944, *15 (D.N.J. 2012) (finding deception and causation could not be established

with common proof where there were "numerous public reports, articles, and broadcasts"

concerning the alleged vehicle defect).

      Deception in this case is not a common issue because both FCA US's and putative class

members' knowledge differed throughout the class period.

      ***Causation***:   In the remarkably similar *Haag* and *Marshall* cases the courts recognized

that "suits alleging defects in motor vehicles often involve complicated issues of individual

causation that predominate over common questions regarding the existence of a defect." *Haag*,

330 F.R.D. at 132 (citation omitted); *Marshall*, 2019 WL 2678023 at *16 (citation omitted).

And, in *Marshall* the court analyzed the causation issue in depth before concluding that it was

not a common one because a determination of whether an alleged defect caused the vehicle

component to corrode would require an assessment of "whether each Class Vehicle was heavily

exposed to deicing materials," "whether each owner abided by the recommended maintenance

schedule," and whether any alleged malfunction resulted from the alleged defect or from one of

the other numerous identified causes that could result in the same type of vehicle issues.   2019

WL 2678023 at *19.  Finding that causation was not a common issue and that class certification was thus improper, the *Marshall* court concluded that "[p]ut simply, 'determining whether each [brake] failed as a result of the allegedly concealed defect or as a result of unrelated issues, *e.g.,* potholes or reckless driving habits, will devolve into numerous mini-trials.'"  *Id.* (*quoting Oscar,* 274 F.R.D. at 513).

The *Marshall* court's causation analysis applies full-force here.  TPMS units and tire valve stems can need replacement for a host of reasons having nothing to do with a defect, including a lack of proper maintenance by the vehicle owner.  *See* § II.F, *supra.*  Thus, just as in *Marshall,* "put simply, 'determining whether each [valve stem] failed as a result of the allegedly concealed defect or as a result of unrelated issues, *e.g.,* potholes or reckless driving habits, will devolve into numerous mini-trials.'"

The fact that causation is not a common issue is also demonstrated by the undisputed evidence which proves that, in making their purchasing decisions, consumers would have relied on varied sources of information, evaluated varied factors, placed differing importance on those factors, and placed differing importance on disclosures.  *See* § II.I, *supra.*  Thus, determining the cause of an injury allegedly occurring at the time and place of purchase requires individual assessments of why each putative class member bought, and whether they would have purchased anyway.  It is these types of facts that have led courts to find that causation is not a common issue when, as here, the alleged deception must be causally linked to a putative class member's decision to purchase a product.  *See, e.g, In re Avon Anti-Aging Skincare Creams & Prod. Mktg. & Sales Practices Litig.*, 2015 WL 5730022, *7 (S.D.N.Y. 2015) (noting that purchasing decisions about cosmetics are "inherently individualized").  Notably, courts have recognized that the "inherently individualized" nature of a product purchase applies in the context of a motor vehicle transaction.  *See Oscar*, 2012 WL 2359964 at *8 (predominance lacking because

vehicles had "a number of characteristics which customers might value, and to differing degrees" and "there is simply no way—without inquiring on a customer-by-customer basis—to determine whether the non-disclosure of the characteristics of RFTs affected the purchase price paid for the MINIs bought by the putative class members").

Remarkably, in seeking certification Plaintiff completely ignores the causation issue. *See, generally,* Pl. Mtn. Because he does so, Plaintiff has clearly failed to meet his burden to show predominance. Accordingly, class certification must be denied.

***Damages***: It is indisputable that Plaintiff is required to ***now*** present a reliable damages model for calculating class-wide damages consistent with his liability theory. *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (2013). But, with respect to his "price premium" damage claim all that Plaintiff proffers is conjecture and innuendo. *See* Pl. Mtn., pp. 41-42. Indeed, Plaintiff makes clear that the damage model he envisions would be based on a consumer survey that has not even been developed.[22] *Id.* This is the exact proposed "damage methodology" evidence that the courts considered and rejected as speculative in *Haag* and *Marshall*, and which led those courts to deny class certification. *Haag*, 330 F.R.D. at 132-33; *Marshall*, 2019 WL 2678023 at *16. In those cases, as here, the plaintiffs "produced no evidence that the Class Vehicles' market value was in fact diminished" by the alleged defect "and/or that putative class members would have paid less for their Class Vehicles had they been informed of the potential for premature [ ] corrosion." *Haag*, 330 F.R.D. at 132; *see also Marshall*, 2019 WL 2678023 at *18 (rejecting same damage "evidence" as proffered here which was from same damage expert (Gaskin) proffering it there).

_____

[22]At deposition, Plaintiff's expert (Gaskin) admitted that his not-yet-developed survey "may" eventually fail to accomplish the goal of showing a price premium damage exists. *See* Deposition of Steven P. Gaskin, attached hereto as Exhibit J, pp. 71-72, 79.

Because the "price premium" argument and "evidence" that Plaintiff presents is no less speculative than, and is in fact identical to, what was rejected by the courts in *Haag* and *Marshall*, it is clearly inadequate to support certification here as well.  Particularly when the evidence here proves that the wide variation in the price paid, and the individualized reasons for paying those prices, renders it impossible to determine how much less, if any, each class member would have paid for his/her Class Vehicle if they had known of the allegedly withheld information. *See* § II.I, *supra.*[23]  This is the exact reason that courts routinely find that, because price premium damages in vehicle defect cases depend "on a whole host of individualized factors including age, mileage, repair and maintenance history and accidents or damage," certification is precluded.  *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 463 (D.N.J. 1998); *see also Oscar,* 2012 WL 2359964, \*6 (denying certification under § 349 because, *inter alia,* "purchase decisions, and … price paid … may be based on a variety of factors").[24]

Perhaps because his counsel has had no recent success in selling "conjoint" or "price premium" damage methodology evidence to any court within the Second Circuit (*see Haag* and *Marshall*), Plaintiff actually appears to be advocating a "cost-of-repair" claim as his main damage theory. *See* Pl. Mtn., pp. 38-41.  But, this damage theory necessitates individual inquiries of each and every putative class member because there is no evidence, whatsoever, that everyone encompassed within the proposed class incurred cost-of-repair damages, let alone the

---

[23]*See also* April 8, 2016 Expert Report of Robert E. McCormick, Ph.D., attached hereto as Exhibit K.

[24]Notably, this District has found that a conjoint methodology *without a survey* – which is exactly what Plaintiff proffers here – does *not* satisfy the Supreme Court's mandate handed down in *Comcast* that a plaintiff must present a viable "damage methodology" at the certification stage. *See Singleton v. Fifth Generation, Inc.*, 2017 WL 5001444, \*\*21-22 (N.D.N.Y. 2017); *see also Miller v. Fuhu, Inc.*, 2015 WL 7776794, \*\*21-22 (C.D.Cal. 2015) (finding plaintiff failed to show damages could be assessed class-wide where survey was not yet developed); *Opperman v. Kong Techs., Inc.*, 2017 WL 3149295, \*\*11-12 (N.D.Cal. 2017) (same).

exact same amount of such damage. It is simply impossible to know who paid what price for what repair without an individual inquiry of each putative class member and an examination of his/her repair records. Indeed, the evidence is undisputed that some repairs may have cost as little as $7, while others could have exceeded $100. *See* Bibb Decl., ¶ 31. This is precisely why the court in *Haag* dismissed out-of-hand the notion that "out-of-pocket costs for parts replacement" could serve as a class-wide damage, noting that "individual issues would clearly predominate over class-wide issues with respect to any damages claims based upon repair and replacement of vehicle parts in individual vehicles." 330 F.R.D. at 132 fn.4 (citations omitted); *see also Marshall*, 2019 WL 2678023 at *13 ("Individualized methods of repair, developed and implemented at the local level, raise the antithesis of a common question").

The damage issue is not common, making clear that certification should be denied.

**D.**     **No Proof Of Superiority As Required By Rule 23(b)(3).**

The numerous individual issues identified above would require separate mini-trials and hence make this case unmanageable. This precludes a finding of superiority. *See, e.g., Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 99 (S.D.N.Y. 2010) ("the need for mini-trials on the resolution of each class member's claims and the applicability of affirmative defenses detracts from the superiority of the class action device, to say the least"). Plaintiff ignores the serious manageability problems inherent in his claims, offers no realistic trial plan, and simply proclaims that a class action is more feasible than individual actions. *See* Pl. Mtn., pp. 42-43. But, Plaintiff must actually ***prove*** that a trial would be manageable to meet the superiority requisite. *See Spagnola,* 264 F.R.D. at 99. He has not even attempted to do so.

Furthermore, Plaintiff offers no trial plan as to how this case could be tried if certification is granted. This is particularly problematic here because, in addition to the host of individual issues that must be addressed for each of the putative class members, this case presents the

unique circumstance of having one plaintiff proceeding on class claims and another plaintiff proceeding only on his own individual claims.  Specifically, there is still a plaintiff in this case who is a used vehicle purchaser and thus is not even part of the class that Plaintiff seeks to have certified (Tomassini).  Plaintiff does not reveal whether he is advocating for this Court to have two separate trials (one for him and one for Tomassini), or if he believes that Tomassini's claim can somehow be adjudicated simultaneously with his.  The latter of these scenario's would certainly necessitate presentation of a trial plan in order to satisfy the superiority requisite.  But, Plaintiff has submitted none.

Plaintiff's utter failure to show that this case is manageable as a class action, standing alone, warrants denial of his motion for certification.

**E.      The Issue Of Liability Cannot Properly Be Certified Under Rule 23(c)(4).**

In a six sentence argument that does little more than announce the legal standard and baldly declare that it is met here, Plaintiff makes an alternative request that a class be certified for "liability purposes" if the Court finds that damage issues preclude a general certification.  *See* Pl. Mtn., pp. 43-44.  However, as demonstrated herein, a liability determination entails resolving a host of significant and critical facts that vary among the members of the putative class, including:  whether a particular type of valve stem is defective; what each putative class members' knowledge was at the time of purchase; what FCA US's knowledge was at the time of each vehicle purchase by a putative class member; and whether any valve stem failure was actually caused by the alleged defect.  *See supra.*  Each of these factual determinations is individualized, leaving the liability issue unsuitable for certification and making a trial on liability issues completely unmanageable.  *Id.*

Furthermore, certification of an "issue" for class treatment is appropriate only when a court determines that resolution of the certified issue(s) will "materially advance" the litigation.

*See Marshall*, 2019 WL 2678023 at *21 (*citing Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 242 (S.D.N.Y. 2010). And, when injury, causation, and damages are individual issues, litigation will not be "materially advanced" by certifying a single issue such as whether a defect exists in a product. *See Marshall*, 2019 WL 2678023 at **21-22; *see also Haag*, 330 F.R.D. at 132 fn.3 (declining to certify a Rule 23(c)(4) class "for liability purposes only" because the plaintiff "made no showing that certifying a class for liability purposes would clearly and meaningfully advance the litigation").

As in *Marshall* and *Haag*, here Plaintiff makes no showing as to how certifying a single "issue" would advance this litigation in any material way. And, clearly it would not as thousands of individual trials would still be necessary to determine knowledge, causation, and damage issues. Accordingly, certification should be denied.

## IV.   <u>CONCLUSION</u>

For the reasons set forth herein, Defendant FCA US LLC respectfully requests that this Court deny Plaintiff Thomas Hromowyk's Motion for Class Certification.

Dated:  November 15, 2019

Respectfully Submitted,

**COUGHLIN & GERHART, LLP**

By:   */s/ Alan J. Pope*
Alan J. Pope
Bar Enroll No. 301508
apope@cglawoffices.com
99 Corporate Drive
Binghamton, New York  13902
Phone:  (607) 723-9511

**THOMPSON COBURN LLP**
Kathy A. Wisniewski
kwisniewski@thompsoncoburn.com
Stephen D'Aunoy
sdaunoy@thompsoncoburn.com
Thomas L. Azar, Jr.
tazar@thompsoncoburn.com
Sharon B. Rosenberg
srosenberg@thompsoncoburn.com
One US Bank Plaza
St. Louis, Missouri 63101
Phone:  (314) 552-6000
Fax:  (314) 552-7000

*Attorneys for FCA US LLC*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 15th day of November, 2019, a copy of FCA US LLC's Memorandum in Opposition to Plaintiff Thomas Hromowyk's Motion for Class Certification was electronically filed with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all counsel of record.

By:   */s/ Alan J. Pope*